UNITED STATES of America

v.

Oliver L. NORTH, Appellant.

No. 89–3118.

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 6, 1990.

Decided July 20, 1990.

As Amended Aug. 22, 1990.

Barry S. Simon, with whom Brendan V. Sullivan, Jr., Paul Mogin, Nicole K. Seligman and John D. Cline were on the brief, for appellant. Terrence O'Donnell, also entered an appearance, for appellant.

Gerard E. Lynch, Atty., Office of Independent Counsel, with whom Lawrence E. Walsh, Independent Counsel, and Robert C. Longstreth, Atty., Office of Independent Counsel, were on the brief, for appellee. John Q. Barrett, Atty., Office of Independent Counsel, also entered an appearance, for appellee.

Kate Martin, Kevin R. Sullivan and Deborah M. Lerner, were on the brief for amicus curiae American Civil Liberties Union, urging reversal.

Before WALD, Chief Judge, SILBERMAN and SENTELLE, Circuit Judges.

Opinion for the Court PER CURIAM.

Opinion dissenting in part filed by Chief Judge WALD.

Opinion concurring in part and dissenting in part filed by Circuit Judge SILBERMAN.

PER CURIAM:

### INTRODUCTION

In November of 1986, a Lebanese newspaper reported that the United States had secretly sold weapons to Iran. Two months later, Congress established two committees charged with investigating the sales of arms to Iran, the diversion of proceeds therefrom to rebels (or "Contras") fighting in Nicaragua, and the attempted cover-up of these activities (controversial events popularly known as "the Iran/Contra Affair"). In July of 1987, Lieutenant Colonel Oliver L. North, a former member of the National Security Council ("NSC") staff, testified before the Iran/Contra congressional committees. North asserted his Fifth Amendment right not to testify before the committees, but the government compelled his testimony by a grant of use immunity pursuant to 18 U.S.C. § 6002. North testified for six days. His testimony was carried live on national television and radio, replayed on news shows, and analyzed in the public media.

Contemporaneously with the congressional investigation, and pursuant to the Independent Counsel statute, 28 U.S.C. §§ 591–599, the Special Division of this Court, see 28 U.S.C. § 49, appointed Lawrence E. Walsh as Independent Counsel ("IC") and charged him with the investigation and prosecution of any criminal wrongdoing by government officials in the Iran/Contra events. As a result of the efforts of the IC, North was indicted and tried on twelve counts arising from his role in the Iran/Contra Affair. After extensive pretrial proceedings and a twelve-week trial, North was convicted in May of 1989 on three counts: aiding and abetting an endeavor to obstruct Congress in violation of 18 U.S.C. §§ 1505 and 2 ("Count 6"); destroying, altering, or removing official NSC documents in violation of 18 U.S.C. § 2071 ("Count 9"); and accepting an illegal gratuity, consisting of a security system for his

home, in violation of 18 U.S.C. § 201(c)(1)(B) ("Count 10"). North now appeals his convictions on these counts.

### SUMMARY

Because of the length and complexity of our disposition of North's appeal, we summarize our holdings.

(1) The District Court erred in failing to hold a full hearing as required by *Kastigar v. United States,* 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972), to ensure that the IC made no use of North's immunized congressional testimony. North's convictions on all three counts are therefore vacated and remanded to the District Court for a *Kastigar* proceeding consistent with this opinion.

(2) The District Court's jury instructions on Count 9 were erroneous in that they allowed the jury to convict without unanimously concluding that North committed any one of the criminal acts charged in Count 9. The instructions therefore violated *United States v. Mangieri,* 694 F.2d 1270 (D.C.Cir.1982). This error mandates reversal of North's conviction on Count 9.

(3) The District Court did not err in refusing to instruct the jury on the defense of authorization purportedly recognized in *United States v. Barker,* 546 F.2d 940 (D.C.Cir.1976). The District Court did err, however, in limiting the jury's consideration of authorization evidence as that evidence was relevant to the issue of intent in Count 9. North's conviction on Count 9 is therefore reversed.

(4) The District Court did not err in quashing North's subpoena of former President Reagan, and the quashal did not violate North's Sixth Amendment rights.

(5) The District Court erred by instructing the jury that, as a matter of law, a congressional inquiry was "pending," a necessary element of 18 U.S.C. § 1505 that must be found by the jury in order to convict. We conclude, however, that this error was harmless.

(6) Although the prosecution made highly improper remarks during closing argument, the District Court did not err in refusing to grant a new trial on that basis.

(7) The District Court's rulings with regard to the Classified Information Procedures Act ("CIPA") did not violate the Due Process Clause and were not otherwise erroneous.

(8) The credit given by the District Court to a juror's denial of bias, even though the juror made false statements on the juror questionnaire, was not erroneous and in no way prevented North from exercising his peremptory challenges.

(9) The District Court did not err in declining to allow into evidence an edited videotape of the congressional testimony of Admiral John Poindexter, North's former superior at the NSC.

(10) The District Court did not violate the Jury Selection and Service Act ("JSSA").

(11) Although the District Court may have been better advised to use a different verdict form, the District Court did not improperly foreclose a general verdict of guilty or not guilty on Counts 6 and 9.

(12) Other than with respect to the element of intent in Count 9, the District Court committed no reversible error in its jury instructions concerning the critical elements of each offense.

(13) Venue in the District of Columbia was proper for Count 10.

(14) The District Court committed no error in allowing North to be tried as an aider and abettor on Count 6.

Therefore, North's convictions on Counts 6, 9 and 10 are vacated and remanded for a *Kastigar* hearing. His conviction on Count 9 is reversed. Chief Judge Wald dissents from our holdings numbered (1) and (2). She also dissents from our holding numbered (3) insofar as we reverse North's conviction on Count 9. Judge Silberman dissents from our holdings numbered (4), (5) and (7), and concurs *dubitante* in our holding number (6). He also dissents from our holding number (3) insofar as we do not reverse North's conviction on Count 6.

## I. USE OF IMMUNIZED TESTIMONY

### A. *Introduction*

No person ... shall be compelled in any criminal case to be a witness against himself. . . .

U.S. Const. Amend. V.

North argues that his Fifth Amendment right against self-incrimination was violated, asserting that the District Court failed to require the IC to establish independent sources for the testimony of witnesses before the grand jury and at trial and to demonstrate that witnesses did not in any way use North's compelled testimony. North further argues that his Fifth Amendment right was violated by the District Court's failure to determine whether or not the IC made "nonevidentiary" use of the immunized testimony.

North's argument depends on the long-recognized principle that a predicate to liberal constitutional government is the freedom of a citizen from government compulsion to testify against himself:

And any compulsory discovery by extorting the party's oath, or compelling the production of his private books and papers, to convict him of crime, or to forfeit his property, is contrary to the principles of free government. It is abhorrent to the instincts of an Englishman; it is abhorrent to the instincts of an American. It may suit the purposes of despotic power; but it cannot abide the pure atmosphere of political liberty and personal freedom.

*Boyd v. United States,* 116 U.S. 616, 631–32, 6 S.Ct. 524, 533, 29 L.Ed. 746 (1886). This rule has been established in England at least since 1641. *See* 8 Wigmore, Evidence § 2250 at 284 & n. 69 (McNaughton rev. ed. 1961); *see also The Queen v. Coote,* 4 L.R.–P.C. 599, 607 (1873) ("[T]he depositions on Oath of a Witness legally

taken are evidence against him, should he be subsequently tried on a criminal charge, except so much of them as consist of answers to questions to which he has objected as tending to criminate him, but which he has been improperly compelled to answer.").

Such compulsion is an ageless badge of tyranny, one that the framers and ratifiers of the Constitution were determined to avoid:

So deeply did the iniquities of the ancient system impress themselves upon the minds of the American colonists that the States, with one accord, made a denial of a right to question an accused person a part of their fundamental law, so that a maxim, which in England was a mere rule of evidence, became clothed in this country with the impregnability of a constitutional enactment.

*Brown v. Walker,* 161 U.S. 591, 597, 16 S.Ct. 644, 647, 40 L.Ed. 819 (1896).

Because the privilege against self-incrimination "reflects many of our fundamental values and most noble aspirations," *Murphy v. Waterfront Comm'n,* 378 U.S. 52, 55, 84 S.Ct. 1594, 1596, 12 L.Ed.2d 678 (1964), and because it is "the essential mainstay of our adversary system," the Constitution requires "that the government seeking to punish an individual produce the evidence against him by its own independent labors, rather than by the cruel, simple expedient of compelling it from his own mouth." *Miranda v. Arizona,* 384 U.S. 436, 460, 86 S.Ct. 1602, 1620, 16 L.Ed.2d 694 (1966).

■ The prohibition against compelled testimony is not absolute, however. Under the rule of *Kastigar v. United States,* 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972), a grant of use immunity under 18 U.S.C. § 6002[1] enables the government to

---

**1.** The federal use immunity statute, 18 U.S.C. § 6002, provides as follows:

Whenever a witness refuses, on the basis of his privilege against self-incrimination, to testify or provide other information in a proceeding before or ancillary to—

(1) a *court or grand jury* of the United States,

(2) an agency of the United States, or

(3) either House of Congress, a joint committee of the two Houses, or a committee or a subcommittee of either House,

and the person presiding over the proceeding communicates to the witness an order issued under this part, the witness may not refuse to comply with the order on the basis of his privilege against self-incrimination; but no

compel a witness's self-incriminating testimony. This is so because the statute prohibits the government both from using the immunized testimony itself and also from using any evidence derived directly or indirectly therefrom. Stated conversely, use immunity conferred under the statute is "coextensive with the scope of the privilege against self-incrimination, and therefore is sufficient to compel testimony over a claim of the privilege.... [Use immunity] prohibits the prosecutorial authorities from using the compelled testimony in *any* respect...." *Kastigar*, 406 U.S. at 453, 92 S.Ct. at 1661 (emphasis in original). *See also Braswell v. United States*, 487 U.S. 99, 108 S.Ct. 2284, 2295, 101 L.Ed.2d 98 (1988) ("Testimony obtained pursuant to a grant of statutory use immunity may be used neither directly nor derivatively.").

When the government proceeds to prosecute a previously immunized witness, it has "the heavy burden of proving that all of the evidence it proposes to use was derived from legitimate independent sources." *Kastigar*, 406 U.S. at 461–62, 92 S.Ct. at 1665. The Court characterized the government's affirmative burden as "heavy." Most courts following *Kastigar* have imposed a "preponderance of the evidence" evidentiary burden on the government. *See White Collar Crime: Fifth Survey of Law–Immunity*, 26 Am.Crim.L.Rev. 1169, 1179 & n. 62 (1989) (hereafter *"Immunity"*). The Court analogized the statutory restrictions on use immunity to restrictions on the use of coerced confessions, which are inadmissible as evidence but which do not prohibit prosecution. *Kastigar*, 406 U.S. at 461, 92 S.Ct. at 1665. The Court pointed out, however, that the "use immunity" defendant may "be in a stronger position at trial" than the "coerced confession" defendant because of the different allocations of burden of proof. *Id.*

■ A trial court must normally hold a hearing (a *"Kastigar* hearing") for the pur-

pose of allowing the government to demonstrate that it obtained all of the evidence it proposes to use from sources independent of the compelled testimony. *See, e.g., United States v. Rinaldi*, 808 F.2d 1579, 1584 (D.C.Cir.1987); *United States v. Garrett*, 797 F.2d 656, 663–65 (8th Cir.1986); *United States v. Zielezinski*, 740 F.2d 727, 733 (9th Cir.1984); *United States v. Beery*, 678 F.2d 856, 863 (10th Cir.1982). As this Court pointed out in *United States v. De Diego*, 511 F.2d 818, 823–24 (D.C.Cir.1975), a trial court may hold a *Kastigar* hearing pre-trial, post-trial, mid-trial (as evidence is offered), or it may employ some combination of these methods. A pre-trial hearing is the most common choice.

Whenever the hearing is held, the failure of the government to meet its burden can have most drastic consequences. One commentator has stated that "[i]f the tainted evidence was presented to the grand jury, the indictment will be dismissed; when tainted evidence is introduced at trial, the defendant is entitled to a new trial. [Defendants] are afforded similar protections against nonevidentiary uses of immunized testimony." *Immunity* at 1179 (footnotes omitted).[2]

■ Dismissal of the indictment or vacation of the conviction is not necessary where the use is found to be harmless beyond a reasonable doubt. *United States v. Serrano*, 870 F.2d 1, 16 (1st Cir.1989); *United States v. Byrd*, 765 F.2d 1524, 1529 n. 8 (11th Cir.1985); *United States v. Gregory*, 730 F.2d 692, 698 (11th Cir.1984), *cert. denied*, 469 U.S. 1208, 105 S.Ct. 1170, 84 L.Ed.2d 321 (1985); *Beery*, 678 F.2d at 860 n. 3, 863; *United States v. Shelton*, 669 F.2d 446, 464 (7th Cir.), *cert. denied*, 456 U.S. 934, 102 S.Ct. 1989, 72 L.Ed.2d 454 (1982).

■ A district court holding a *Kastigar* hearing "must make specific findings on the independent nature of this proposed

testimony or other information compelled under the order (or any information directly or indirectly derived from such testimony or information) may be used against the witness in any criminal case, except a prosecution for

perjury, giving a false statement, or otherwise failing to comply with the order.

**2.** As we will discuss in Section C(1), *infra,* the extent of prohibition of "nonevidentiary" use is the subject of much disagreement.

[allegedly tainted] evidence." *Rinaldi*, 808 F.2d at 1584. Because the burden is upon the government, the appellate court "may not infer findings favorable to it on these questions." *Id.* at 1583 (citing *United States v. Hampton*, 775 F.2d 1479, 1485–86 (11th Cir.1985)). A district court's determination that the government has carried its burden of showing independent sources is a factual finding that is subject to review under the "clearly erroneous" standard. *Serrano*, 870 F.2d at 15; *United States v. Garrett*, 849 F.2d 1141, 1142 (8th Cir.1988); *United States v. Brimberry*, 803 F.2d 908, 917 (7th Cir.1986), *cert. denied*, 481 U.S. 1039, 107 S.Ct. 1977, 95 L.Ed.2d 817 (1987); *United States v. Romano*, 583 F.2d 1, 7 (1st Cir.1978).

### B. *District Court Proceedings*

Before North's trial, the District Court held a "preliminary" *Kastigar* inquiry and issued an order based thereon which it subsequently adopted as final (with certain changes) without benefit of further proceedings or hearings. *Compare United States v. Poindexter*, 698 F.Supp. 300, 302 (D.D.C.1988) (hereafter *"Kastigar Memo"*) ("[A]ny final consideration of the issue must be deferred until after a full trial.") *with United States v. North*, No. 88–0080–02, 1989 WL 57487 (D.D.C. May 26, 1989) (order denying North's motion to dismiss or for a *Kastigar* hearing) ("Defendant North's post-trial *Kastigar* motion raises few new issues. It seeks in most instances to relitigate issues already resolved by the Court, presenting no new information that would justify changing the Court's Memorandum Opinion and Order of June 16, 1988 [the *Kastigar Memo* ] dealing with the full range of *Kastigar* problems....").[3]

After reviewing the relevant factual and statutory background, the District Court made four findings concerning the government's alleged use of immunized testimony before the grand jury. *Kastigar Memo*, 698 F.Supp. at 314–15. First, "[d]efendants' immunized testimony was not sub-

mitted to the grand jury in any form." Second, "[t]he grand jurors were effectively warned not to read about or look at or listen to this immunized testimony and it played no part in the grand jury's unanimous decision to indict." Third, "[t]he grand jury transcript and exhibits reflect solid proof and ample probable cause to indict on each and every count." Fourth, "[n]one of the testimony or exhibits presented to the grand jury became known to the prosecuting attorneys on Independent Counsel's staff or to him personally either from the immunized testimony itself or from leads derived from the testimony, directly or indirectly." *Id.*.

In reaching these conclusions, the District Court noted that the "Independent Counsel's legitimate independent leads to every significant witness were carefully documented," *id.* at 307–08; that the grand jury heard many witnesses before the immunity order issued, *id.* at 308; that North's testimony was undertaken and concluded while the grand jury was in recess, *id.;* and that the "grand jurors were specifically, repeatedly and effectively instructed to avoid exposure to any immunized testimony." *Id.* at 309. The District Court provided examples of various warnings given to grand jurors, *id.* at 309–11, and to grand jury witnesses. *Id.* at 311–12. The District Court also noted that Associate Independent Counsel were "apparently careful to avoid broad, rambling questions," *id.* at 312, and that "written materials from Independent Counsel demonstrat[ed] that all the prosecutor's substantive witnesses were known to him before the first immunity grant." *Id.* at 313.

Addressing what it referred to as nonevidentiary problems, the District Court noted that "[w]itnesses, probably a considerable number of them, have had their memories refreshed by the immunized testimony," *id.*, but because of its belief that "there is no way of determining, except possibly by a trial before the trial, whether or not any defendant was placed in a substantially worse position by the possible refreshment

---

**3.** The memorandum of the District Court's preliminary consideration of North's *Kastigar* claims is styled *United States v. Poindexter* be-

cause North's case was not yet severed from that of Admiral John Poindexter.

of a witness' memory through such exposure," *id.* at 314, the District Court concluded that "[i]f testimony remains truthful the refreshment itself is not an evidentiary use." *Id.*

### C. *Analysis*

North's primary *Kastigar* complaint is that the District Court failed to require the IC to demonstrate an independent source for each item of evidence or testimony presented to the grand jury and the petit jury, and that the District Court erred in focusing almost wholly on the IC's leads to witnesses, rather than on the content of the witnesses' testimony. North also claims that the IC made an improper nonevidentiary use of the immunized testimony (as by employing it for purposes of trial strategy), or at least that the District Court failed to make a sufficient inquiry into the question. North also protests that his immunized testimony was improperly used to refresh the recollection of witnesses before the grand jury and at trial, that this refreshment caused them to alter their testimony, and that the District Court failed to give this question the careful examination it deserved. In our discussion here, we first consider alleged nonevidentiary use of immunized testimony by the IC. We will then proceed to consider the use of immunized testimony to refresh witnesses' recollections. Finally, we will address the distinction between use of immunized testimony as a lead to procure witnesses and use insofar as it affects the substantive content of witnesses' testimony.

Assuming without deciding that a prosecutor cannot make nonevidentiary use of immunized testimony, we conclude that the IC here did not do so and that the District Court's inquiry and findings on this issue are not clearly erroneous. Thus, we do not decide the question of the permissibility or impermissibility of nonevidentiary use. However, contrary to the District Court, we conclude that the use of immunized testimony by witnesses to refresh their memories, or otherwise to focus their thoughts, organize their testimony, or alter their prior or contemporaneous statements, constitutes evidentiary use rather than non-

evidentiary use. The District Court on remand is to hold the searching type of *Kastigar* hearing described in detail below, concerning North's allegations of refreshment. Finally, because the District Court apparently interpreted *Kastigar* as prohibiting the government only from using immunized testimony *as a lead* rather than *using it at all,* we hold that the District Court's truncated *Kastigar* inquiry was insufficient to protect North's Fifth Amendment right to avoid self-incrimination.

### 1. "Nonevidentiary" Use

The District Court briefly discussed the problem of nonevidentiary use of immunized testimony through witnesses and through the IC's staff. *Kastigar Memo,* 698 F.Supp. at 313–14. The District Court found that witnesses had their memories refreshed with immunized testimony by "hearing the testimony, reading about it, being questioned about aspects of it before the Select Committees and, to some extent, by exposure to it in the course of responding to inquiries within their respective agencies." *Id.* at 313. This exposure was not motivated, the Court found, by a desire "to harm a defendant or help the prosecution." *Id.* The District Court concluded that in such a circumstance a "trial before the trial" was not necessary because "[n]o court has ever so required, nor did *Kastigar* suggest anything of the kind." *Id.* at 314.

The District Court was similarly untroubled by allegations of prosecutorial exposure to immunized testimony through a grand juror or a witness: "Defendants in their zeal treat this as if even the tiniest exposure to a witness or grand juror constituted exposure to an incurable disease. Such is clearly not the case. Exposure to a fleeting snippet means nothing." *Id.* As a matter of "common sense," the District Court determined that a "prosecutor who inadvertently overhears mention of a fact already confirmed by his own independent investigation" cannot be said to have used immunized testimony; similarly, a defendant's "Fifth Amendment rights are not infringed if a witness hears immunized tes-

timony yet testifies solely to facts personally known to the witness." *Id.* The District Court concluded that "[t]he good faith of Independent Counsel cannot be questioned on this record." *Id.*

This Circuit has never squarely addressed the question of whether or not *Kastigar* encompasses so-called nonevidentiary use of immunized testimony. The federal use immunity statute does not speak in terms of "evidence," but rather provides that "no testimony *or other information* compelled under the order (*or any information directly or indirectly derived from such testimony or other information*) may be used against the witness in any criminal case...." 18 U.S.C. § 6002 (emphasis supplied). *Kastigar* does not define, except perhaps by implication, what nonevidentiary use of compelled testimony might be nor does it expressly discuss the permissible scope of such use.

As we suggested above, *see* note 2, *supra,* courts have differed on this question. *Compare United States v. Semkiw,* 712 F.2d 891 (3d Cir.1983); *United States v. Pantone,* 634 F.2d 716, 723 (3d Cir.1980); *United States v. First W. State Bank,* 491 F.2d 780, 787–88 (8th Cir.), *cert. denied,* 419 U.S. 825, 95 S.Ct. 42, 42 L.Ed.2d 49 (1974); *United States v. McDaniel,* 482 F.2d 305 (8th Cir.1973); *United States v. Carpenter,* 611 F.Supp. 768, 779 (N.D.Ga. 1985); *United States v. Smith,* 580 F.Supp. 1418, 1421–22 (D.N.J.1984); and *United States v. Dornau,* 359 F.Supp. 684, 687 (S.D.N.Y.1973), *rev'd on other grounds,* 491 F.2d 473 (2d Cir.1974) (all holding or strongly suggesting that *Kastigar* prohibits nonevidentiary use of compelled testimony) *with United States v. Serrano,* 870 F.2d 1, 16 (1st Cir.1989); *United States v. Mariani,* 851 F.2d 595, 600–01 (2d Cir. 1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 1654, 104 L.Ed.2d 168 (1989); *United States v. Crowson,* 828 F.2d 1427, 1431–32 (9th Cir.1987), *cert. denied,* 488 U.S. 831, 109 S.Ct. 87, 102 L.Ed.2d 63 (1988); and *United States v. Byrd,* 765 F.2d 1524, 1528–31 (11th Cir.1985) (all holding or observing that *Kastigar* does not prohibit nonevidentiary use of compelled testimony).

The two principal scholarly commentaries on the nonevidentiary use aspect of *Kastigar* also disagree. *Compare* Strachan, *Self–Incrimination, Immunity, and Watergate,* 56 Tex.L.Rev. 791, 820 (1978) ("[U]nless an immunized defendant is accorded a firm right to discovery and a comprehensive pretrial hearing on the issues of evidentiary and nonevidentiary use, the defendant is left totally dependent on the good faith of the prosecutors for the preservation of his constitutional rights— the result both the majority and dissent in *Kastigar* regarded as constitutionally unacceptable.") *with* Humble, *Nonevidentiary Use of Compelled Testimony: Beyond the Fifth Amendment,* 66 Tex.L.Rev. 351, 355– 56 (1987) ("[N]either the immunity statute nor the fifth amendment requires the government to prove that it made no nonevidentiary uses of the defendant's compelled testimony.").

An initial difficulty is that a precise definition of the term nonevidentiary use is elusive. *See, e.g.,* Humble, 66 Tex.L.Rev. at 353 (defining nonevidentiary uses as "uses that do not furnish a link in the chain of evidence against the defendant"); Strachan, 56 Tex.L.Rev. at 807 (Nonevidentiary use is "use of immunized disclosures that does not culminate directly or indirectly in the presentation of evidence against the immunized person in a subsequent criminal prosecution. This definition is too vague to be very helpful...."). Thus, we follow the lead of other courts and delineate nonevidentiary use by example rather than definition: "One court has described such nonevidentiary use as 'conceivably includ[ing] assistance in focusing the investigation, deciding to initiate prosecution, refusing to plea bargain, interpreting evidence, planning cross-examination, and otherwise generally planning trial strategy.'" *Serrano,* 870 F.2d at 16 (quoting *McDaniel,* 482 F.2d at 311). Prosecutorial knowledge of the immunized testimony may help explicate evidence theretofore unintelligible, and it may expose as significant facts once thought irrelevant (or vice versa). Compelled testimony could indicate which witnesses to call, and in what order. Com-

pelled testimony may be helpful in developing opening and closing arguments. *See* Strachan, 56 Tex.L.Rev. at 806–10.

*Kastigar* itself did not expressly discuss the propriety of nonevidentiary use. The Court simply held that

> immunity from use and derivative use is coextensive with the scope of the privilege against self-incrimination, and therefore is sufficient to compel testimony over a claim of the privilege. While a grant of immunity must afford protection commensurate with that afforded by the privilege, it need not be broader. Transactional immunity, which accords full immunity from prosecution for the offense to which the compelled testimony relates, affords the witness considerably broader protection than does the Fifth Amendment privilege.

*Kastigar*, 406 U.S. at 453, 92 S.Ct. at 1661. Thus, because "[i]mmunity from the use of compelled testimony, as well as evidence derived directly and indirectly therefrom" provides protection coextensive with the Fifth Amendment, the use immunity statute "prohibits the prosecutorial authorities from using the compelled testimony in *any* respect, and it therefore insures that the testimony cannot lead to the infliction of criminal penalties on the witness." *Id.* (emphasis in original).

Responding to the contention that the use immunity statute provides scant protection from the various ways in which the government might use the compelled testimony, the Court pointed out that "[t]he statute provides a *sweeping* proscription of *any* use, *direct or indirect*, of the compelled testimony *and* any *information* derived therefrom. . . . This *total prohibition on use* provides a comprehensive safeguard, barring the use of compelled testimony as an 'investigatory lead,' and also barring the use of any evidence obtained by focusing investigation on a witness as a result of his compelled disclosures." *Kastigar*, 406 U.S. at 460, 92 S.Ct. at 1665 (emphasis supplied). Section 6002 is constitutional, the Court concluded, because it "leaves the witness and the prosecutorial authorities in substantially the same posi-

tion as if the witness had claimed the Fifth Amendment privilege." *Id.* at 462, 92 S.Ct. at 1666.

Construing *Kastigar* in *McDaniel*, the Eighth Circuit forbade "all prosecutorial use of the testimony, not merely that which results in the presentation of evidence before the jury." *McDaniel*, 482 F.2d at 311. Through a misunderstanding of North Dakota law, the United States Attorney read three transcript volumes of McDaniel's immunized state grand jury testimony before he obtained the indictment from the federal grand jury. He did not know that McDaniel was immunized, so "he therefore could have perceived no reason to segregate McDaniel's testimony from his other sources of information." *Id.* Similarly, the court could not "escape the conclusion that the testimony could not be wholly obliterated from the prosecutor's mind in his preparation and trial of the case." *Id.* at 312. The court concluded that "if the immunity protection is to be coextensive with the Fifth Amendment privilege, as it must to be constitutionally sufficient, then it must forbid all prosecutorial use of the testimony, not merely that which results in the presentation of evidence before the jury." *Id.* at 311. *See also Semkiw*, 712 F.2d at 895 (remanding for hearing as to prosecutor's access to grand jury testimony and "what use she may have made of it in the preparation and conduct of the trial"); *Pantone*, 634 F.2d at 721 (finding that the government met its *Kastigar* burden partly because "a primary concern of *Kastigar* and the Department of Justice Guidelines, that mere access to immunized information may catalyze chains of investigation or subliminally affect decisions to prosecute, is not even in issue here").

The *McDaniel* rule has been criticized or rejected by *Serrano*, 870 F.2d at 16, *Mariani*, 851 F.2d at 600–01, and *Byrd*, 765 F.2d at 1528–31. A judgment upon the nonevidentiary use issue was not necessary to the First Circuit's holding in *Serrano* because the defendant had failed to raise the issue in the district court. However, the First Circuit disagreed with the *McDaniel* standard in dicta, stating that "[s]uch an approach amounts to a per se

rule that would in effect grant a defendant *transactional* immunity once it is shown that government attorneys or investigators involved in the prosecution were exposed to the immunized testimony." *Serrano,* 870 F.2d at 17 (emphasis in original). Because *Kastigar* expressly stated that a grant of immunity short of transactional immunity can still be constitutional if the grant is coextensive with the Fifth Amendment, the First Circuit "[did] not think this purpose is automatically frustrated by the government's mere exposure to immunized testimony." *Id.* The court concluded:

> We also reject the notion that all nonevidentiary use necessarily violates the Fifth Amendment. While we need not decide whether certain nonevidentiary uses of immunized testimony may so prejudice the defendant as to warrant dismissal of the indictment, we agree with the Second Circuit that a prosecution is not foreclosed merely because the 'immunized testimony might have tangentially influenced the prosecutor's thought processes in preparing the indictment and preparing for trial.'

*Id.* at 17–18 (quoting *Mariani,* 851 F.2d at 600).

In *Byrd,* 765 F.2d at 1530–31, the Eleventh Circuit apparently agreed with the First and the Second:

> So long as all the evidence presented to the grand jury is derived from legitimate sources independent of the defendant's immunized testimony, and the grand jury finds that independent evidence sufficient to warrant the return of an indictment, the defendant's privilege against self-incrimination has not been violated.... [T]he privilege against self-incrimination is concerned with direct and indirect *evidentiary* uses of compelled testimony, and not with the exercise of prosecutorial discretion. If the contrary views of *McDaniel* and *Semkiw* were adopted, the realistic difference between transactional immunity and use immunity would become hopelessly blurred if not totally extinguished, thus negating the plain import of *Kastigar....*

The court then rejected as premature the defendant's contention that the prosecutors had used his immunized testimony to make strategic decisions. *Id.* at 1531. We note that in a case following *Byrd,* the Eleventh Circuit continued to insist that *Kastigar* is concerned with evidentiary use only, but the court included as "evidentiary" certain "investigatory" uses that could reasonably be considered to be nonevidentiary. *See United States v. Hampton,* 775 F.2d 1479, 1490–91 & n. 53 (11th Cir.1985).

The IC favorably cites *United States v. Schwimmer,* 882 F.2d 22, 25 (2d Cir.1989), but it does not help him greatly on the nonevidentiary use point: "Section 6002 provides a 'sweeping proscription' of any direct or indirect use of the testimony, including its *use as an investigatory lead, or as a means of focusing an investigation on the witness." Id.* (emphasis supplied). Indeed, in language which places in some doubt the Second Circuit's apparent rejection in *Mariani* of the *McDaniel* approach, the *Schwimmer* opinion points out the danger of use that "might assist the prosecutor in focusing additional investigation, planning, cross-examination, or otherwise generally mapping a strategy for retrial," *id.* at 26, and suggests that the prosecutors, in the event of a retrial, should establish a Chinese wall.

■ The District Court in the present case distinguished *McDaniel* on the grounds that *McDaniel* turned on "unusual circumstances" (*i.e.,* the prosecutor read the testimony and did not know that it was immunized). *Kastigar Memo,* 698 F.Supp. at 307 & n. 8. We are not so persuaded. The prosecutor's knowledge (or lack thereof) that the testimony was immunized is relevant to the question of prosecutorial good faith, not prosecutorial use. The Fifth Amendment right of the defendant— which is, after all, *Kastigar's* point and our concern—can be violated whether or not the prosecutor has knowledge that the testimony is immunized or that his witness has heard immunized testimony. Insofar as *Serrano, Mariani,* and *Byrd* may be read as establishing a rule that *Kastigar* allows nonevidentiary use of compelled tes-

timony under all circumstances, we find those cases troubling. We are not unsympathetic, nevertheless, to the concerns voiced by the First, Second and Eleventh Circuits and by the District Court here. In the present appeal, the record is extensive and the District Court's findings are thorough as to precautions taken by the IC to prevent untoward exposure or use by his staff. The record is clear and the findings are not clearly erroneous. Without significant exposure, the IC could not have made significant nonevidentiary use, permissible or impermissible. Thus, even assuming without deciding that a prosecutor cannot make nonevidentiary use of immunized testimony, in the case before us the IC did not do so. We do not reach the precise question, therefore, of the permissible quantum of nonevidentiary use by prosecutors, or indeed whether such use is permissible at all. Our concern is the use of immunized testimony by witnesses before the grand jury and at trial.

█ We cannot agree with the District Court that the use of immunized testimony to refresh the memories of witnesses is a nonevidentiary matter and that therefore refreshment should not be subject to a *Kastigar* hearing because "[n]o court has ever so required, nor did *Kastigar* suggest anything of the kind." *Kastigar Memo*, 698 F.Supp. at 314. In our view, the use of immunized testimony by witnesses to refresh their memories, or otherwise to focus their thoughts, organize their testimony, or alter their prior or contemporaneous statements, constitutes *indirect evidentiary* not *nonevidentiary use*. This observation also applies to witnesses who studied, reviewed, or were exposed to the immunized testimony in order to prepare themselves or others as witnesses.

Strictly speaking, the term *direct evidentiary use* may describe only attempts by the prosecutors to offer the immunized testimony directly to the grand jury or trial jury, as by offering the testimony as an exhibit. But the testimony of other witnesses is also *evidence* that is to be considered by the grand jury or the trial jury. When the government puts on witnesses who refresh, supplement, or modify that evidence with compelled testimony, the government uses that testimony to indict and convict. The fact that the government violates the Fifth Amendment in a circuitous or haphazard fashion is cold comfort to the citizen who has been forced to incriminate himself by threat of imprisonment for contempt. The stern language of *Kastigar* does not become lenient because the compelled testimony is used to form and alter evidence in oblique ways exclusively, or at a slight distance from the chair of the immunized witness. Such a looming constitutional infirmity cannot be dismissed as merely nonevidentiary. This type of use by witnesses is not only evidentiary in any meaningful sense of the term; it is at the core of the criminal proceeding.

In summary, the use of immunized testimony—before the grand jury or at trial—to augment or refresh recollection is an evidentiary use and must be dealt with as such.

### 2. Refreshment

Both the trial and the grand jury proceedings involved "a considerable number" of witnesses who had "their memories refreshed by the immunized testimony," *Kastigar Memo*, 698 F.Supp. at 313, a use of compelled testimony that the District Court treated as nonevidentiary. *Id.* The District Court stated that "[t]here is no way a trier of fact can determine whether the memories of these witnesses would be substantially different if it had not been stimulated by a bit of the immunized testimony itself" and that "there is no way of determining, except possibly by a trial before the trial, whether or not any defendant was placed in a substantially worse position by the possible refreshment of a witness' memory through such exposure." *Id.* at 314. The District Court found that such taint occurs in the "natural course of events" because "[m]emory is a mysterious thing that can be stirred by a shaggy dog or a broken promise." *Id.* at 313.

█ This observation, while likely true, is not dispositive of the searching inquiry *Kastigar* requires. The fact that a

sizable number of grand jury witnesses, trial witnesses, and their aides apparently immersed themselves in North's immunized testimony leads us to doubt whether what is in question here is simply "stimulation" of memory by "a bit" of compelled testimony. Whether the government's use of compelled testimony occurs in the natural course of events or results from an unprecedented aberration is irrelevant to a citizen's Fifth Amendment right. *Kastigar* does not prohibit simply "a whole lot of use," or "excessive use," or "primary use" of compelled testimony. It prohibits *"any* use," direct or indirect. From a prosecutor's standpoint, an unhappy byproduct of the Fifth Amendment is that *Kastigar* may very well require a trial within a trial (or a trial before, during, or after the trial) if such a proceeding is necessary for the court to determine whether or not the government has in any fashion used compelled testimony to indict or convict a defendant.

 We readily understand how court and counsel might sigh prior to such an undertaking. Such a *Kastigar* proceeding could consume substantial amounts of time, personnel, and money, only to lead to the conclusion that a defendant—perhaps a guilty defendant—cannot be prosecuted. Yet the very purpose of the Fifth Amendment under these circumstances is to prevent the prosecutor from transmogrifying into the inquisitor, complete with that officer's most pernicious tool—the power of the state to force a person to incriminate himself. As between the clear constitutional command and the convenience of the government, our duty is to enforce the former and discount the latter.

 The District Court ruled that "[i]f testimony remains truthful the refreshment itself is not an evidentiary use." *Id.* at 314. But *Kastigar* addresses "use," not "truth." If the government uses immunized testimony to refresh the recollection of a witness (or to sharpen his memory or focus his thought) when the witness testifies before a grand jury considering the indictment of a citizen for acts as to which the citizen was forced to testify, then the government clearly has *used* the immunized testimony. Even if "truthfulness" were the focus of the *Kastigar* inquiry, the present record does not disclose the basis for the determination that the testimony of any witness was "truthful," nor does it indicate how we might review such a determination.

The IC attempts to meet North's refreshment argument by relying on *United States v. Apfelbaum*, 445 U.S. 115, 124–27, 100 S.Ct. 948, 953–55, 63 L.Ed.2d 250 (1980), for the proposition that *Kastigar* "prohibits use [of immunized testimony] by the prosecution, not by others." Brief for Appellee at 24. The IC misreads *Apfelbaum*, which is concerned with how immunized testimony may or may not be used rather than with who may or may not use it. In *Apfelbaum*, the Supreme Court stated that it had never held that the Fifth Amendment precludes all use of immunized testimony because "[s]uch a requirement would be inconsistent with the principle that the privilege does not extend to consequences of a *noncriminal* nature, such as threats of liability in civil suits, disgrace in the community, or loss of employment." *Apfelbaum*, 445 U.S. at 125, 100 S.Ct. at 954 (emphasis supplied). North does not contend that the government violated his Fifth Amendment right because he received bad press as a result of his immunized testimony, or that he has been unable to find employment. Rather, he protests that the government used his immunized testimony to secure his indictment and subsequent conviction as a federal felon. Because North appeals a judgment that apparently violates his Fifth Amendment privilege by the imposition of criminal sanctions, we find *Apfelbaum* inapplicable to this case.

The IC further relies on *Monroe v. United States*, 234 F.2d 49, 56–57 (D.C.Cir.), *cert. denied*, 352 U.S. 873, 77 S.Ct. 94, 1 L.Ed.2d 76 (1956), for the proposition that recollection may be refreshed with inadmissible evidence even when the government violated the Fourth and Fifth Amendments to obtain the evidence. In *Monroe*, this Court allowed an undercover police officer

to refresh his recollection with recordings of conversations between himself and the defendants. The recordings were not in evidence. The refreshment was permissible because, inasmuch as the conversations were his own, the "connection between any possible violation of the statute [section 605 of the Federal Communications Act, 47 U.S.C. § 605] and his testimony had 'become so attenuated as to dissipate the taint' in its relation to admissibility." *Monroe*, 234 F.2d at 57 (quoting *Nardone v. United States*, 308 U.S. 338, 341, 60 S.Ct. 266, 267 84 L.Ed. 307 (1939)). Thus, the officer's "testimony was not itself the product of an illegal interception; he repeated on the stand what he himself had heard." *Id.* The IC analogizes the officer in *Monroe* to the witnesses here, claiming that "the testimony of witnesses about matters they had personally heard or observed is the product of their own memory, not of immunized testimony they might have seen or read." Brief for Appellee at 25.

We cannot agree. As an initial matter, *Monroe* nowhere hints that a violation of the Fourth or Fifth Amendments was at issue. In *Monroe*, this Court concluded that refreshed testimony was not "publication" within the meaning of section 605 of the Federal Communications Act. Here, what the federal use immunity statute prohibits is "use" of the immunized testimony. The IC would have us adopt a parallel rule: as refreshment was not "publication," so now refreshment is not "use." But, the immunity statute is constitutional only because it is coextensive with the Fifth Amendment. The clear language of the Constitution, coupled with the Supreme Court's sweeping approach in *Kastigar*, requires us to define "use" more broadly than we defined "publication" for purposes of the Federal Communications Act and prevents the sort of parallelism that the IC urges upon us. Because we conclude that refreshment is "use" within the meaning of *Kastigar* and the statute, the *Monroe* rule is inapplicable.

Indeed, the fact that immunized testimony has entered the consciousness of someone other than the immunized witness does not lessen the heavy burden upon the government to show that it has made no use, directly or indirectly, of the compelled testimony. The following hypothetical illustrates the weakness of the IC's argument. A prosecutor locates a witness known to have observed certain events, seemingly inconsequential at the time but later critical to a criminal prosecution. The witness has absolutely no recollection of those events. The prosecution then arranges to procure the immunized testimony of the defendant. The forgetful witness sits in the gallery and listens to that immunized testimony. Under the IC's theory, that witness could then be brought forward to relate the events he had previously forgotten. It would require a curiously strained use of language and learning to hold that in such a case no "use" of the immunized testimony had been made against the defendant.

The IC offers no logical distinction between that hypothetical and the dangers of use in the case at bar. It may be that it is possible in the present case to separate the wheat of the witnesses' unspoiled memory from the chaff of North's immunized testimony, but it may not. There at least should be a *Kastigar* hearing and specific findings on that question. If it proves impossible to make such a separation, then it may well be the case that the prosecution cannot proceed. Certainly this danger is a real one in a case such as this where the immunized testimony is so broadly disseminated that interested parties study it and even casual observers have some notion of its content. Nevertheless, the Fifth Amendment requires that the government establish priorities before making the immunization decision. The government must occasionally decide which it values more: immunization (perhaps to discharge institutional duties, such as congressional fact-finding and information-dissemination) or prosecution. If the government chooses immunization, then it must understand that the Fifth Amendment and *Kastigar* mean that it is taking a great chance that the witness cannot constitutionally be indicted or prosecuted.

Even before the congressional Iran/Contra committees began taking testimony, the IC recognized this problem in his memorandum to the committees concerning use immunity: "[A]ny grant of use and derivative use immunity would create serious—and perhaps insurmountable—barriers to the prosecution of the immunized witness." Memorandum of the Independent Counsel Concerning Use Immunity 1 (Jan. 13, 1987) (Submitted to the Joint Congressional Iran/Contra Committees) (JA at 2502). *See also id.* at 4 (JA at 2505) ("Indeed, the prosecutor must demonstrate that *all* its evidence is based on entirely legitimate sources, independent of the compelled testimony.... [S]ince *Kastigar*, most lower courts have held that Section 6002 prohibits both evidentiary and nonevidentiary use of compelled testimony.") (emphasis in original); *id.* at 5 (JA at 2506) ("Under these principles, the prosecution must not only prove that all of its evidence was derived from sources independent of the immunized testimony, but also demonstrate that no nonevidentiary or strategic use was made of the immunized testimony or the fruits of the testimony. In practice, these burdens are often very difficult to satisfy."); *id.* at 6 (JA at 2507) (" '[U]nder the circumstances of many cases, use of the statute will effectively preclude a future prosecution of the witness for the matters to which his/her testimony related.' ") (citing United States Attorneys' Manual at 1–11.212) (emphasis supplied in IC's memorandum). These observations have indeed proven prescient, and we commend them to the District Court upon remand.

### 3. "Identity of Witness" vs. "Content of Testimony"

 The refreshment of witnesses' recollections is indicative, but not exhaustive, of the *Kastigar* questions left unanswered on the present record. The District Court's disposition of the "identity-of-witness" issue, *see supra* at 855–56, does not dispose of the "content-of-testimony" *Kastigar* problem: the District Court inquired as to whether the names of witnesses were derived independently of the immunized testimony, but it made no determination of

the extent to which the substantive content of the witnesses' testimony may have been shaped, altered, or affected by the immunized testimony.

A central problem in this case is that many grand jury and trial witnesses were thoroughly soaked in North's immunized testimony, but no effort was made to determine what effect, if any, this extensive exposure had on their testimony. Papers filed under seal indicate that officials and attorneys from the Department of Justice, the Central Intelligence Agency, the White House, and the Department of State gathered, studied, and summarized North's immunized testimony in order to prepare themselves or their superiors and colleagues for their testimony before the investigating committees and the grand jury. JA at 3365–92 (classified appendix). A few examples will suffice.

A senior Department of Justice official, identified as "Witness No. 1" in North's *ex parte* appendix filed under seal with the District Court, watched North's testimony on a television located in his office, read media reports of the immunized testimony, and received transcribed portions of that testimony. This senior official watched the testimony because he headed a Department of Justice team charged with preparing the Attorney General for his testimony before the committees and the grand jury. Subsequent to his study of the immunized testimony, this official testified before the grand jury in late January or early February of 1988. Defendant's *Ex Parte* Designation of Witnesses Pursuant to Court Order 1–2 (Apr. 21, 1988) (JA at 3240–41).

Another senior Justice Department official, identified as "Witness No. 4," also saw the immunized testimony and gathered reports (particularly in two areas) in his capacity as a member of the team headed by Witness No. 1. *Id.* at 4 (JA at 3243). Indeed, the Attorney General testified before the grand jury seven times after having been exposed to the immunized testimony directly and indirectly through this "prep team." A Department of Justice official ("Witness No. 5") was assigned to help the IC obtain evidence from overseas sources.

Witness No. 5 was exposed to immunized testimony through the public media and through in-house Department of Justice publications that reported on the immunized testimony. *Id.* at 4–5 (JA at 3243–44). Another member of the Justice Department's prep team for the Attorney General ("Witness No. 6") was similarly exposed to the testimony, *id.* at 5 (JA at 3244), as was a colleague on the team ("Witness No. 7") who subsequently testified before the grand jury in December of 1987. *Id.* at 6 (JA at 3245). Another senior Department of Justice official ("Witness No. 8") watched much of the testimony on the television in his office, watched media analyses of the testimony, was part of the prep team, and testified before the grand jury in January of 1988. *Id.*

Nor were all of the apparently tainted witnesses from the Department of Justice. Three CIA attorneys and one CIA official were exposed to North's immunized testimony. One CIA attorney ("Witness No. 10") watched most of North's testimony, videotaped it, and obtained transcripts of the testimony, transcripts which he subsequently annotated. He also read press accounts of the testimony and was part of a CIA prep team charged with helping CIA employees ready themselves for their testimony before Congress and the grand jury. Witness No. 10 had interviews with the Office of Independent Counsel and allegedly used knowledge gleaned from the immunized testimony in discharging his duty as counsel to CIA employees who subsequently testified. *Id.* at 7–8. (JA at 3246–47). Another CIA attorney ("Witness No. 11") was apparently part of a CIA task force on the Iran/Contra affair. Her function and the degree of her exposure approximated that of Witness No. 10. *Id.* at 8–9 (JA at 3247–48). The CIA official ("Witness No. 12") apparently suffered extensive exposure to media reports of the testimony. Although he did not testify to the grand jury or at trial, he was interviewed by the IC after his exposure. *Id.* at 9–10 (JA at 3248–49).

Furthermore, two White House officials ("Witnesses Nos. 13 and 15") were exposed by watching the testimony and reading about it in newspapers and magazines. Witness No. 13 did not testify to the grand jury after his exposure, but did testify at trial. After his exposure, he met with the IC in February of 1988 and provided him with factual information. Witness No. 15 was similarly exposed, and testified before the grand jury in February of 1988. *Id.* at 10–11 (JA at 3249–50).

The testimony of Robert C. McFarlane, the National Security Advisor to President Reagan, is especially troubling and is indeed emblematic of both the weakness of the IC's position and the necessity of further *Kastigar* inquiry. Although McFarlane completed his grand jury testimony before North gave his immunized testimony, McFarlane was a key government witness at trial. He testified before the investigating committees prior to North's immunized testimony, but then specifically requested and was granted a second appearance after North testified in order to respond to North's testimony. *See* Senate Select Comm. on Secret Military Assistance to Iran and the Nicaraguan Opposition & House Select Comm. to Investigate Covert Arms Transactions with Iran, Report of the Congressional Comm. Investigating the Iran/Contra Affair, with Supplemental, Minority and Additional Views, S.Rep. No. 216, H.R.Rep. No. 433, 100th Cong., 1st Sess. 687 (1987). In his second appearance on Capitol Hill, McFarlane revised his earlier testimony in light of North's testimony, and directly responded to North's testimony at certain points. *See, e.g., id.* at 40, 41, 399 and accompanying notes. He also apparently managed to recall items that he had not remembered in his prior testimony. McFarlane subsequently testified at North's trial. Trial Transcript at 3916 *et seq.* (JA at 1041 *et seq.*). No effort was made to determine what use—if any—this government witness made of North's testimony in his trial testimony.

Our dissenting colleague chastises us for use of the passive voice when we state that "many grand jury and trial witnesses were thoroughly soaked in North's immunized testimony...." *See supra* at 863; Wald Dissent at 920 n. 7. As a general proposi-

tion, we agree that the virtues of the active voice are irrefutable. *See* W. Strunk, Jr. & E.B. White, The Elements of Style 18 (3d ed. 1979). Our colleague goes further, however. The dissent concludes that all of these witnesses, familiar with *Kastigar,* "soaked *themselves* in the immunized testimony" and that "it goes beyond reason to insist that the IC must additionally demonstrate that Justice Department officials from the same Administration as North himself did not purposefully use North's immunized testimony in preparing for their own or their colleagues' grand jury appearances...." Wald Dissent at 920 n. 7 (emphasis in original).

As an initial matter, there is absolutely nothing in the voluminous record that would even begin to support the conspiracy theory that the dissent advocates. In this heavily lawyered and professionally argued appeal, this notion appeared neither in the briefs nor at oral argument. Even when presented with colorable evidence, conspiracy theories are often difficult to believe, if only because the claims made for them are simultaneously grandiose and improbable. Such a theory presented without any evidence at all, indeed, without any allegations, is even less persuasive.

■ The more important point, however, is that such a conspiracy—even if it existed—would be entirely irrelevant to the issue before us, which is whether or not North's Fifth Amendment right was violated. The Department of Justice could have held evening classes in "The Parsing and Deconstruction of *Kastigar*" for the very purpose of "derailing" the IC's prosecution, and such a curriculum would have been simply irrelevant to the question of whether or not the prosecution's case made *use* of North's compelled testimony. As the District Court aptly observed, we do not countenance political trials in this country, and this matter is not styled *Independent Counsel v. Executive Branch,* or even *Congress v. Executive Branch.* Rather, this is an individual's appeal from his criminal conviction, an appeal based on his contention that the government has violated his fundamental, enumerated constitutional

right not to incriminate himself. We must so treat it.

The IC relies on *Patton v. Yount,* 467 U.S. 1025, 1035, 104 S.Ct. 2885, 2891, 81 L.Ed.2d 847 (1984), for the proposition that exposed jurors need not be disqualified (even if they have formed an opinion as to guilt) if they can put their opinions aside and make a judgment on the record. The IC's reliance on *Patton* is ill-placed. *Patton* is a Sixth Amendment case that is concerned with impartial jurors, not immunized testimony. North's *Kastigar* argument does not depend on the partiality of jurors. Rather, he protests that the government used his compelled testimony against him. *Patton* simply does not speak to the question before us.

The core purpose of the immunity statute, 18 U.S.C. §§ 6001–6005, is to allow the prosecution of an immunized witness while preventing use of his compelled testimony. One forbidden use of the immunized testimony is the identification of a witness, but other uses of a citizen's immunized testimony—as by presenting the testimony of grand jury or trial witnesses that has been derived from or influenced by the immunized testimony—are equally forbidden. As we said in *United States v. De Diego,* 511 F.2d 818, 821 (D.C.Cir.1975), it is clear "that '[o]nce immunity is shown, the prosecutor has the burden of demonstrating that its use of the immunized testimony has not tainted *any* aspect of the case up to indictment and will not do so during trial.'" (emphasis supplied). In *De Diego,* the trial court had dismissed the indictment against a burglar involved in the break-in of a psychiatrist's office. The district court dismissed the indictment on the grounds that the Special Prosecutor (the predecessor of the Independent Counsel) had not met his burden of establishing that De Diego's testimony, compelled pursuant to the immunity granted by the State of Florida, would not taint the case. This Court reversed because the district court "had no discretion to dismiss the case without giving the Government an opportunity to prove lack of taint." *De Diego,* 511 F.2d at 822. We also noted that the government had independent, legitimate evidence as to De Die-

go's involvement in the break-in. *Id.* at 824. In the face of North's *Kastigar* protest, the case before us presents the opposite danger: requiring no demonstration of independent sources for the evidence presented to the grand jury.

The District Court relied on *United States v. Rinaldi*, 808 F.2d 1579, 1583–84 (D.C.Cir.1987) (per curiam), for its conclusion that the IC's independent discovery of witnesses was dispositive of the invalidity of North's *Kastigar* claim. *Kastigar Memo*, 698 F.Supp. at 313 n. 15. We read *Rinaldi* otherwise.

In *Rinaldi*, the defendant pled guilty to a count of conspiracy to import heroin. He appealed the district court's denial of his motion to suppress certain testimony that he alleged was known to the government only through his immunized testimony. A codefendant who had been present during some of Rinaldi's immunized testimony later testified to the grand jury. Her grand jury testimony was elicited in part by leading questions from the government attorney. The government argued that the codefendant knew all the important details, that the government had developed her as a witness independently of the immunized testimony, and that its discovery of her testimony was inevitable, but the trial court made no specific findings to that effect on the record before it. The government had provided no independent basis for the leading questions. This Court therefore remanded for further evidentiary hearings and specific findings.

In *Rinaldi* we pointed out that "[a]s the government bore the burden of proving that Reardon's *testimony was free of taint and independently derived*, we may not infer findings favorable to it on these questions." *Rinaldi*, 808 F.2d at 1583 (emphasis supplied) (citing *United States v. Hampton*, 775 F.2d 1479, 1485–86 (11th Cir.1985)). The emphasized portion of this statement directs us to two inquiries: the *taint* of the testimony and the *derivation* of the testimony. The District Court in the present case concentrated only on the independence of the leads to witnesses, rather than on the substance of their testimony.

*Kastigar Memo*, 698 F.Supp. at 313 ("[A]ll the prosecutor's substantive witnesses were known to him before the first immunity grant."); *id.* at 312 ("[T]he immunized testimony taken before the Select Congressional Committees was elicited relatively late and well after the apparent diversion of funds, various cover-up tactics and many other facts relevant and material to the charges in this indictment were known to Independent Counsel."); *id.* at 308 ("Nearly 950 pages of transcript [of the IC's interrogation of Secord] cover interviews occurring before either North or Poindexter were compelled to testify publicly."). Although a methodology based on derivation is a sound starting point for a *Kastigar* inquiry, such an approach is incomplete. On the record, it is clear that the District Court focused solely on the derivation of the witnesses' testimony while dealing with that testimony's substantive content only by invoking other devices, such as the IC's "warnings" to grand jury witnesses.

Our dissenting colleague would avoid the entire foregoing analysis by equating the District Court's "finding" that North's immunized testimony was not presented to the grand jury with a "finding" that the testimony was not used at trial, an equation allegedly supported by the District Court's remark that North's post-trial *Kastigar* motion "presented no new information" that would warrant an additional hearing. Concluding that these are factual findings, the dissent indicates that we may not reverse them unless they are clearly erroneous. *See* Wald Dissent at 916, 921–923.

■■■ We disagree. In addition to the fact that the District Court did not actually make a specific finding that North's immunized testimony was not used at trial, we note that the District Court also "found" that grand jury witnesses had their memories refreshed by immunized testimony, but held that this use of the immunized testimony posed no *Kastigar* difficulty as long as the witnesses' testimony was truthful. As we have already discussed, *see supra* at 860–863, such a use of immunized testimony is impermissible,

and the resulting truth or falsity of the witnesses' testimony is irrelevant to the issue before us. Thus, our colleague cannot logically proceed from a "finding" concerning the grand jury to a "finding" concerning the trial because the former is the product of straightforward legal error not subject to clearly erroneous review. Simply put, a reviewing court cannot always accept as a "factual finding" any conclusion so labeled by a district court; rather, the appellate court must be aware of what the district court believed to be the object of its search. If the lamp by which the District Court here searched was legally erroneous, then even an encyclopedia of facts boots it little. Indeed, as the dissent implicitly concedes, *see* Wald Dissent at 915, the District Court did not even claim to examine the grand jury transcripts for the presence of immunized testimony in the *substance* of witnesses' testimony.

Because of the legal infirmity of the District Court's grand jury finding, we decline to place great weight on the assertion that North's post-trial *Kastigar* motion presented "no new information." We are particularly mystified by our colleague's statement that "[i]n determining that the trial testimony presented 'no new information' vis-a-vis the grand jury testimony, Judge Gesell obviously compared the substance of McFarlane's presentations before the grand jury and at trial." Wald Dissent at 923. To the contrary, the District Court's "no new information" statement in no way suggests that there was a comparison between McFarlane's grand jury testimony and his trial testimony. Given the witness's 180–degree public about-face before Congress, we doubt that the two sets of testimony were the same. At the very least, we are unprepared to hold that they were the same without a hearing on the question or to state that the District Court made such a finding when in fact it did not.

Our dissenting colleague asserts that she examined the grand jury transcripts, determined which witnesses testified as to matters touching upon Counts 6, 9 and 10, and then compared the substance of those witnesses' testimony both with their prior statements to the FBI and with North's

trial testimony. Although we do not doubt our colleague's thoroughness and perseverance, her review cannot substitute for the hearing required under *Kastigar* for at least three reasons. First, the dissent does not determine that *trial* witnesses in no way incorporated, used or relied upon North's testimony in giving their own; rather, it relies on the District Court's legally erroneous finding concerning grand jury testimony, an approach that is flawed for the reasons noted above. Second, even by the dissent's lights, two Justice Department officials were substantially exposed to North's testimony and subsequently testified before the grand jury on matters concerning Count 6. *See* Wald Dissent at 919–920. Even if we were to accept the dissent's conclusion that one of those witnesses testified consistently with a prior FBI interview, *see id.* at 919, we are still left with the other witness. Under *Rinaldi*, the presence of the remaining witness requires a remand, unless the "pragmatic" approach that the dissent apparently thinks we endorsed in that case, *see* Wald Dissent at 914, is correct and *Kastigar* has virtually no substance. Finally, and most importantly, an *ex parte* review in appellate chambers is *not* the equivalent of the open adversary hearing contemplated by *Kastigar*. *See United States v. Zielezinski*, 740 F.2d 727, 734 (9th Cir.1984); *see also* Section (D), *infra*.

▮▮▮▮ The primary teaching of *Rinaldi* is not pragmatism, but that the government *always* bears the burden of proof and that we may not infer findings favorable to the government. The dissent simply shifts the burden of proof to North, apparently heedless of *Kastigar* and *Rinaldi*. The dissent repeats this somewhat fundamental error in its discussion of witness refreshment, *see* Wald Dissent at 920–22; in its inference of findings that the District Court did not make concerning the substance of grand jury testimony; in its discussion of grand juror exposure, *see id.* at 921–22; and, tellingly, in its assumption that there is no significant difference between the grand jury and the trial records because North's "counsel does not cite to

even a single line of trial testimony that indicates either a change from the witness' grand jury testimony or any other evidence of taint." *Id.* at 923. Pragmatism is doubtless a virtue, but its invocation cannot override the Fifth Amendment, *Kastigar*, and *Rinaldi*.[4]

In giving the IC a *Kastigar* clean bill of health, the District Court emphasized the warnings that were given to witnesses who appeared before the grand jury:

Beginning in July, 1987, the lawyers and investigators began instructing potential witnesses during interviews not to repeat any of the immunized testimony they may have been exposed to. When the grand jury reconvened in September, grand jury witnesses were formally instructed on matters related to immunized testimony.

*Kastigar Memo*, 698 F.Supp. at 311.[5] The District Court went on to note that "a limited number of cooperating witnesses agreed to avoid exposing themselves to any of the immunized testimony elicited by Congress" and that Associate Independent Counsel "were apparently careful to avoid broad, rambling questions that might inadvertently invite generalized answers that comprehended facts not personally known to the witness but learned from immunized testimony." *Id.* at 312.

■ We conclude that the District Court's reliance on warnings to witnesses (to avoid testifying as to anything they had learned from North's immunized testimony) was not sufficient to ensure that North's testimony was not used. As North argues, "witnesses could not possibly filter each answer through the court's hypotheti-

cal 'prior knowledge' test." Brief for Appellant at 19 n. 28. The fact that the District Court reviewed transcripts of testimony before the grand jury *in camera* would have alerted the Court to the presence of North's immunized testimony only if it were clearly identified as such. Such a review could not have disclosed the unattributed inclusion of immunized testimony in other evidence and is defective. The only proper remedy is the searching *Kastigar* inquiry prescribed in Section (E), *infra*.

### D. *Appropriate Legal Standards On Remand*

■ To assist the parties and the District Court, we offer some further observations on the legal standards to be applied on remand. First, it is important to note what is *not* at issue here. In certain situations, a grand jury may be presented with incompetent evidence—for example, physical evidence seized in violation of the Fourth Amendment, or hearsay evidence, or evidence resulting from the violation of grand jury secrecy rules. In such circumstances, it is clear that dismissal of the indictment is not necessary. *Midland Asphalt Corp. v. United States*, 489 U.S. 782, 109 S.Ct. 1494, 103 L.Ed.2d 879 (1989); *United States v. Calandra*, 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974); *United States v. Blue*, 384 U.S. 251, 86 S.Ct. 1416, 16 L.Ed.2d 510 (1966); *Lawn v. United States*, 355 U.S. 339, 78 S.Ct. 311, 2 L.Ed.2d 321 (1958); *Costello v. United States*, 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956) (roughly, the *"Costello–Calandra* rule"). In essence, the *Costello–Calandra* rule says that a facially valid indictment need not be dismissed sole-

---

**4.** For similar reasons we are not convinced by the dissent's belief that the *Kastigar* inquiry should be limited to witnesses who testified about the events underlying the counts on which North was eventually convicted. We do not doubt that North's *credibility* could have been compromised by a witness who used the immunized testimony but who happened to testify concerning matters not directly related to the conviction counts. Similarly, such testimony could have influenced North's decision to waive his right not to testify. The harmfulness of such use is, of course, a question for the District Court to determine on remand.

**5.** After each grand jury witness was sworn, each was instructed as follows:

Certain witnesses have testified under Congressional grants of limited immunity before House and Senate Committees investigating the Iran/Contra matter.... Please make sure that your answers to our questions are based solely on your own personal knowledge and recollection of the events in question. Do not relate to us anything which you learned for the first time as a result of listening to or reading or hearing about immunized testimony.

*Kastigar Memo*, 698 F.Supp. at 311–12.

ly because the grand jury has considered evidence that would be inadmissible at trial because that evidence was obtained in violation of some constitutional or statutory prohibition. The rule applies where the allegedly unlawful or unconstitutional action is independent of or prior to the consideration by the grand jury of that action's consequences. The terms of the Fourth Amendment do not prevent a grand jury from contemplating papers that have been seized without a warrant and without probable cause; rather, it prohibits the seizure of those papers in the first instance. Similarly, grand jury secrecy rules prohibit the publication of grand jury proceedings, not the government's use of those proceedings once the publication has occurred. The *Costello–Calandra* rule gives substance to this distinction.

■ As we explain in some detail below, that is not the situation before us. Here, what is prohibited and unconstitutional under the Fifth Amendment and *Kastigar* is the *very presentation of the immunized testimony*. Where immunized testimony is used before a grand jury, the prohibited act is simultaneous and coterminous with the presentation; indeed, they are one and the same. There is no independent violation that can be remedied by a device such as the exclusionary rule: the grand jury process itself is violated and corrupted, and the indictment becomes indistinguishable from the constitutional and statutory transgression. The *Costello–Calandra* rule depends upon a distinction between the prohibited action and the presentation to the grand jury of the fruits of that prohibited action. *Kastigar* prohibits use. There is no antecedent or prior wrong to be remedied, but use is a wrong that goes to the quick of the indictment. This distinction eludes the IC and the District Court; it becomes clearer, however, upon a comparison of cases from other circuits.

In *United States v. Garrett*, 797 F.2d 656 (8th Cir.1986), the defendant was convicted of conspiracy to distribute cocaine. He appealed on the grounds that the grand jury that indicted him was the same grand jury to which he had testified on related matters under a grant of use immunity, and therefore his Fifth Amendment right was violated. The district court held no evidentiary hearing. The Eighth Circuit reversed and remanded for an evidentiary hearing on the grand jury issue. The government argued, much as it does here, that under *Costello* (which held that the grand jury clause of the Fifth Amendment does not require dismissal of an indictment that was based solely on hearsay evidence), and its progeny "courts may not dismiss or question an indictment, valid on its face, on the ground that the grand jury considered incompetent evidence, including evidence obtained in violation of an individual's fifth amendment privilege." *Garrett*, 797 F.2d at 660. Agreeing with the Ninth Circuit's decision in *United States v. Zielezinski*, 740 F.2d 727, 732 (9th Cir.1984), the *Garrett* court rejected the government's *Costello* analogy because "*Costello* simply does not consider the power of a court to look behind or dismiss an indictment where there is a strong likelihood that the grand jury process itself violated the witness's fifth amendment privilege." *Garrett*, 797 F.2d at 661.

In *Zielezinski*, an Arizona firefighter under a grant of use immunity testified before a grand jury that he had used cocaine once, but denied further involvement. Other grand jury witnesses identified the defendant as a source and user of cocaine. The grand jury indicted him for drug offenses and perjury. The government submitted to the trial court grand jury transcripts and case-agent reports in order to establish the requisite independent sources. Defense counsel never saw the materials, which the court reviewed *in camera*. The Ninth Circuit remanded for an evidentiary hearing at which the government would be required to show independent sources, noting that "[t]he government cannot simply provide transcripts to the court, *in camera*, and assume that it has met its *Kastigar* burden. Only a hearing can convincingly establish that the command of the Fifth Amendment has been satisfied." *Zielezinski*, 740 F.2d at 734.

In *United States v. Hampton*, 775 F.2d 1479 (11th Cir.1985), the defendant gave immunized testimony to a Florida state grand jury, portions of which played a role in his subsequent indictment by a federal grand jury on charges involving the same events. For at least part of the investigation, federal investigators were using state materials and took no measures to insulate themselves from immunized testimony. The Eleventh Circuit reversed the conviction, holding that the district court erred in its conclusion that those of Hampton's statements that were not immunized sufficed as an independent source for all the evidence that the grand jury considered. The court stated that *"Kastigar* and its progeny require dismissal of an indictment of a previously immunized witness unless the government can demonstrate that *'none* of the evidence presented to the grand jury is derived, directly or indirectly, from the immunized testimony....'" *Id.* at 1489 (quoting *United States v. Byrd*, 765 F.2d 1524, 1530 (11th Cir.1985)) (emphasis supplied in *Hampton*).

In *United States v. Beery*, 678 F.2d 856 (10th Cir.1982), a debtor was convicted of withholding a document and concealing assets in a bankruptcy. The debtor had been granted use immunity under 11 U.S.C. § 25(a)(10) (1976), the immunity provision of the Bankruptcy Act of 1898. He then claimed that the trustee had used the immunized testimony in testifying before the grand jury. The Tenth Circuit found the government's assertions conclusory and the trial court's findings insufficient. It therefore remanded for a hearing that would "afford the Government an opportunity to meet its burden of proof as to its sources of its evidence presented to the grand jury and at trial, with any response the defendant may have." *Beery*, 678 F.2d at 863. The court also noted that the *Costello* principle was not necessarily applicable "where what was transpiring before the grand jury would itself violate a constitutional or statutory privilege." *Id.* at 860 (citing *Calandra*, 414 U.S. at 346, 94 S.Ct. at 619).

*Garrett* and *Zielezinski* both rejected the approach of the Second Circuit in *United States v. Hinton*, 543 F.2d 1002 (2d Cir.), *cert. denied*, 429 U.S. 980, 97 S.Ct. 493, 50 L.Ed.2d 589 (1976), and its progeny. In *Hinton*, the defendant testified under a grant of use immunity and gave some 200 pages of testimony to a grand jury concerning her involvement in a narcotics distribution ring. Two years later, that same grand jury indicted her. The Second Circuit reversed Hinton's conviction because

> [t]he prospect of peering into the grand jurors' minds, or of examining them individually, to ascertain whether Hinton's testimony was improperly used, is both impractical and unpalatable.... [A]s a matter of fundamental fairness, a Government practice of using the same grand jury that heard the immunized testimony of a witness to indict him after he testifies, charging him with criminal participation in the matters being studied by the grand jury, cannot be countenanced.

*Id.* at 1010. Thus, *Hinton* supports a *per se* rule requiring dismissal of the indictment where it is shown that the indicting grand jury has been exposed to any immunized testimony. Circuit law as established in *United States v. De Diego*, 511 F.2d 818 (D.C.Cir.1975), instructs us to allow the government an opportunity to make its case at a hearing, and therefore we decline to adopt the *per se* rule of *Hinton*.

The IC has pointed us to several cases that he claims support application of a *Costello–Calandra* treatment in an immunized testimony case. In *Midland Asphalt Corp. v. United States*, 489 U.S. 782, 109 S.Ct. 1494, 1499–1500, 103 L.Ed.2d 879 (1989), the Court stated that "[w]e have held that even the grand jury's violation of the defendant's right against self-incrimination does not trigger the Grand Jury Clause's 'right not to be tried.'" (citing *Lawn v. United States*, 355 U.S. 339, 349, 78 S.Ct. 311, 317, 2 L.Ed.2d 321 (1958)). The Court went on to state that "[o]nly a defect so fundamental that it causes the grand jury no longer to be a grand jury, or the indictment no longer to be an indictment, gives rise to the constitutional right not to be tried." *Id.* The Court found that the alleged violation of a grand jury secre-

cy rule, Fed.R.Crim.P. 6(e) (prohibiting government attorneys' disclosure of matters before the grand jury), did not give rise to such a right. *Midland Asphalt,* 109 S.Ct. at 1499–1500. North's whole point, of course, is that in his situation his widely disseminated testimony caused "the grand jury no longer to be a grand jury," and we conclude that such may have been the case; at the very least, it is impossible to tell from the record before us.

▨ The IC also points to *United States v. Society of Independent Gasoline Marketers of America,* 624 F.2d 461, 473–74 (4th Cir.1979), *cert. denied,* 449 U.S. 1078, 101 S.Ct. 859, 66 L.Ed.2d 801 (1981) (hereafter *"SIGMA"*), as support for the proposition that "the *Costello–Calandra* principle has been applied to claims that the Government has improperly used immunized testimony." Brief for Appellee at 13 n. 21. *SIGMA* fails to recognize the violation-of-process distinction pointed out in cases such as *Beery* and *Garrett,* and to that extent we decline to follow the Fourth Circuit. The IC attempts to distinguish the grand jury cases on the grounds that they all involved the government *itself* presenting immunized testimony, whereas in the present case it is presented by witnesses, if presented at all. *Kastigar* prohibits "use," however, regardless of the conduit through which the government passes the testimony. The fact that Congress or a government witness, rather than the IC personally, provides compelled testimony to the grand jurors is legally irrelevant under *Kastigar.* The IC agreed that some of the grand jury witnesses had been exposed, Transcript of Kastigar Hearing at 221 (Apr. 25, 1988) (JA at 756), and the issues of the replacement jurors' exposure, noted *infra* at Section (E), and of the effectiveness of the warnings, described *supra* at 868, strengthen us in our conclusion that it was error for the District Court to fail to hold a full Kastigar hearing concerning the *content* as well as the *sources* of the witnesses' testimony.

We note again that use of immunized testimony before the grand jury *could possibly* lead to dismissal of the indictment.

Apparently aware of this possibility, the IC protests that he sealed and filed (or "canned") both evidence and prosecution theories prior to North's congressional testimony. It is not clear to what extent the District Court saw and relied on these materials, or what part they played in the District Court's review. *See Kastigar Memo,* 698 F.Supp. at 315–16 (listing materials reviewed). The District Court reviewed both sealed and unsealed materials. The sealed materials include the in-court testimony of IC Walsh; transcribed portions of the grand jury proceedings, including exhibits; the transcript of the *voir dire* of the replacement grand jurors; transcripts of interviews with General Richard V. Secord; a subpoena index; correspondence between the Congress and the IC concerning use immunity; and the so-called "Douglass file," a collection of papers noting instances of exposure to the immunized testimony on the part of the IC and his staff. The sealed materials also included "[t]wo bound volumes of material establishing independent 'leads' to all trial witnesses providing substantive information who may be called in the government's case-in-chief." *Id.* at 315.

At oral argument, North's counsel asserted that the canned materials played no part in the District Court's review:

> The interviews and any materials that had been sealed, so-called canned material, was not given to the District Court judge, although it had been filed with the District Court while the investigation was ongoing. There was an order, which is in the record, that that material was then transferred back to the Office of Independent Counsel for preservation, in case it was ever needed, so that the interviews with these witnesses were not before the trial judge. He didn't consider those in making his determination.

Transcript of Oral Argument at 20–21. Counsel for the IC did not contest this proposition, except to note that after the trial North had access to grand jury testimony and trial testimony concerning the three counts on which he was convicted, as well as access to the two volumes of leads noted by the District Court. Transcript of

Oral Arg. at 50. *See also United States v. Poindexter*, No. 88–0080–02 (D.D.C. Apr. 28, 1988) (J.A. at 287–88) (order to the Court Security Officer ("CSO") that he remove from the Office of the Clerk of the Court the material filed there under seal by the IC, and further instructing the CSO that the material be deposited in the sensitive compartmented information facility maintained by the IC). On the current record, therefore, we cannot determine the proper weight to afford these materials. On remand, the record must be clear and specific about the District Court's review of and reliance upon any canned testimony in its *Kastigar* determination.

### E. *Conclusion*

■ North also asserts that a full *Kastigar* hearing is in order concerning the grand jury which was in recess from 29 June 1987 to 2 September 1987. *Kastigar Memo*, 698 F.Supp. at 308. North's immunized testimony before Congress began on 7 July 1987 and ended 14 July 1987. No matter how many warnings the grand jurors were given, North argues, they were out of the presence of court and counsel for two months. During one of these weeks North was testifying before Congress. During the other seven weeks his testimony was disseminated widely and analyzed thoroughly. In addition, two replacement grand jurors were qualified after the immunized testimony had been taken, as the District Court noted: "Neither grand juror was questioned in any detail concerning any knowledge either might have of the content or nature of the immunized testimony. The records of the grand jury indicate that in the normal course of later events they were adequately warned." *Id.* at 311 n. 13. Although the government's possible use of compelled testimony via the grand jury and trial witnesses concerns us most among North's voluminous protestations, factors such as the grand jury's recess during the daily, ubiquitous broadcast of North's immunized testimony, and the apparent decision of the District Court not to inquire in any detail as to the possible taint of the replacement grand jurors cause us to note with even

greater concern the District Court's decision not to hold a full-blown, item-by-item *Kastigar* hearing. The assertion that there was "solid proof and ample probable cause to indict," *id.* at 315, even if true, cannot replace a *Kastigar* inquiry. Coerced confessions and compelled testimony may often supply proof and cause, but that fact does not diminish their constitutional offensiveness in virtually all uses.

■ The District Court also stated that "[t]he grand jurors were specifically, repeatedly and effectively instructed to avoid exposure to any immunized testimony.... Many more warnings were given during the course of the grand jury's tenure." *Id.* at 309. There is no evidence that the warnings to the grand jurors were effective, however, because grand jury deliberations are not transcribed and therefore could not have been part of the record reviewed by the Court. These concerns underscore our conclusion as expressed above that the present convictions cannot stand. We are not persuaded, however, to extend our holding and require an unprecedented *Kastigar* -type hearing concerning possible exposure of individual grand jurors through the media.

Nonetheless, as to witness exposure, such a hearing is required.

■ The convictions are vacated and the case is remanded to the District Court. On remand, if the prosecution is to continue, the District Court must hold a full *Kastigar* hearing that will inquire into the *content* as well as the *sources* of the grand jury and trial witnesses' testimony. That inquiry must proceed witness-by-witness; if necessary, it will proceed line-by-line and item-by-item. For each grand jury and trial witness, the prosecution must show by a preponderance of the evidence that no use whatsoever was made of any of the immunized testimony either by the witness or by the Office of Independent Counsel in questioning the witness. This burden may be met by establishing that the witness was never exposed to North's immunized testimony, or that the allegedly tainted testimony contains no evidence not "canned" by the prosecution before such exposure oc-

curred. Unless the District Court can make express findings that the government has carried this heavy burden as to the content of all of the testimony of each witness, that testimony cannot survive the *Kastigar* test. We remind the prosecution that the *Kastigar* burden is "heavy" not because of the evidentiary standard, but because of the constitutional standard: the government has to meet its proof only by a preponderance of the evidence, but *any* failure to meet that standard must result in exclusion of the testimony.

If the District Court finds that the government has failed to carry its burden with respect to any item or part of the testimony of any grand jury or trial witness, it should then consider whether that failure is harmless beyond a reasonable doubt. If the District Court concludes that the government's failure to carry its burden with respect to that particular witness or item is harmless beyond a reasonable doubt, the District Court should memorialize its conclusions and rationales in writing. If the government has in fact introduced trial evidence that fails the *Kastigar* analysis, then the defendant is entitled to a new trial. If the same is true as to grand jury evidence, then the indictment must be dismissed.

## II. Jury Unanimity Instruction

North alleges error as to Count 9 in the trial court's refusal to give a specific unanimity instruction. The Court gave a general unanimity instruction:

> The verdict must represent the considered judgment of each juror. In order to return a verdict on any aspect of this case it is necessary that each juror agree to the verdict. Your verdict must be unanimous.

In addition to this instruction, North contends that he was entitled to further instruction directing the jury that it must be unanimous as to the specific act (or acts), method, mode or manner by which North violated the statute as charged in Count 9. Upon review of the facts of this case and the appropriate authorities, we conclude that the District Court committed reversi-

ble error as to Count 9 in its refusal to include a specific unanimity requirement in its instructions to the jury.

In 1982, in *United States v. Mangieri*, 694 F.2d 1270 (D.C.Cir.1982), we considered a defendant's "argument ... that when the government seeks to convict for one offense by proving two or more acts, proof of either one being sufficient, the court must ... instruct jurors that they must be unanimous in their finding that the government has proven the same one (or more) act(s)." *Id.* at 1280. In *Mangieri*, Chief Judge Wald, writing for a unanimous panel, noted "that the District of Columbia Court of Appeals has announced a rule requiring an instruction on the need for unanimity on the particular acts on which a guilty verdict is based." *Id.* at 1281 (citing *Hack v. United States*, 445 A.2d 634, 641 (D.C.App. 1982)). The *Mangieri* panel went on to note the reasoning underlying the District of Columbia rule, that is, " 'the possibility of a nonunanimous verdict, when one charge encompasses two separate incidents,' " so that a judge should (and under the District of Columbia's rule *must*) " 'instruct the jury that if a guilty verdict is returned the jurors must be unanimous as to which indictment or incident they find the defendant guilty.' " *Mangieri*, 694 F.2d at 1281 (quoting *Hack*, 445 A.2d at 641 (other citations omitted)). We described the District of Columbia's rule as "sensible and appropriate—and we urge[d] trial courts to employ the instruction without request in cases" where the possibility of non-unanimity as to specifics of the offense exists. *Id.*

Nonetheless, in *Mangieri* we did not reverse. The defendant had not requested a specific unanimity instruction. Despite our urging that the instruction should be given without request, we noted that "[t]his circuit, along with others, has not heretofore adopted a rule requiring the particularized instruction." *Id.* Therefore, we examined the context of the entire instruction and the charge, and subjected the allegation to a "plain error" analysis. Finding no plain error, we affirmed.

More recently, in *United States v. Hubbard*, 889 F.2d 277 (D.C.Cir.1989), we confronted the same argument in the context of a defendant who had not objected to the general instruction given by the trial court and had made no request for a specific unanimity instruction. Again, we rejected the defendant's specific-unanimity-instruction argument under a plain error analysis, but we reiterated that "[t]his Circuit strongly approved a District of Columbia Court of Appeals rule requiring an instruction on the need for unanimity on the particular acts on which a guilty verdict is based." *Id.* at 279 (citing *Mangieri*).

In the present case, we do not confront a specific-unanimity-instruction question in a plain error context. North did request the instruction from the trial court and did object to the court's refusal to give it. Therefore, the issue is before us for definitive resolution. We must determine whether the refusal to give the requested instruction was reversible error. We conclude that it was.

A. *The Standard*

Although we have not previously squarely faced this issue in other than a plain error context, other circuits have. In *United States v. Gipson*, 553 F.2d 453 (5th Cir.1977), the Fifth Circuit considered an appeal by a defendant who had been charged in one count with selling or receiving a stolen car that had moved in interstate commerce in violation of 18 U.S.C. § 2313. The Fifth Circuit noted that under the instructions actually given in that case, the guilty verdict could have resulted from each individual juror finding "that the defendant perform[ed] one of ... six prohibited acts—receiving, concealing, storing, bartering, selling, or disposing—on a stolen vehicle moving in interstate commerce that the defendant knew to be stolen." *Id.* at 458. Speaking for the court, Judge Wisdom noted that "Rule 31(a) of the Federal Rules of Criminal Procedure requires that a jury verdict in a federal criminal trial be unanimous," and that Rule 31(a) "gives explicit recognition to a requirement that the Supreme Court has long assumed to inhere in a federal criminal defendant's

sixth amendment right to a trial by jury." *Id.* at 456 (footnote omitted) (citing, *inter alia, Andres v. United States*, 333 U.S. 740, 748–49, 68 S.Ct. 880, 884–85, 92 L.Ed. 1055 (1948)). Thus, the Fifth Circuit concluded, an instruction that permits the jury to return a guilty verdict where all jurors agree that he is guilty of *something* is not sufficient. The defendant's right to a unanimous verdict is not adequately "protected unless [the] prerequisite of jury consensus as to the defendant's course of action is also required." *Gipson*, 553 F.2d at 458 (footnote omitted). Finally, the *Gipson* court held that "[b]ecause it is impossible to determine whether all of the jurors agreed that the defendant committed acts falling within one of the two conceptual groupings, we cannot say that the district court's instruction was harmless beyond a reasonable doubt...." *Id.* at 459 (citing *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)). Thus, the court reversed and remanded for a new trial.

In *United States v. Beros*, 833 F.2d 455 (3d Cir.1987), the Third Circuit considered the specific unanimity question. In that case the indictment charged a union official with embezzling, stealing, abstracting or converting to his own use funds belonging to the union. Like the defendant in *Gipson*, and North in the present case, the official had requested a specific unanimity instruction in the district court. The Third Circuit noted that each of the counts alleged "four separate and distinct theories of criminal activity: embezzlement, abstraction, stealing and conversion." *Id.* at 461. It further noted that "[e]ach count also enumerates several acts upon which a finding of guilty could be predicated." *Id.* In that circumstance, the court concluded that "[i]t is plainly not enough that the jury was unanimous in finding one theory on which it believed Beros culpable. The jury needed also to match that finding to another unanimous finding regarding a particular act." *Id.*

In an opinion by Judge Higginbotham, the *Beros* court described the circum-

stances that mandate a specific unanimity instruction:

> When the government chooses to prosecute under an indictment advancing multiple theories, it must prove beyond a reasonable doubt at least one of the theories to the satisfaction of the entire jury. It cannot rely on a composite theory of guilt, producing twelve jurors who unanimously thought the defendant was guilty but who were not unanimous in their assessment of which act supported the verdict.

*Id.* at 462. Thus, the Third Circuit concluded that the Sixth Amendment requires the jury to be unanimous as to the specific act and theory underlying the defendant's guilt and that the reviewing court "must be certain that the jury was properly instructed to achieve" that unanimity. *Id.* (citing *United States v. Peterson*, 768 F.2d 64, 67 (2d Cir.), *cert. denied*, 474 U.S. 923, 106 S.Ct. 257, 88 L.Ed.2d 264 (1985)). Expressly distinguishing our decision in *Mangieri* where the defendant had not requested the specific unanimity instruction, the *Beros* court, like the Fifth Circuit in *Gipson*, subjected the question to a harmless error analysis and vacated Beros's convictions on the counts under review. *Id.* at 462–63.

The Sixth Circuit faced the specific unanimity issue in *United States v. Duncan*, 850 F.2d 1104 (6th Cir.1988), *aff'd without op. on appeal after remand*, 881 F.2d 1077 (6th Cir.1989), *cert. denied sub nom. Downing v. United States*, — U.S. —, 110 S.Ct. 732, 107 L.Ed.2d 751 (1990). In *Duncan*, each of two counts of the indictment charged the defendant with criminal acts relating to the filing (Count 3) and preparation (Count 5) of a false tax return. As to each of those counts, the allegations and the prosecution's evidence supported the inclusion of two distinct false statements in the relevant tax return. Hence, the possibility existed that one or more jurors might have found that the defendant acted criminally with respect to one of the false statements, even though the juror (or jurors) harbored doubt as to the other statement. Thus, a jury, unanimous as to guilt, might have been divided as to the specific act upon which that conclusion of guilt was founded. In considering the defendant's argument that it was error for the trial judge not to have offered a specific unanimity instruction, the Sixth Circuit first considered the question, "Must the jury's verdict actually have been unanimous as to one or the other statement?" *Id.* at 1111. The court held that "unanimity on alternatives is necessary when 'discrete acts are alleged in a single count, such as charges of separate false statements, any one of which is sufficient to convict.'" *Duncan*, 850 F.2d at 1113 (quoting *United States v. Ferris*, 719 F.2d 1405, 1407 (9th Cir.1983) (Kennedy, J.)).

Having reached that conclusion, the Sixth Circuit then considered the question, "[G]iven the necessity for a unanimous verdict, [was] the trial judge ... required to instruct the jury of that necessity[?]" *Duncan*, 850 F.2d at 1113. Relying heavily on Judge Higginbotham's discussion in *Beros*, the *Duncan* court answered that question in the affirmative:

> 'When it appears ... that there is a genuine possibility of jury confusion or that a conviction may occur as a result of different jurors concluding that the defendant committed different acts, the general unanimity instruction does not suffice.
>
> To correct any potential confusion in such case, the trial judge *must augment the general instruction to insure the jury understands its duty to unanimously agree to a particular set of facts.*'

*Duncan*, 850 F.2d at 1114 (quoting *Beros*, 833 F.2d at 461) (emphasis supplied in *Duncan*) (other citations omitted).

We adopt the holding of our sister circuits in *Duncan*, *Beros*, and *Gipson* and conclude that the trial court erred in refusing to instruct that in order to return a unanimous verdict of guilty on a count involving multiple distinct underlying acts, jurors are required to be unanimous as to the specific act by which the defendant violated the law. We hold that in cases where there is a danger of a fragmented verdict the trial court must upon request offer a specific unanimity instruction.

In discussing the application of this rule to the present case, we will further delineate the circumstances warranting such an instruction.

### B. *Application to the Present Case*

At the outset, we recognize that as a rule a general instruction on unanimity like the one given in the present case—advising the jury that its members must unanimously agree on any aspect of the case as to which it renders a verdict—protects the defendant's right to a unanimous jury decision. *Duncan,* 850 F.2d at 1113. A further safeguard in the form of a particularized instruction is required, however, in the face of "a genuine risk that the jury is confused or that a conviction may occur as the result of different jurors concluding that the defendant committed different acts." *Id.* at 1114. The present case presents such a genuine risk. Analyzing the question in common-law terms, we would state that in order to return a guilty verdict under Count 9, the jury was required to agree that the defendant did commit a charged *actus reus* with a *mens rea. Cf. Duncan,* 850 F.2d at 1111. Count 9 charged that North, having custody of NSC documents, "willfully and knowingly did conceal, remove, mutilate, obliterate, falsify and destroy and did cause to be concealed, removed, mutilated, obliterated, falsified and destroyed records, papers and documents filed and deposited in a public office...." JA at 260–61.[6] In his jury instruction on Count 9, the trial judge summarized the indictment as charging North with destroying, altering, and removing documents from mid- to late November 1986. JA at 645. In effect, then, the jury had three alternative theories of destroying, altering, or removing on which it might have convicted North under section 2071(b).

Where several factual predicates support a guilty verdict, a defendant is entitled to unanimous agreement among the jury as to which of those "alternative factual predicates" provided a basis for conviction. *Duncan,* 850 F.2d at 1112 (citing cases). As a general rule, when an indictment charges several "distinct conceptual groupings" of activities in an individual count, as opposed to "a single conceptual grouping of related facts," the jury must agree unanimously as to which of these distinct groupings the defendant is guilty. *Id.* at 1113. *See Gipson,* 553 F.2d at 458 (actions are conceptually indistinct when they are interrelated or when they cannot be characterized separately from each other). When a statute criminalizes false statements, for example, each false statement charged in a single count is properly treated as a distinct conceptual grouping; to convict, the jury must unanimously agree upon which one of those statements the defendant made. *See Mangieri,* 694 F.2d at 1281; *United States v. Ryan,* 828 F.2d 1010, 1019 (3d Cir.1987); *see also Beros,* 833 F.2d at 460–63 (three alternative transactions charged in same count as occasions of "embezzlement, stealing, abstracting, or converting to own use" require specific unanimity in verdict); *United States v. Peterson,* 768 F.2d 64, 67 (2d Cir.), *cert. denied,* 474 U.S. 923, 106 S.Ct. 257, 88 L.Ed.2d 264 (1985) (two separate instances charged in single count of drug possession require specific unanimity in verdict).

In North's case, the factual predicates on which the indictment was based are, in our view, distinct enough to necessitate specific unanimity. North testified that he destroyed documents beginning in late October 1986 and that he continued to do so until he was fired in November 1986. At Casey's instruction, he destroyed a ledger of the Contra operating fund, Transcript

---

**6.** North also contends that the District Judge erred by instructing the jury that having custody over documents "simply means that a record or document came into the person's possession or control as a government official. Someone with custody does not have to be employed as a librarian or as an official record keeper." JA at 647. We find this instruction entirely appropri-ate: North's implication that he should escape censure for the destruction, alteration, and removal of documents because he was not the official custodian of NSC records would give license to any government official not serving as a "librarian" or "custodian" to violate section 2071(b) with impunity.

of Testimony ("Tr.") at 7138–39; acting on his own, in order to avoid jeopardizing clandestine supporters of American activities in the Middle East and Central America, Tr. at 7578, he also destroyed documents concerning the Iranian arms sales and Contra support initiatives, Tr. at 7561–63, 7574–75. He explained that he regarded the destroyed documents as part of his personal files, Tr. at 7560, and, therefore, did not consider his actions unlawful.

North also testified that, on McFarlane's instructions, he altered five official documents—apparently System IV NSC documents—relating to the Iranian arms sales. Tr. at 6905. North thought that altering only the five or six documents indicated by McFarlane "didn't ... [make] any sense," Tr. at 6906, because other documents included equally sensitive information about Contra support. North said that he did not consider the alterations unlawful because he had prepared the documents in question for McFarlane. Tr. at 6907.

Finally, North testified that after he was fired, he removed documents from his NSC office on the advice of Secord's counsel. Tr. at 7109, 7113. He returned the documents a few days later on the advice of his present counsel, whom he had retained in the intervening period. Tr. at 7117.

Thus, the jury could have found that North violated section 2071(b) in several different ways. The circumstances of his destruction, alteration, and removal of documents were distinct; any of those activities could serve as an underlying criminal act. Furthermore, the evidence bearing on North's knowledge of the lawfulness of his actions—and, in effect, on the criminality of his intent—varied from instance to instance. Each of the possible predicates for a conviction on Count 9, therefore, required distinct, individuated proof. As a result, we conclude that the jury had to agree unanimously as to which, if any, of these combinations of *actus reus* and *mens rea* actually occurred, and the trial court should have so instructed.

The IC attempts to distinguish *Gipson, Beros,* and *Ferris* on the argument that the charge in Count 9 "involves a continuing course of conduct, rather than *conceptually distinct* episodes of destruction, alteration and removal...." Brief for Appellee at 66 (emphasis supplied). This argument is not supportable either on the law or the facts. Although the presence of a "conceptual distinction" in the acts charged was important to other circuits in some of the cited cases, *see, e.g., Gipson,* 553 F.2d at 458, that term is simply a useful formulation of a circumstance requiring the specific unanimity instruction. The exact parameters of the universe of cases in which the instruction must be given cannot be determined by a niggling construction of that phrase. In *Peterson,* the Second Circuit noted the Fifth Circuit's use of that phrase as a qualifier in *Gipson.* The Second Circuit, in an opinion by Judge Friendly, read the *Gipson* court's use of "the 'distinct conceptual grouping' qualification" as "refer[ring] to situations where the same act is characterized in different ways, each of which constitutes a crime under the same count of an indictment." *Peterson,* 768 F.2d at 67 (footnote omitted). The *Peterson* court went on to note that "the two instances of possession offered in support of [a single count] ... would constitute 'distinct conceptual groupings' despite their close coincidence in time and similarity in nature." *Id.*

Likewise, after considering the *Gipson* court's use of the phrase and Judge Friendly's construction of it in *Peterson,* the Sixth Circuit concluded in *Duncan* that "a count containing two false representations ... is normally treated as containing two distinct conceptual groupings." *Duncan,* 850 F.2d at 1113 (internal quotations omitted). The *Duncan* court went on to state in its analysis of the necessity for a specific unanimity instruction, "the touchstone has been the presence of a genuine risk that the jury is confused or *that a conviction may occur as the result of different jurors concluding that a defendant committed different acts.*" *Id.* at 1114 (emphasis supplied). Because the indictment in the present case charged several distinct acts of concealing, removing or falsifying documents, the *Peterson/Duncan* analysis of the *Gipson* phrase "distinct conceptual grouping"

seems to us apposite, and the danger that a jury unanimous as to guilt could have been divided as to the specific act committed seems most real.

As the Ninth Circuit has stated, "[w]hen it appears ... that there is a genuine possibility of jury confusion or *that a conviction may occur as a result of different jurors concluding that the defendant committed different acts,* the general unanimity instruction does not suffice.... [T]he trial judge must augment the general instruction to ensure the jury understands its duty to unanimously agree to a particular set of facts." *United States v. Echeverry,* 719 F.2d 974, 975 (9th Cir.1983) (emphasis supplied) (modifying 698 F.2d 375 (9th Cir.1983)) (adopted in *Beros,* 833 F.2d at 455; *Duncan,* 850 F.2d at 1114). Count 9 presents just such a situation.

It is certainly a genuine possibility, and perhaps not an unlikely one, that individual jurors or groups of jurors differed on whether North performed the separate acts charged under Count 9 with the requisite intent.[7] For example, some jurors may have concluded that North knew only that destroying official documents was unlawful, while other jurors may have believed that he knew only that altering System IV documents was unlawful, and still others may have believed that he knew only that removing documents from his office after being fired was unlawful. It is also possible, albeit less likely, that despite North's testimony, jurors could have disagreed as to which *actus reus* North committed, regardless of his intent. Because "the permutations that can support a valid conviction are varied and several," *Beros,* 833 F.2d at 462, the possibility that the jury did not reach a verdict of specific unanimity is significant and real. Consequently, we cannot conclude that the District Court's refusal to give a particularized unanimity instruction was harmless error. We reverse Count 9 on this ground.

7. As we note in Part IV of this opinion, the parties are agreed that violations of 18 U.S.C. § 2071(b) such as those charged in Count 9

## III. Authorization

North argues that his convictions on Counts 6 and 9 must be reversed because the jury was improperly instructed concerning North's claimed authorization from his superiors to do the acts underlying those counts. He raises two arguments that at least appear to be conceptually distinct. First, North asserts that under our decision in *United States v. Barker,* 546 F.2d 940 (D.C.Cir.1976), the jury should have been instructed to return a verdict of not guilty if it found the necessary elements of a so-called "authorization defense." That is, he claims that he was entitled to an instruction that reasonable reliance on the apparent authority of one's superiors is an absolute defense. We hold that the District Court did not err in refusing to give an authorization defense instruction. Second, North claims that the District Judge erred when he instructed the jury to ignore all evidence of authorization in deciding whether North had the requisite intent in either count unless "the defendant was specifically ordered and directed by a superior to act contrary to the law, and if no alternative was available to him to comply with the order by other lawful means ... [and if] he reasonably believed the order was legally proper." JA at 674–75. We hold that the District Court erred in limiting the jury's consideration of the evidence of authorization with reference to Count 9, but not as to Count 6.

### A. *Authorization Defense*

North claims that the District Court erred by refusing to instruct the jury that authorization is a complete defense requiring acquittal if supported by the evidence. This argument is raised separately and distinctly from the claim that the jury was improperly constrained in its consideration of the evidence of authorization. North asserts in his brief that "there is an enormous difference between (1) an instruction that authorization is merely relevant to intent and (2) an instruction that authoriza-

require the unusually high mental element of knowledge of unlawfulness.

tion is a defense that requires acquittal if supported by the evidence." Brief for Appellant at 37. Specifically, North requested the following instruction:

If you find that LtCol North acted in good faith on a superior's apparent authorization of his action, and that his reliance was reasonable based on the facts as he perceived them, that is a complete defense to [Counts Six and Nine].

JA at 2459. North argues that he was entitled to such an instruction under our decision in *United States v. Barker*, 546 F.2d 940 (D.C.Cir.1976), which, he claims, establishes an authorization defense in this Circuit quite apart from the question of intent. North faults the District Court for its failure to follow *Barker*. Although North's argument has an initial appeal because *Barker* is a previous case of our Circuit, we have read *Barker*, and reread it, and simply cannot find in it a rule of law to apply.

In *Barker*, we reversed the convictions of Bernard Barker and Eugenio Martinez, who participated in the burglary of Dr. Lewis Fielding's office at the behest of E. Howard Hunt. Hunt, who was known to Barker and Martinez as a long-time CIA agent, worked under the supervision of John Ehrlichman in the White House and was attempting to obtain information about Daniel Ellsberg, the source of the Pentagon Papers leak. Dr. Fielding was Ellsberg's psychiatrist, and Hunt hired Barker and Martinez to break into Fielding's office for the purpose of photographing Ellsberg's file. That break-in led to charges under 18 U.S.C. § 241 against Barker and Martinez, among others, for conspiring to violate Dr. Fielding's Fourth Amendment rights. The defendants claimed that they lacked the *mens rea* necessary for conviction because they had reasonably relied on Hunt's authority to engage them in carrying out the burglary, and that the district court had erred by refusing to instruct the jury accordingly and by excluding evidence that would tend to establish their theory of the case.

All three judges issued separate opinions, two of which supported reversal on grounds that the defendants were entitled to put on evidence and have the jury instructed on the defense of good faith reasonable reliance on the apparent authority of Hunt. Judge Wilkey thought the case presented an exception to the usual rule that a mistake of law is no defense to a criminal charge. He observed first that it would be a mistake of *law*, not fact, for a police officer to search someone's home or office in reliance on a warrant that was issued by a judicial officer who mistakenly believed that there was probable cause for the search:[8] "It is readily apparent that few courts would countenance an instruction to a jury ... which advised that since the mistake in acting on an invalid warrant was one of *law*, it would not excuse the agent's unlawful search.... [T]here is an overriding societal interest in having individuals rely on the authoritative pronouncements of officials whose decisions we wish to see respected." 546 F.2d at 947 (opinion of Wilkey, J.) (emphasis in original) (footnotes omitted). Judge Wilkey thought that interest implicated only when the reliance was objectively reasonable under the circumstances (as it clearly would be for the officer relying on an invalid judicial warrant). *See id.* at 947–48 (opinion of Wilkey, J.).[9] Judge Wilkey therefore concluded that the district court's instruction that a mistake of law cannot be an excuse required reversal *unless*

there is no legal possibility of equating the reliance of Barker and Martinez on Hunt's apparent authority with the reliance of a police officer on a judicial

---

8. Of course, that error could also be described as a mistake of fact in that the search would not have been illegal if the facts were as the officer believed them to be—if the officer possessed a valid warrant.

9. The same approach would be warranted in the case of a government official enlisting the aid of a private citizen, for instance a police officer seeking assistance in making an unlawful arrest, in part because "the gap ... between a private citizen and a government official with regard to their ability and authority to judge the lawfulness of a particular governmental activity is great." *Id.* at 948–49 (opinion of Wilkey, J.).

warrant subsequently held invalid. And this will be true *if and only if* Barker and Martinez could not show *both* (1) *facts* justifying their reasonable reliance on Hunt's apparent authority and (2) *a legal theory* on which to base a reasonable belief that Hunt possessed such authority.

*Id.* at 949 (opinion of Wilkey, J.) (emphasis in original). Judge Wilkey went on to determine that Barker and Martinez could make both of those showings. As to the facts, Judge Wilkey thought there was evidence to support the conclusion that the defendants "honestly and reasonably believed they were engaged in a top-secret national security operation lawfully authorized by a government intelligence agency." *Id.* at 949 (opinion of Wilkey, J.). They could meet the legal theory requirement as well, continued Judge Wilkey, on the grounds that it was plausible to believe at the time of the break-in that the President had the power to confer authority on his aides to conduct warrantless searches pertaining to foreign agents. *See id.*

Sitting by designation, Judge Merhige of the Eastern District of Virginia also thought the case fit into an exception to the "mistake of law is not an excuse" rule and analogized the case to situations in which a defendant acted on the basis of erroneous government advice, thereby making a criminal conviction unduly harsh. The quintessential examples mentioned by Judge Merhige were individuals acting in reliance on a statute later held to be unconstitutional or on a court decision that a statute is unconstitutional that is subsequently overruled. *See* 546 F.2d at 956 (opinion of Merhige, J.). In order to avoid convictions in those situations, Judge Merhige thought a defense should be available to a defendant who

> (1) reasonably, on the basis of an objective standard, (2) relies on a (3) conclusion or statement of law (4) issued by an official charged with interpretation, administration, and/or enforcement responsibilities in the relevant legal field.

*Id.* at 955 (opinion of Merhige, J.). Responding to the fear that such a defense would reward public ignorance of the law

to the detriment of the rule of law in general, Judge Merhige stated that "the defense requires that the individual either seek out or be cognizant of the official statement upon which he or she relies. Some knowledge of the law, verified by an independent and typically competent source, is required." *Id.* Furthermore, the defense would be narrowed because "[t]he reasonableness of the reliance may dissipate if one depends on nonenforceable advisory opinions of minor officials.... Similarly, the defense does not extend to reliance on individuals, who ... have no interpretative or administrative responsibilities in the area associated with the legal concepts involved in the mistaken opinion or decision." *Id.* at 956 (opinion of Merhige, J.).

North cannot even approach the showing that Judge Merhige's formulation of the defense requires. North does not even claim that he relied on *any* "conclusion or statement of *law*," let alone one "issued by an official charged with interpretation, administration, and/or enforcement responsibilities in the relevant legal field." *See id.* at 955 (opinion of Merhige, J.). On the other hand, neither did Barker or Martinez, yet Judge Merhige voted that their convictions had to be reversed. Despite all that was recounted above, Judge Merhige concluded:

> Barker and Martinez assert that they relied on Hunt's authority as delegated from an intelligence super-structure controlled by the White House.... The Executive Branch ... is vested with substantive responsibilities in the field of national security, and decisions of its officials on the extent of their legal authority deserve some deference from the public. A jury may well find that John Ehrlichman ... expressed or implied that the break-in of Dr. Fielding's office was legal ... and that Hunt ... passed the position on to the defendants, which they, acting as reasonable men, relied upon in performing the break-in.

*Id.* at 957 (opinion of Merhige, J.) (footnotes omitted).

■ We suppose we could simply ignore the reasoning of Judge Merhige's

opinion and merely infer the contours of an authorization defense from the facts in *Barker* that he thought warranted an authorization instruction. But the very premise of appellate review is that reasoning matters. Indeed, that is one of the crucial reasons why we are bound only by prior *published opinions* of this Circuit and not by other means of deciding cases. We do not think that any coherent principle can be gleaned from the *Barker* case because the reasoning of Judge Merhige's opinion does not mesh with its outcome. In such a situation, we could not fault a district court solely for a failure to "follow" *Barker.*

■ North's suggested instruction, quoted above, goes so far as to conjure up the notion of a "Nuremberg" defense, a notion from which our criminal justice system, one based on individual accountability and responsibility, has historically recoiled. In the absence of clear and comprehensible Circuit authority that we must do so, we refuse to hold that following orders, without more, can transform an illegal act into a legal one.[10]

### B. *Evidence of Authorization*

#### 1. Count 6

■ We conclude that Judge Gesell's limitations on the jury's consideration of authorization evidence were not prejudicial to North as to Count 6. If we compare the standard of criminal intent in 18 U.S.C. § 1505,[11] the statute underlying North's convictions on Count 6, with the authorization evidence he actually submitted at trial, the lack of any prejudicial effect from the judge's instructions becomes clear.

■ Section 1505 mandates a fine or imprisonment, or both, for anyone who "corruptly, or by threats or force, or by any threatening letter or communication influences, obstructs, or impedes or endeavors to influence, obstruct, or impede ... the due and proper exercise of the power of inquiry under which any inquiry or investigation is being had by either House, or any committee of either House or any joint committee of the Congress...." Thus, absent evidence of threats or force, a person violates section 1505 by "corruptly" influencing, obstructing, or impeding a congressional investigation or attempting to do the same. Because Congress is not shown to have intended otherwise, "corruptly" should be understood by a jury and by a court to have its usual meaning. In general, common words in statutes should be given their common or popular meanings, in the absence of congressional definition. *See, e.g., Perrin v. United States,* 444 U.S. 37, 41–45, 100 S.Ct. 311, 313–15, 62 L.Ed.2d 199 (1979); *United States v. Stewart,* 311 U.S. 60, 63, 61 S.Ct. 102, 104–05, 85 L.Ed. 40 (1940); *Old Colony R.R. Co. v. Commissioner,* 284 U.S. 552, 560, 52 S.Ct. 211, 213–14, 76 L.Ed. 484 (1932); *Martin v. Hunter's Lessee,* 14 U.S. (1 Wheat) 556, 571, 4 L.Ed. 97 (1816); *United States v. Smith,* 209 F.Supp. 907, 917 (E.D.Ill.1962); *Svilokos v. State, Dep't of Community Aff.,* 220 N.J.Super. 441, 532 A.2d 743, 744–45 (1987); *Allgood v. Bradford,* 473 So.2d 402, 411 (Miss.1985); 2A Sutherland Statutory Const. § 47.28, at 223 (4th ed.) and at 50 (Supp.1989). According to a standard dictionary, "corruptly" is the adverbial form of the adjective "corrupt," which means "depraved, evil: perverted into a state of moral weakness or wickedness ... of debased political morality: characterized by bribery, the selling of political favors, or other improper political or legal transactions or arrangements." Webster's Third New International Dictionary 512 (1976). A "corrupt" intent may also be defined as

---

**10.** We do not mean to suggest that criminal defendants in this Circuit could not avail themselves of the defense of reliance on an official misstatement of law as that defense is described in Judge Merhige's opinion. But that defense is far more circumscribed than the one sought by North here.

**11.** Even though he was actually convicted only of aiding and abetting others in their violation of section 1505, aiders and abettors must possess the same criminal intent as the principals. Section 1505 thus provides the appropriate threshold for North's criminal intent on Count 6. *See United States v. Sampol,* 636 F.2d 621, 676 (D.C.Cir.1980).

"the intent to obtain an improper advantage for [one]self or someone else, inconsistent with official duty and the rights of others." Ballentine's Law Dictionary 276 (3d ed. 1969) (definition of "corruptly").

Several courts of appeal, in upholding convictions under 18 U.S.C. § 1505, and its companion statute, 18 U.S.C. § 1503, which criminalizes corrupt obstructions of judicial proceedings, have said that the word 'corruptly' means nothing more than an intent to obstruct the proceeding. In so doing, they have not read the corrupt intent requirement out of the statute; rather, these cases have recognized that "constitutionally unprotected and purportedly illicit" conduct—behavior that is "not ... inadvertent, negligent, or even reckless[ly] nonpurposeful"—reflects a " 'corrupt[ ]' endeavor to interfere with the due administration of justice." *United States v. Jeter*, 775 F.2d 670, 679 (6th Cir.1985), *cert. denied*, 475 U.S. 1142, 106 S.Ct. 1796, 90 L.Ed.2d 341 (1986). Clandestinely obtaining grand jury transcripts and selling them to targets of the grand jury's investigation, *id.*, or purposefully concealing documents subpoenaed by the IRS, *United States v. Laurins*, 857 F.2d 529, 536–37 (9th Cir. 1988), or by a grand jury, *United States v. Rasheed*, 663 F.2d 843, 852 (9th Cir.1981), *cert. denied sub nom. Phillips v. United States*, 454 U.S. 1157, 102 S.Ct. 1031, 71 L.Ed.2d 315 (1982), have readily been held to meet the requisite corrupt standard.

For the conduct covered by section 1503 such a legal presumption may well be warranted because, after all, very few non-corrupt ways to or reasons for intentionally obstructing a judicial proceeding leap immediately to mind. The Fifth Circuit has made similar observations:

Although the special considerations surrounding a criminal trial have caused courts interpreting section 1503 to impute 'corrupt' intent to many practices, the independent significance of this term has not been suppressed.... [W]here a defendant has endeavored to obstruct a criminal proceeding, the 'advantage inconsistent with the duties and rights of others' is so clear that courts have often been willing to impute the desire to obtain such advantage on a *per se* basis.... [S]ection 1503 presupposes a proceeding the disruption of which will almost necessarily result in an improper advantage to one side in the case.

*United States v. Reeves*, 752 F.2d 995, 999 (5th Cir.), *cert. denied*, 474 U.S. 834, 106 S.Ct. 107, 88 L.Ed.2d 87 (1985).

■■■ But to import that legal presumption to section 1505—and thus to assert that all endeavors to influence, obstruct or impede the proceedings of congressional committees are, as a matter of law, corrupt—would undoubtedly criminalize some innocent behavior. Unlike courts of law covered by section 1503, congressional committees are part and parcel of a political branch of government and therefore serve wide-ranging political functions not limited to a search for truth in accordance with formal rules. They may also have a far-flung investigative scope and evoke legitimate political jousting between the executive and legislative branches. No one can seriously question that people constantly attempt, in innumerable ways, to obstruct or impede congressional committees. An executive branch official, for example, might call the chairman of a congressional committee convened to investigate some wrongdoing and say, "We both know this investigation is really designed to embarrass the President (or a Senator), not to investigate wrongdoing. Why don't you call it off?" The official surely intends to obstruct or impede the inquiry, but it does not necessarily follow that he does so corruptly. Similarly, a political activist might contact his representative and tell her that unless she stops spending her time pursuing a certain investigation rather than some other legislative endeavor, the activist's group will oppose her reelection. Again, the activist is endeavoring to impede or obstruct the investigation, but is not necessarily doing so corruptly.

Even if we do not apply the presumption from section 1503 to indictments under section 1505, however, North was entitled only to the instruction on intent given, and to a jury that applied "corruptly" according to its usual definitions. He contends, never-

theless, that the trial court erred, in its intent instruction, by placing limitations on the jury's use of his evidence of authorization. The trial court instructed that the jury could consider authorization on the question of intent, but only subject to the following limitations:

It [authorization] must be specific, not simply a general admonition or vague expression of preference. It must be sufficiently precise to assure a reasonable person that it was intended to apply in the circumstances that develop subsequently which were not otherwise specifically stated.

. . . . .

Finally, if an authorization can be satisfied by two different courses of action, one clearly legal and one illegal or of dubious legality and a person chooses the illegal or dubious course when other legal action would comply, authorization cannot be viewed as affecting intent.

JA at 675.

Although the trial court might well have omitted any reference to authorization, the instruction it actually gave apparently represents an attempt to synthesize the two opinions constituting the majority in *Barker* with *United States v. Ehrlichman,* 546 F.2d 910 (D.C.Cir.1976), decided by the same panel on the same day. From this synthesis, the trial court drew the three requirements that there be (1) specific instruction, (2) no alternative lawful means of compliance, and (3) a reasonable belief in the legal propriety of the order. *Ehrlichman* contains language supporting the first requirement of a specific instruction. *See* 546 F.2d at 925. In *Ehrlichman,* the defendants were charged with conspiring to violate the civil rights of a psychiatrist by planning and conducting an unlawful search of his office. They relied on a claimed "national security exception" to the Fourth Amendment protections against unlawful searches and seizures. It was in the context of evaluating that specific defense that the *Ehrlichman* panel laid down

the specific-instruction requirement. *Ehrlichman* may be read beyond its holding when the specific-instruction requirement is extended beyond the *Ehrlichman* circumstances and is imposed on a defendant who asserts that he was properly authorized to do what he did and therefore lacked the necessary criminal intent regardless of the underlying act. The requirement of no-alternative-means-of-compliance is also a reasonable reading of *Ehrlichman* and, at least on the *Ehrlichman* facts, seems to be a proper statement of the law.[12] None of this, however, has a direct bearing on the facts of the present case.

North's evidence, as we have demonstrated above, does not support a mistake-of-law defense. In effect, he is arguing that the jury should have been instructed or permitted to consider the authorization evidence not as it bore on his intent to commit the acts charged or the nature of the acts, but rather on his motive in committing the acts. This argument invites us to establish a rule that in determining whether a defendant charged with violating section 1505 acted corruptly, the trial judge should instruct the jury that in order to find the defendant guilty, it must find that he acted from a "corrupt motive." We have seen no authority to this effect, and we cannot agree. Just as we noted above, there are myriad ways of "impeding" or "obstructing" congressional investigations that are not in themselves corrupt; so are there equally corrupt ways of impeding or obstructing Congress that do not proceed from corrupt motives. Allowing an official's personal motive to exculpate otherwise corrupt obstructive conduct would give him license to "substitute for law his own notions of right, [which] would be in effect to subvert the law." G. Williams, Criminal Law—The General Part § 241 (2d ed. 1961) (quoting Cr.L.Comm'rs., 7th Rep. (1843) *Parl.Pap.* xix 33).

The implications of a contrary view are stunning. Could a jury sympathetic to the

---

12. As the *Ehrlichman* court reminded us, any other view would permit a "Becket" defense excusing the commission of murder to free the king from a "turbulent priest." *See Ehrlichman,* 546 F.2d at 926 & n. 68.

official's individual notion of morality exculpate a self-styled Robin Hood bureaucrat who concealed, altered, or destroyed documents that he knew Congress needed for its oversight of budgetary disbursements? Could a bigoted jury excuse a white supremacist official who altered documents eventually slated for Congress's review of misuse of government set-asides by minority businesses? To hold that North was entitled to have the jury consider the authorization of his superiors because it bore on his motive for committing the acts in question does little more than restate the purported *Barker* defense which we already rejected above. Under either formulation, the defendant is enabled to escape the criminal consequences of his otherwise unlawful acts merely by asserting that his reason for committing the acts was that he was "following orders."

 If knowledge of unlawfulness were required in order to convict a defendant of violating section 1505, North's argument might be more colorable. But this is not the case. Although the violation of this statute is a "specific intent" offense, "the mental state required for most 'specific intent' offenses does not involve knowledge of illegality." *Ehrlichman*, 546 F.2d at 919 (footnote omitted). North received from the trial court the instruction that

> [s]pecific intent requires that a person not only acted knowingly, voluntarily and deliberately, but that he acted with a bad purpose, having decided in his mind what he would do and that he then did something prohibited.

JA at 672–73. Thus, because knowledge of illegality was not required, he was not entitled to an instruction that the jury should consider authorization as bearing on knowledge of illegality. The jury was not empaneled to determine whether or not the defendant knew that his acts were illegal, but only whether "he specifically intended to do something the law prohibits, whether he knew of the law or not." JA at 674. In this case, the act that the law prohibited

was to "corruptly ... endeavor[ ] to influence, obstruct, or impede" a congressional inquiry. 18 U.S.C. § 1505. Because the District Court had correctly defined for the jury the required intent, and because "corruptly" and the other words in the statute are to be understood according to their common meanings, necessitating no specific definitional instructions from the court, we see no way in which the evidence of authorization would bear on the decisions the jury was required to make. If the jury was convinced beyond a reasonable doubt that North's creation of a false chronology was an intentional (as defined in the instructions) endeavor corruptly to influence the congressional investigation (as defined in the common use and sense of those terms), then it was the jury's duty to return a verdict of guilty. Whether or not he was "following orders" was immaterial to that decision, and there was no error in the trial court's refusal to give the instruction.

### 2. Count 9

██ In Count 9, North was charged with violating 18 U.S.C. § 2071(b), which makes it a crime for anyone who has custody of "any record, proceeding, map, book, paper, document, or other thing, filed or deposited with any clerk or officer of any court of the United States, or in any public office, or with any judicial or public officer of the United States," to *"willfully and unlawfully* conceal[ ], remove[ ], mutilate[ ], obliterate[ ], falsify[ ], or destroy[ ] the same...."* (emphasis supplied). North was alleged to have violated this section by concealing, removing, and destroying a number of NSC documents concerning both the provision of aid and assistance to the Contras and the sale of arms to Iran, acting with the knowledge that doing so contravened an internal NSC regulation governing the proper means of handling documents. As both parties agree, a conviction under section 2071(b) requires that the government prove that North acted with knowledge that his conduct was unlawful.[13]

---

13. The dissent treats this count as if North were convicted of a crime requiring only a generic

"specific intent" rather than the unusual intent requirement that the prosecution prove knowl-

With regard to the relevance of authorization to the jury's deliberations about North's state of mind on this (and other) counts, the District Court instructed:

> If the defendant was *specifically ordered and directed* by a superior to act contrary to the law, and if *no alternative was available to him to comply with the order by other lawful means,* you may weigh this authorization along with other facts in determining his specific intent, provided under the facts and circumstances he *reasonably believed the order was legally proper.*
>
> However, authorization requires *clear, direct instructions to act a given time in a given way.* It must be specific, not simply a general admonition or vague expression of preference.... A person's general impression that a type of conduct was expected, that it was proper because others were doing the same, or that the challenged act would help someone or avoid political consequences, does not satisfy the defense of authorization.
>
> Finally, if an authorization can be satisfied by two different courses of action, *one clearly legal and one illegal or of dubious legality,* and a person chooses the illegal or dubious course when other, legal action would comply, authorization *cannot be viewed as affecting intent.*

JA at 674–75 (emphasis supplied).[14]

▇▇ It may well have been acceptable if the District Court had said nothing at all about authorization when instructing the jury about intent and merely told them to consider all of the surrounding circumstances when deciding if North knew his actions were unlawful. Instead, the District Judge decided that the jury could not *consider* at all the instructions, statements, and behavior of North's colleagues, whether superiors or not, unless the evidence sufficed to warrant an "authorization defense" instruction to the jury. But whatever might have once been thought to constitute an "authorization defense"—*see* Section III(A), *supra*—it was error to preclude the jury from considering whatever evidence of authorization exists in the record as it bears on the jury's determination of whether North had subjective knowledge of unlawfulness.[15] As we have made clear above, authorization from one's superiors cannot convert illegal activity into legal, yet it surely can affect a defendant's *belief* that his conduct was lawful—particularly when we are dealing in an area of international security concerns, and when the authorization is thought to come from the President himself.

▇▇ Of course communications from associates or even subordinates would also be relevant if they bear on the defendant's state of mind regarding the lawfulness of a given action. It is only incidental that this case arises in the context of a superior communicating with a subordinate. Nor is the issue unique to government. An individual working in a corporation, a union, or even a private law firm charged with a crime under which the government must prove knowledge of unlawfulness would be entitled to put in evidence communications from others in the institution that rebutted the contention that he was aware his conduct was unlawful. Communications from a superior might be given greater weight

---

edge of unlawfulness. For that reason, the Chief Judge's opening discussion as to the general implication of our opinion for the administration of criminal law seems to us to be wholly irrelevant.

**14.** North objected to those instructions. Tr. at 8515–18, 8523–24. To be sure, the District Court had earlier instructed the jury that "you may infer the defendant's intent from the surrounding circumstances. You may consider any statement made and act done or omitted by the defendant at the time, and all other facts and circumstances in evidence which indicate his state of mind, including all testimony of any witness you find credible." JA at 673. But in the face of the more particular instruction quoted in the text, it is obvious that the jury was not, in fact, free to consider all evidence of authorization in its deliberations.

**15.** As we have already noted, it appears that the instructions were crafted in an attempt to adhere to Circuit precedent on the question of authorization. As we explained earlier, the District Judge faced a difficult task because the Circuit's precedent was incoherent. But that the ultimate fault lies with our Court rather than with the District Court renders the instructions no less erroneous.

by a jury than, say a subordinate or equal but that would be because of the natural assumption that a superior knows more and, therefore, the defendant might be thought to more likely rely upon the superior's view, not because the superior's status entitles him or her to direct the subordinate to violate the law. Here, however, since we are concerned with an internal regulation concerning part of the White House staff, it is quite possible that North could have believed (even reasonably) that the President's direction, specific or implicit, overrode the regulation. In this case then the President's status as it bears on Count 9 is relevant. In particular, we think that the emphasized passages of the instructions quoted above were all prejudicial to North on this point. The requirement that North "reasonably believed the order was legally proper" was improper as it relates to Count 9, which, we repeat, both parties agree requires a jury determination that North knew he was acting unlawfully. When that is the nature of the intent required for conviction, the jury by definition must measure the defendant's intent by a subjective standard. *See United States v. Rhone*, 864 F.2d 832, 835 (D.C.Cir.1989); *United States v. Aitken*, 755 F.2d 188 (1st Cir.1985). Thus, even an unreasonable belief that one's conduct was not unlawful would seem properly to preclude conviction for a crime requiring knowledge of unlawfulness. *See Liparota v. United States*, 471 U.S. 419, 425 n. 9, 105 S.Ct. 2084, 2088 n. 9, 85 L.Ed.2d 434 (1985). The dissent maintains that a conviction is appropriate under section 2071(b) if the defendant "lacks a reasonable belief that his actions are not unlawful." Wald Dissent at 929. Assuming for the moment that there is such a reasonableness requirement, the dissent's articulation would entirely reverse the burden of proof on the state-of-mind requirement for this statute. It is the

prosecution that must prove, beyond a reasonable doubt, that the defendant *knew* he was acting *unlawfully* (or, *arguendo*, that he lacked a reasonable belief that he was not acting unlawfully). We realize that this last clause is a double negative, but the change in wording makes a real difference: if North had no belief at all about the lawfulness *vel non* of his actions, or if he was uncertain, then the proper result is acquittal. Knowledge of unlawfulness means just that; it does not mean lacking the knowledge (or reasonable belief) that the conduct was legal.

Indeed, the whole issue raised by the dissent—that there is a requirement that the defendant's belief that he was not acting unlawfully be reasonable—is a red herring. The District Court instructed the jury that "[f]or [Count 9], the defendant must have *known* his conduct was unlawful." JA at 649 (emphasis supplied). For purposes of this appeal, that should be the end of the matter.[16] The dissent may well be correct that "the consensus is overwhelming that a defendant's mistake of law must be reasonable to be exculpatory." Wald Dissent at 930; *United States v. Aguilar*, 883 F.2d 662, 674–75 nn. 4 & 5 (9th Cir.1989) (criticizing *Rhone*). But we are not dealing here with the mere negation of specific intent; rather, we are dealing with a statute that indisputably (at least as between the parties) requires *subjective* knowledge of unlawfulness for conviction. *None* of the cases cited by the dissent involved statutes that require knowledge of unlawfulness for conviction.[17] We also note that statutes requiring actual knowledge of unlawfulness for conviction are rare, making all but irrelevant the dissent's exaggerated concern about defendants being exculpated for "bizarre and incredible mistakes of law." Wald Dissent at 930. The obvious answer to this fear is that if the defendant's belief

---

**16.** Although the IC does argue on appeal that an unreasonable belief that his conduct was legal would not negate guilt, he cites no authority for that proposition. That lack of authority is not surprising because the IC's proposition does not follow logically from the requirement that the prosecution had to prove that North knew he was acting unlawfully.

**17.** The special requirement of the statute at issue here—knowledge of unlawfulness—is of great significance to our decision. We do not suggest that evidence of authorization in this case pertains to the garden-variety specific intent requirement.

in the lawfulness of his behavior is indeed incredible, then the jury will not credit it, and he will not be exculpated.[18] In any event, even if we adopted the reasonableness limitation, it would not affect our decision on Count 9. We surely could not hold that it is *unreasonable as a matter of law* to believe that one's superiors in the NSC, including the National Security Advisor himself, could authorize the destruction of internal NSC documents, especially when only an NSC regulation prohibits their destruction in the first place. This last point is critical because it makes it all the more plausible that the jury would credit North's claim that he did not think he was acting unlawfully. Thus, the jury should have been able to consider the evidence of authorization in the record that was excluded by the District Court's instructions even if it had been determining whether North reasonably believed his conduct was not unlawful.

█ Equally damaging was the instruction not to consider the evidence of authorization unless North was given "clear, direct instructions to act at a given time in a given way." That instruction alone could very well have stopped the jury from considering any of the authorization evidence in the record. That evidence included North's testimony that Casey told him "to get the operation in Central America cleaned up," Tr. at 7023, 7029, and "to get rid of things that weren't necessary." Tr. at 7553. North also testified that, in North's presence, Poindexter personally destroyed a Presidential Finding approving a shipment of HAWK missiles to Iran in 1985. Furthermore, McFarlane sent North a note on November 8, 1986 stating that he hoped "someone was purging the NSA traffic files on [a matter relating to the Iranian arms shipment]." Tr. at 4781. Finally, with respect to certain altered documents concerning aid to the Contras, North testified that McFarlane told him to "fix these documents so that they are consistent with what we have basically told Congress." Tr. at 6903. All of that testimony was within the scope of what the jury should have been able to consider in its deliberations on Count 9, but *none* of it meets the District Court's requirement that there be "clear, direct instructions to act *at a given time in a given way.*" Not even the IC disputes this. *See* Brief for Appellee at 35–36 (Casey's "general directive" was "vague, informal and inexact." "McFarlane did not actually instruct North at that time to alter any documents." "North did not offer evidence that he was specifically instructed ...").[19]

█ Finally, we think the related instructions that the jury could consider authorization only "if no alternative was available to [North] to comply with the order by other lawful means," and that the authorization evidence could not be considered if "an authorization can be satisfied by two different courses of action, one clearly legal and one illegal or of dubious legality, and a person chooses the illegal or dubious course when other, legal action would comply," were prejudicial. These instructions improperly direct the jury's deliberations away from North's state of mind and instead focus them on the objec-

---

**18.** The same is true with respect to the dissent's concern about unreasonable reliance on an "incompetent or venal" superior. *See* Wald Dissent at 931.

**19.** We see no basis for the dissent's claim that this instruction merely prevented the jury from "exculpat[ing] North on the grounds of authorizations that were not, in its view, even intended to control his conduct, but were mere suggestions or vague permissions to commit illegal acts if he felt like performing them...." Wald Dissent at 930. But it is not implausible that the authorizations at issue here were intended to control North's conduct, although not specifying particular acts to be performed at a particu-

lar time and place. There is also no merit to the dissent's suggestion that these authorizations would have met the District Judge's specificity limitation if the jury "interpreted them—as North did—as orders to do [particular acts]." Wald Dissent at 930. The jury was not instructed that they were to "interpret" the orders given to North, much less that they could consider how North interpreted them. Indeed, that is precisely the testimony that the jury was forbidden to consider by the specificity instruction. Thus, once the jury determined that the *direction* itself was not specific as to the expected behavior and time, it was told not to consider it at all, regardless of how specific North interpreted his instructions to be.

tive question of whether the destruction of documents violated the executive branch regulation. The dissent argues that these instructions were harmless because North had to destroy, alter, and remove documents in order to comply with his instructions and there were no alternative lawful means to do that because to do so would violate the executive branch regulation. *See* Wald Dissent at 930. Obviously, these instructions require the jury to determine whether a course of action is legal, illegal, or *of dubious legality* (whatever that means) without considering the evidence of authorization. In this context, as the question here is whether that authorization made the defendant believe (reasonably or unreasonably) that he was acting lawfully notwithstanding the regulation, this limitation is prejudicial. If he did so believe, then his course was not illegal or even dubious. The District Court's instruction in effect makes violation of the regulation a *per se* violation of the statute without regard to the defendant's belief that his authorization from the highest echelons of the executive branch could trump a regulation about document control.

■ Our dissenting colleague appears to agree that evidence of authorization is relevant to Count 9 on the issue of North's knowledge of unlawfulness. Nevertheless, the dissent defends all of the District Judge's strictures on the jury's consideration of that evidence. In effect, the dissent argues that one must make out a full-blown authorization defense consisting of reasonable reliance on a superior's assurance that the desired action is legal—based on that superior's interpretation of the law—before the evidence of what the superior told you can even be considered by the jury.[20] Where, as here, the statute requires the jury to find subjective knowledge of unlawfulness, that view cannot prevail. Evidence of what one's superiors say and do, even if they do not explicitly assure one that the conduct is legal, might be crucial in establishing the defendant's be-

lief that his conduct was not unlawful. This does not mean, as the dissent suggests, that a defendant charged with this crime or a similar one can gain acquittal simply by pleading he was "following orders." Those orders or directions or communications permit the jury to acquit *only* if the jurors find that the defendant did not know his *conduct* was illegal. Because the District Court's instruction on authorization precluded the jury from fully considering whether North's claim of authorization rebutted the prosecution's burden of showing North's knowledge that his behavior was unlawful, and because it is impossible to say that the error was harmless—authorization being the core defense—North's conviction on Count 9 must be reversed.

## IV. THE REAGAN SUBPOENA

North contends that his convictions on Counts 6 and 9 should be reversed because the District Court erroneously quashed his subpoena to former President Ronald Reagan. Finding that Mr. Reagan's testimony would not have added anything material to North's defense to Counts 6 and 9, we decline to reverse North's convictions on this ground.

### A. *Background*

Prior to his trial, North served then-President Reagan with a subpoena *ad testificandum*. Mr. Reagan, represented by the Attorney General, moved to quash the subpoena. The District Court held the matter in abeyance until trial was underway, when North again asked the court to require Mr. Reagan's appearance. The court ordered North to file "under seal, *ex parte* a succinct particularized statement of facts defendant desires to elicit from President Reagan." *United States v. North*, Cr.No. 88–0080–02, 1989 WL 57512 (D.D.C. Mar. 27, 1989) (order). North identified thirteen subjects on which he expected to elicit favorable testimony from Mr. Reagan, including the fact that "between November 7 and

---

**20.** Of course, the evidence of communications from superiors can lead the jury to acquit based on their view that defendant did not have the requisite knowledge of unlawfulness without

that evidence justifying an instruction from the judge on the *Barker* defense of authorization. For that reason, unlike the dissent, *see* Wald Dissent at 926 we see no anomaly in this.

November 25, 1986, Mr. Reagan approved of and participated in efforts to withhold many aspects of the [Iran] initiative from Congress and the public." JA at 3237 (sealed appendix). After examining North's proffer along with Mr. Reagan's written responses to grand jury interrogatories and portions of Mr. Reagan's personal diary, the court concluded that "[t]here has been no showing that President Reagan's appearance is necessary to assure Lt. Col. North a fair trial." *United States v. North*, 713 F.Supp. 1448, 1450 (D.D.C. 1989).

B. *Legal Standard*

 The Sixth Amendment guarantees a defendant the right "to have compulsory process for obtaining witnesses in his favor." U.S. Const.Amend. VI. "Few rights are more fundamental" than this one, *Chambers v. Mississippi*, 410 U.S. 284, 302, 93 S.Ct. 1038, 1049, 35 L.Ed.2d 297 (1973), for it is "in plain terms the right to present a defense," *Washington v. Texas*, 388 U.S. 14, 19, 87 S.Ct. 1920, 1923, 18 L.Ed.2d 1019 (1967). In practice, however, this right is subject to several limitations. *See, e.g., United States v. Thornton*, 733 F.2d 121, 125 (D.C.Cir.1984) (right to compulsory process does not compel witness to waive Fifth Amendment privilege). Most important in the instant context is the requirement that the witnesses' testimony be "material and favorable to [the] defense." *United States v. Valenzuela–Bernal*, 458 U.S. 858, 867, 102 S.Ct. 3440, 3446, 73 L.Ed.2d 1193 (1982). *See also Washington*, 388 U.S. at 23, 87 S.Ct. at 1925 (witnesses must be "relevant and material" to defense). The primary concern on review is whether the defendant suffers actual prejudice from his inability to obtain compulsory process. *See Valenzuela–Bernal*, 458 U.S. at 869, 102 S.Ct. at 3447.

C. *Application*

In Part III(A), *supra* at 878–81, we dismiss North's contention that he was entitled to an instruction charging the jury to return a verdict of not guilty if it found the necessary elements of an "authorization defense." As a result, we need not consider whether Mr. Reagan's testimony was necessary for North to make out such a defense. Rather, our inquiry is limited to whether Mr. Reagan would have presented to the jury evidence relevant and material to North's claim that he lacked the criminal intent defined by the statutes under which he was convicted.

1. Count 6

North's argument on appeal as to his need for Mr. Reagan's testimony focuses on his conviction under Count 6 for obstructing pending congressional inquiries as an aider and abettor, in violation of 18 U.S.C. §§ 1505 and 2. Brief for Appellant at 45–46. North asserts that Mr. Reagan would have corroborated his defense by testifying that he authorized William Casey and John Poindexter to withhold information from Congress concerning the 1985 sales of HAWK missiles to Iran. Assuming that presidential authorization would have exonerated Casey and Poindexter from the "corrupt" intent required by the statute, North contends that his conviction as an aider and abettor, stemming from his role in preparing a false chronology to be used by Casey and/or Poindexter when they testified before congressional committees on November 21, 1986, and in destroying, altering, and concealing official NSC records and papers concerning arms sales to Iran and efforts to aid the Contras, logically would have fallen as well. North points out that only Mr. Reagan could have told the jury whether he had authorized Poindexter and Casey to conceal the 1985 HAWK sales from Congress.

We have said in Part III(B)(1), *supra* at 881–884, that a person who "corruptly" intends to obstruct a pending investigation has the requisite criminal intent under 18 U.S.C. § 1505. The person need not know that his actions are unlawful in order to violate the statute. Thus, evidence of authorization, presumably intended to demonstrate that the defendant believed his actions were lawful, would not exculpate a defendant who admitted performing actions that impeded or obstructed a congressional investigation in a corrupt manner.

By extension, neither principals who corruptly obstructed Congress nor their aiders and abettors would be exculpated by evidence that the principals' actions were authorized by their superior.[21]

■ The jury, of course, could not have convicted North of aiding and abetting unless Poindexter or Casey had acted as a principal in corruptly obstructing Congress. And, correlatively, if Casey or Poindexter had intended corruptly to obstruct Congress, evidence of a putative presidential authorization would be irrelevant to their criminal intent under 18 U.S.C. § 1505, as well as to North's under 18 U.S.C. § 2. North's testimony at trial provided the jury with substantial evidence of Poindexter's and Casey's endeavor to destroy or suppress evidence relevant to Congress's ongoing investigation. North testified that at a meeting held in Poindexter's office and attended by Poindexter, North proposed false and obfuscatory changes in the chronology that was supposed to accompany Casey's congressional testimony the following day. Tr. at 7631.[22] North further recalled that Casey also instructed him specifically to destroy the Contra operating fund ledger and more generally to "start cleaning things up, to get rid of things that weren't necessary." Tr. at 7553. North also saw Poindexter destroy a Finding by President Reagan approving the 1985 HAWK shipment to Iran. Tr. at 7612–13.

We explained in Part III(B)(1), *supra*, that the jury was authorized to interpret the "corrupt[ ]" intent requirement in 18 U.S.C. § 1505 according to the word's common meaning. *See supra* at 881. Provided that the jury was convinced beyond a reasonable doubt that Casey's and Poindexter's actions in preparing the false chronology and altering and destroying official

documents were intentional endeavors corruptly to influence an ongoing congressional inquiry, and that North aided and abetted Casey and Poindexter with the same corrupt intent, the jury was duty-bound to find North guilty of aiding and abetting the corrupt obstruction of a pending congressional inquiry. In those circumstances, whether or not Casey or Poindexter—or North himself—was following President Reagan's orders is immaterial to North's defense. *See supra* at 884. Nor would Casey's and Poindexter's motives, however laudable, exculpate their otherwise corrupt endeavor to obstruct an ongoing congressional investigation. *See supra* at 883–884.

Furthermore, the available evidence concerning Mr. Reagan's involvement in Casey's and Poindexter's concealment is entirely unhelpful to North. In his responses to the IC's interrogatories, Mr. Reagan flatly denied authorizing any of Casey's statements to Congress concerning the Iran arms sales; indeed, he reported receiving his only advance knowledge of Casey's testimony on the eve of that testimony, when Secretary of State Shultz informed him of discrepancies between his own recollections and what he understood would be Casey's testimony the following day. *Cf.* Silberman Dissent at 950 n. 26.[23] Nor do Mr. Reagan's responses provide any sustenance for North's belief that Mr. Reagan concealed the HAWK shipments during a meeting with congressional leaders in early November 1986 and thus authorized his subordinates to act similarly; Mr. Reagan's answers imply that he had no recollection in November 1986 of arms sales that took place a year earlier. *Cf.* Brief for Appellant at 45 n. 77.

---

21. Defendants convicted under 18 U.S.C. § 2 of aiding and abetting must have the same intent as defendants convicted under a principal statute. *See supra* at 881 n. 11.

22. It is unclear from the record whether the chronology was also supposed to accompany Poindexter's testimony. Regardless of whether Casey or Poindexter ever actually presented the false chronology to Congress or destroyed or altered documents, 18 U.S.C. § 1505 criminal-

izes any corrupt "endeavor" to obstruct a pending congressional investigation.

23. Our reading of the record leads us to disagree with the Dissent's comment that the interrogatory responses "contain indications, which I am not free to reveal, suggesting that Mr. Reagan might well testify consistently with Mr. North's proffer." Silberman Dissent at 950 n. 26.

## 2. Count 9

■ Count 9 charged North with concealing, mutilating, obliterating, falsifying and destroying official documents. North never claims that Mr. Reagan authorized any such conduct; at most, North contends that Mr. Reagan indirectly encouraged him to withhold information from Congress. *See* JA at 3237 (sealed appendix). As we indicate in Part III(B)(2) of our opinion, conviction on Count 9 required the jury to believe that North knew he was violating the law. Absent any proffer by North that Mr. Reagan ever approved the destruction, alteration, or concealment of official NSC documents, the District Court fairly concluded that any evidence of authorization provided by Mr. Reagan would have had no bearing on whether North considered his activities lawful. Even if, as North claims, Mr. Reagan indicated to his subordinates that he did not want the Iran and Contra initiatives disclosed, North presents no evidence that the President authorized his subordinates to employ the means charged in Count 9. In light of the NSC's internal regulation severely restricting the removal and destruction of official documents, *see* National Security Council Administrative Manual 33 (Oct.1984) [Supplemental Appendix at 105], the trial judge was fully justified in refusing to credit North's contention that Mr. Reagan's comments about nondisclosure were meant to authorize the destruction, alteration, and concealment of official documents.[24]

## 3. Corroborative Effect of Mr. Reagan's Testimony

■ In considering the materiality of the evidence North hoped to elicit from Mr. Reagan, the District Court inquired only into "whether or not Mr. Reagan while President, directly or indirectly, authorized Lt. Col. North to take any of the actions" underlying his indictment. *United States v. North*, 713 F.Supp. at 1450. North attacks this standard as not taking into consideration the corroborative force of Mr. Reagan's testimony to North's defense. Clearly, corroborative evidence can be material to a defense. *See United States v. Detrich*, 865 F.2d 17, 22 (2d Cir.1988). But the record in this case contains ample evidence for the jury to have found that Casey, Poindexter, and North himself intended corruptly to obstruct an ongoing congressional inquiry, and no reason whatsoever to suspect that Mr. Reagan would have offered any testimony indicating that he authorized concealment of the 1985

**24.** The Dissent contends that "if Mr. Reagan implicitly or indirectly indicated his desires, that would certainly bear on *North's view* as to whether or not he was authorized *by law* to destroy the documents." Silberman Dissent at 948 (emphasis in original) (footnote omitted). That concerns about the President's "desires"—which, *according to North's own claim*, were limited to "efforts to withhold many aspects of the [Iran] initiative from Congress" and to authorizations of "denials" of knowledge of support for the Contras, JA at 3235, 3237 (sealed appendix)—should have led the District Judge to require Mr. Reagan's testimony strikes us as precisely the "capricious[ ] or needless[ ]" abuse of subpoenas against Presidents and ex-Presidents that the Dissent properly disdains. *See* Silberman Dissent at 954. Surely the Dissent does not quarrel with the District Judge's instruction that "[n]either the President nor any of [North's] superiors had the legal authority to order anyone to violate the law," JA at 676, particularly if such "orders," explicit or implicit, represented nothing more than their desires.

Nor do we see the relevance of the Dissent's argument that Mr. Reagan should have been called to testify because "North worked in the White House, only one step removed from the President himself, with what appears to have been enormous responsibility." Silberman Dissent at 954. There is a big difference between working in the White House and being a step removed from the President; indeed, North himself does not claim that he ever received personal authorizations from the President. *See* Reply Brief of Appellant at 16. Even if, as the Dissent claims, North believed he was "doing the President's bidding, and doing so with regard to a substantive area of national security policy," Silberman Dissent at 954, neither of those arguments advances any reason why, when confronted with North's limited claims that the President approved the withholding of information from Congress, the trial judge should have required Mr. Reagan to take the stand so that North could prove that he believed the destruction and alteration of official documents was lawful. Finally, since the criminal statutes themselves prohibited the destruction and falsification of the official documents involved here, independent of any internal NSC regulation, the Dissent's implication that the application of those statutes somehow unfairly caught North off his guard is unsupportable.

HAWK shipment from Congress. The record also contains no evidence whatsoever that Mr. Reagan ever suggested that North alter, destroy, or conceal official documents. Consequently, the District Judge's narrow formulation of the standard for granting North's subpoena amounted to at worst harmless error.[25]

### D. *Conclusion*

There is no indication that Mr. Reagan would have provided evidence material or favorable to North with respect to Counts 6 and 9.[26] Accordingly, we decline to reverse his conviction on the grounds of the denial of the Reagan subpoena.

### V. PENDING INQUIRY INSTRUCTION

North's conviction on Count 6 for aiding and abetting the obstruction of a congressional inquiry required the IC to prove that an "inquiry or investigation is *being had* by either House, or any committee of either House or any joint Committee of the Congress ..." 18 U.S.C. § 1505 (emphasis supplied); *see also* JA at 634 (jury instructions) (evidence must establish that congressional inquiry "underway" in November 1986). North contends that his Fifth Amendment right to due process and his Sixth Amendment right to a jury verdict were violated when the District Judge instructed the jury

> as a matter of law that congressional inquiries were pending and that Congress was authorized to inquire into arms sales [to Iran] and Contra assistance, both of which were relevant and material issues. [¶] You need only deliberate regarding the other three elements [of 18 U.S.C. § 1505]....

JA at 635. North's counsel objected to the finding "that as a matter of law" congressional inquiries were underway in November 1986 on the grounds that "what this permits the jury to do is to find there was an obstruction of an investigation concerning a matter that was in fact not pending at that time...." Tr. 8499.

■ We agree that the District Court erred by removing this element of the offense from the jury's province. Indeed, in their proposed jury instructions both North and the IC requested that the jury decide whether the inquiry was pending. *See* JA at 2434, 2468–70. We do not, however, believe that the judge's charge deprived North of a fair trial.

The Supreme Court has "repeatedly reaffirmed the principle that an otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt." *Delaware v. Van Arsdall*, 475 U.S. 673, 681, 106 S.Ct. 1431, 1436, 89 L.Ed.2d 674 (1986). Thus, while some constitutional errors, such as the complete denial of the right to counsel, *Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), or adjudication by a biased judge, *Tumey v. Ohio*, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927), are so egregious as to require reversal "without regard to the facts or circumstances of the particular case," *Van Arsdall*, 475 U.S. at 681, 106 S.Ct. at 1436 constitutional errors that occur at "a trial, at which the defendant, represented by counsel, may present evidence and argument before an impartial judge and jury" are properly subjected to a harmless error analysis. *Rose v. Clark*, 478 U.S. 570, 578, 106 S.Ct. 3101, 3106, 92 L.Ed.2d 460 (1986). Provided that "beyond a reasonable doubt ... the error complained of did not contribute to the verdict obtained," *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d

---

**25.** The District Judge also required that North "demonstrate with *requisite specificity in concrete terms*" the information that he expected President Reagan to supply. *United States v. North*, 713 F.Supp. at 1449 (emphasis supplied). In light of the judge's decision not to allow North or his counsel to see Mr. Reagan's answers to the grand jury interrogatories or portions of his diary, this standard may have been too demanding. Nonetheless, any error was harmless because of the negligible likelihood that Mr. Reagan's testimony would have been exculpatory.

**26.** Unlike the Dissent, therefore, we need not reach the question of whether Mr. Reagan enjoyed a testimonial privilege sufficient to warrant quashing North's subpoena.

705 (1967), the error is not grounds for reversal.

The Supreme Court has never held that the trial judge's determination of one of the elements of a crime is *per se* reversible error. *Cf.* Silberman Dissent at 956–957. Indeed, in *Carella v. California*, —— U.S. ——, 109 S.Ct. 2419, 105 L.Ed.2d 218 (1989), the Court remanded for a harmless error inquiry even though the jury instructions at issue "relieved the State of its burden of . . . proving by evidence every essential element of Carella's crime beyond a reasonable doubt." *Id.* 109 S.Ct. at 2420. Four Justices concurring in the judgment placed the harmless error remand in context, explaining, *inter alia*, that "an instruction establishing a conclusive presumption with regard to an element of the crime that the defendant in any case admitted" was properly subject to harmless error analysis. *Id.* at 2423 (Scalia, J., concurring in the judgment). The mere fact that an error "deprives the jury of its factfinding role" is not *per se* grounds for reversal, *id.*, and *is* subject to harmless error analysis when no rational jury could find the other elements of the offense without finding the fact presumed, *see id.* at 2421 (per curiam); *id.* at 2423 (Scalia, J., concurring in the judgment).

■ We have no doubt that a harmless error analysis is appropriate here. Although the District Judge's instruction took one narrow determination away from the jury, the error neither "aborted the basic trial process" nor "denied it altogether." *Rose*, 478 U.S. at 578 n. 6, 106 S.Ct. at 3106 n. 6. Since the jury had to find all of the other elements of a violation of 18 U.S.C. § 1505—whether North knew of the pending inquiries, whether he endeavored to obstruct them, and whether he did so with requisite criminal intent, *see* JA at 635—the instruction imposed no conclusive presumption of guilt, *see Carella*, 109 S.Ct. at 2421, and left the jury, rather than the judge, as the ultimate arbiter of whether North violated 18 U.S.C. § 1505, *see Rose*,

478 U.S. at 578, 106 S.Ct. at 3106.[27] In these circumstances, we are not concerned that the trial court was "direct[ing] a verdict for the prosecution in a criminal trial by jury"—a matter of concern to the Supreme Court in a situation where the "wrong entity" actually adjudged the defendant's *guilt, id. Cf.* Silberman Dissent at 956.

■ There can be little doubt that this instruction did not deprive North of a fair trial on the charge of corruptly obstructing Congress. North conceded at trial that he substituted the acronym "USG" [United States Government] for "CIA" and "NSC" throughout the chronology that was supposed to accompany Casey's and/or Poindexter's testimony before Congress—a change that North admitted left the chronology as a "false statement." Tr. 7631. While preparing the false chronology, "[i]t [was] [North's] understanding that Director Casey was going to testify, and Admiral Poindexter, I think I knew at that point, was going to brief [Congress]. . . ." Tr. at 7632–33. North further testified that while he did not "recall people talking about specifically that [the false chronology] is going to be used at this meeting of the Congress or that meeting of the Congress," he "apparently . . . had a card that showed the times later on the next day" for Casey's and Poindexter's appearances before Congress. Tr. at 7635. North also readily admitted at trial that he altered, destroyed, and concealed official documents in this same time frame. *See* Tr. at 6907 (North "had the documents pulled from the files and altered them consistent with what [McFarlane] had earlier asked me to do"); Tr. at 7138–39 (North's testimony about destruction of Contra operating fund ledger on Casey's instruction); Tr. at 7109–13 (North's testimony about removal of official documents after being fired to "protect" himself). It is clear from North's own trial testimony, therefore, not only that congressional inquiries were in fact pending in November 1986, but also

27. Thus, the Dissent's contention that *Carella* is distinguishable from this case because the District Judge's instruction constituted a "blatant directed verdict," rather than presumption shifting the burden of proof, does not hold. *See* Silberman Dissent at 957.

that he himself realized they were pending at that time.

 Carella's test for harmless error is that "no rational jury could find the predicate acts but fail to find the fact presumed." 109 S.Ct. at 2421 (citing Rose).[28] Similarly, in light of North's own testimony, no rational jury could find that North knew of the pending congressional investigation, endeavored to obstruct it, and did so with specific corrupt intent without concomitantly finding that the investigation was pending in the first place.[29] See also id. at 2423 (Scalia, J., concurring in the judgment) ("When the predicate facts relied upon in the instruction, or other facts necessarily found by the jury, are so closely related to the ultimate fact to be presumed that no rational jury could find those facts without also finding that ultimate fact, making those findings is functionally equivalent to finding the element required to be presumed" and the error is harmless.).[30]

In light of North's admissions at trial, we believe the judge's error in his instruction on Count 6 properly comes under a harmless error analysis that reveals no prejudice to North. We therefore affirm North's conviction on Count 6.

**28.** The Dissent relies heavily on the rulings of three other circuits that declined to apply harmless error analysis when the trial judge found one of the elements of the crime as a matter of law. In none of these cases, however, was the undisputed fact found by the trial judge a logical prerequisite for the jury's finding of the other elements of the crime; indeed, one of the cases cited by the Dissent suggested that it *would have* applied harmless error analysis had the "jury finding prerequisite to conviction [been] a logical certainty." *United States v. Voss,* 787 F.2d 393, 399 n. 4 (8th Cir.), *cert. denied,* 479 U.S. 888, 107 S.Ct. 286, 93 L.Ed.2d 261 (1986). This *distinction is particularly rele-*vant in light of *Carella*'s emphasis on "whether [a] rational jury could find the predicate acts but fail to find the fact presumed." 109 S.Ct. at 2421. Additionally, the three circuit cases cited by the Dissent all preceded *Carella.*

**29.** The Dissent argues that the District Judge's instruction could not have been harmless because North might have sought to keep information away from interested congressmen without realizing that they constituted a "pending inquiry" within the meaning of 18 U.S.C. § 1505. This claim, however, raises only the question of

## VI. CLOSING ARGUMENT

North contends that certain comments made by the IC to the jury during closing arguments were improper and mandate reversal of his convictions. In particular, North complains about the IC's comparison of his conduct to Adolf Hitler's, and about the IC's statement that Richard Secord and Albert Hakim made a "killing" from arms sales to Iran and the Contras, despite the absence of any evidence in the record concerning the amount of their profits. Although both of the prosecutor's remarks were clearly improper, we find that neither was sufficiently prejudicial to North as to warrant the reversal of any or all of his convictions.

### A. Legal Standard

 A prosecutor may not make "statements calculated to arouse the passions or prejudices of the jury," *United States v. Monaghan,* 741 F.2d 1434, 1440 (D.C.Cir.1984), *cert. denied,* 470 U.S. 1085, 105 S.Ct. 1847, 85 L.Ed.2d 146 (1985), or "statements of fact to the jury not supported by proper evidence introduced during trial," *United States v. Perholtz,* 842

whether the congressmen's actions constituted an "inquiry," not whether their actions were "pending" or "being had," 18 U.S.C. § 1505, which by hypothesis they were. It is indisputable that the question of whether a proceeding constitutes an inquiry under § 1505 is a matter of law for the court. *United States v. Fruchtman,* 421 F.2d 1019, 1021 (6th Cir.), *cert. denied,* 400 U.S. 849, 91 S.Ct. 39, 27 L.Ed.2d 86 (1970).

**30.** North alleges "serious" doubt as to whether congressional inquiries were pending in November 1986 concerning Contra support; since Count 6 charged obstruction of inquiries into both assistance to the Contras and arms sales to Iran, North claims that the trial judge's error could not be harmless. This contention is meritless, however, because the question of whether North's obstruction related to inquiries into one or both issues is one of "pertinency," not "pendency," and is therefore a question of law for the court rather than for the jury. *See Sinclair v. United States,* 279 U.S. 263, 298, 49 S.Ct. 268, 273, 73 L.Ed. 692 (1928). In any event, the issue is a "Johnny-come-lately," for North himself made no mention of the subject of the investigation in his proposed jury instructions. JA at 2468–70.

F.2d 343, 360 (D.C.Cir.) (quoting *Gaither v. United States*, 413 F.2d 1061, 1079 (D.C. Cir.1969)), *cert. denied*, 488 U.S. 821, 109 S.Ct. 65, 102 L.Ed.2d 42 (1988). When an objection is timely made, such remarks, while improper, are cause for reversal only if they "sufficiently prejudiced" the defendant. *United States v. Fowler*, 608 F.2d 2, 12 (D.C.Cir.1979) (quoting *Gaither*, 413 F.2d at 1079). We have generally looked to three factors in determining whether improper remarks by the prosecutor sufficiently prejudiced a defendant: "the closeness of the case, the centrality of the issue affected by the error, and the steps taken to mitigate the effects of the error." *Fowler*, 608 F.2d at 12 (quoting *Gaither*, 413 F.2d at 1079). We have also framed the test for prejudice in terms of the severity of the prosecutor's misconduct, the measures adopted to cure the misconduct, and the certainty of conviction absent the improper remarks. *Perholtz*, 842 F.2d at 361; *Monaghan*, 741 F.2d at 1443. "[I]n assessing the effect a prosecutor's remark would have had on a jury," however, we seek to avoid an overly mechanistic application of these criteria by according "due respect" to "the jurors' common sense and discrimination." *Monaghan*, 741 F.2d at 1440.

### B. *Application*

#### 1. Reference to Hitler [31]

■■■ The IC stated during closing argument that:

So far in this drama in August and September of 1985, North and McFarlane are following Adolf Hitler's old strategy. He was the one who said, the victor will never be asked if he told the truth. And

the idea here was if the lies work, Congress will stop asking questions.

Tr. at 8011. Unquestionably inflammatory, the reference to Hitler reflected remarkably poor judgment by the IC. Nonetheless, in response to North's timely motion for a mistrial, the District Court pointed out that "defendant's ... counsel took full advantage of the reference in his effective response before the jury." *United States v. North*, Cr. No. 88–0080–02, 1989 WL 57493 (D.D.C. May 5, 1989) (order) [hereafter "May 5 Order"].[32] Clearly, the District Judge is better situated than we are to assess the impact of both sides' hyperbole upon the jury. In light of defense counsel's forceful reply to the IC's ill-chosen remark, we have no reason to disagree with the District Court's perception that the IC's statement caused no substantial prejudice to North. To suspect that the reference to Hitler swayed the jury on a close and critical issue would underestimate the common sense that we properly attribute to the jury. We therefore decline to reverse any of North's convictions on this ground.

#### 2. Reference to Secord's and Hakim's "Killing"

■■■ During the course of the trial, the IC elicited testimony from Willard Zucker that Zucker had distributed "profits" from certain bank accounts to Albert Hakim and Richard Secord. Tr. at 5218. The IC also sought to introduce evidence that would have established the *amount* of profits Secord and Hakim had made from arms sales to Iran. North objected, claiming that the amount of profits was immaterial to the charges against him. Tr. at 5233. In an ensuing bench conference, the IC explained

---

**31.** North does not specify which conviction counts, or whether all three counts, should be reversed on the basis of this argument.

**32.** In his closing argument, North's counsel stated:

But worst still and beyond anything I have heard in a courtroom, and outrageous to the extent that it should send a course of rage through everybody in this room, is the reference to Adolf Hitler.
This marine, retired, was linked in this courtroom to Adolf Hitler. Some in this room have fought Adolf Hitler. They know what

Adolf Hitler was. And this man is not Adolf Hitler and he doesn't do things like Adolf Hitler, and to suggest it indicates the extraordinary drive, the force, the power of this government to put its might on top of Colonel North, to see what they can say is a crime. You should be offended by it. And you should judge everything they say, because anyone that will link Colonel North to Adolf Hitler is not credible and should not be believed.

Tr. at 8089.

that the evidence was crucial to establishing North's motive in accepting a security fence from Secord in return for official acts, as charged in Count 10. By showing that Secord had made large profits through the business channeled to him by North, the IC apparently hoped to persuade the jury that North accepted the fence as an illegal gratuity, rather than as a gift from a solicitous friend seeking to protect North's family. Tr. at 5234. As the IC told the trial judge, "[t]he amount [of profits] certainly gives a powerful motive on both sides." Tr. at 5234–35.

The District Judge initially suggested that "the way to deal with it is to simply say were those amounts substantial or something of that kind and go on." Tr. at 5235. North's counsel objected to that proposal, intimating that if the IC introduced any evidence about the amount of profits, North would be entitled to respond by explaining Secord's and Hakim's businesses in detail. The District Judge agreed and told the IC that "if you want to put some figure in terms of small or large profits, if you want to call it profits," then North would be permitted to explore "[a]ll the other businesses that [Secord and Hakim] do." Tr. at 5237. Faced with that prospect, the prosecutor said, "We don't want to do that." *Id.* He then added, "I think we'll leave it alone." Tr. at 5239. Nevertheless, the IC did raise the issue of the amount of Secord's and Hakim's profits in the closing argument. He stated:

> To understand the security fence charge I think you need to consider the testimony about North's relationship with Secord and Hakim. Secord and Hakim were making a killing, a killing. Millions in Contra arms sales, millions coming in from the Iranian arms sales. All from the business that Oliver North, the government official, the action officer of the NSC, the person who could say this is the White House calling, all from the business that he brought to them.... [North knew] that Secord and Hakim were taking a fair and reasonable profit but he didn't know what they considered a fair and reasonable profit. Would you send ten million or 20 million or 14 mil-

lion or five million or even $5 to somebody who is going to take a fair and reasonable profit without talking to them about what a fair and reasonable profit was? Secord and Hakim were making a killing....

Tr. at 8038–40. Although North moved for a mistrial on the basis of that statement, the District Judge denied the motion on the grounds that "the use of the word 'killing' was mere characterization." *See* May 5 Order.

In light of the prosecutor's agreement not to introduce evidence of the size of Secord's and Hakim's profits, his description of their profits as a "killing" or as "millions" was improper. Whether or not those references were slips of the tongue in the heat of oral argument, they amounted to "statements of fact ... not supported by proper evidence introduced during trial." *Perholtz,* 842 F.2d at 360. We must therefore determine whether the remarks sufficiently prejudiced North to require reversal of his conviction on Count 10—the only conviction count implicated by the prosecutor's misstatement. As we consider the various factors that this Court has identified as relevant to the prejudicial effect of prosecutorial misconduct, *see id.* at 361; *Fowler,* 608 F.2d at 12, we focus on three criteria: the magnitude of the potential prejudice, the magnitude of the prosecutor's error, and the curative measures adopted by the trial judge.

### a. *Magnitude of Potential Prejudice*

■ To convict North under Count 10, the jury had to find only that he accepted the security system "for or because of" an official act. 18 U.S.C. § 201(c)(1)(B)(1988). The evidence that North channeled a substantial amount of arms business to Secord and Hakim is undisputed; North himself testified that he knew Secord sold the Contras approximately $11 million worth of weapons and made a sufficient profit on those transactions so as to receive "fair and just" and "reasonable" compensation. Tr. at 7181, 7307. Even absent evidence as to the size of Secord's and Hakim's profits, the jury had ample grounds to infer that

Secord gave North the security fence as a gratuity in exchange for referring to him millions of dollars of arms business. As this inference provided sufficient basis for conviction, the jury's decision to convict could not have turned critically on the prosecutor's improper description of the size of Secord's and Hakim's profits. In light of the record evidence of the substantial links between North and Secord and Hakim, the reference to the size of the profits could have had only limited corroborative effect on the jury's perception of North's motive in accepting the fence. The prosecutor's comments, therefore, were at worst minimally prejudicial.

### b. *Magnitude of Prosecutorial Misconduct*

 Like other courts of appeal, we have traditionally been chary of reversing convictions solely on the grounds of a misstatement in a closing argument. *See Monaghan*, 741 F.2d at 1443 (affirming conviction because improper remarks confined to closing argument, rather than part of cumulative evidence that proceeding driven by passion and prejudice); *see also United States v. Modica*, 663 F.2d 1173, 1181 (2d Cir.1981) (upholding conviction despite several improper remarks by prosecutor during summation), *cert. denied*, 456 U.S. 989, 102 S.Ct. 2269, 73 L.Ed.2d 1284 (1982). Without other compelling factors, a single misstatement confined to a closing argument rarely amounts to severe misconduct. The Supreme Court has approved this approach, holding that absent "consistent and repeated misrepresentation" to influence a jury, "[i]solated passages of a prosecutor's argument, billed in advance to the jury as a matter of opinion not of evidence, do not reach the same proportions." *Donnelly v. DeChristoforo*, 416 U.S. 637, 646, 94 S.Ct. 1868, 1873, 40 L.Ed.2d 431 (1974). By contrast, tainted closing arguments that follow on the heels of improper and indecorous prosecutorial conduct during trial are more likely to amount to the type of severe misconduct that justifies reversing a conviction. *See*

*Berger v. United States*, 295 U.S. 78, 84–89, 55 S.Ct. 629, 631–33, 79 L.Ed. 1314 (1935).

### c. *Curative Measures*

Our unwillingness to reverse a conviction has been particularly pronounced when the trial judge issues curative instructions. *See Perholtz*, 842 F.2d at 361 (citing precedent for proposition that "[c]ourts have often emphasized the curative power of a trial court's instructions"). Indeed, a former member of this Court declared that "it is the law, pure and simple, that jury instructions can sufficiently protect a defendant's interest in being free from undue prejudice." *Id.* (citing *United States v. Daniels*, 770 F.2d 1111, 1120 (D.C.Cir.1985) (Starr, J., concurring)). Here, Judge Gesell expressly addressed the role that closing arguments should play in the jury's deliberations, and explicitly reminded the jurors that "the statements, opinion, and arguments of counsel are not evidence." JA at 601. He stressed repeatedly that the jurors' "recollection alone" is controlling as to "all aspects of the evidence." JA at 602. The District Judge could not have more directly communicated to the jury the limited evidentiary value of closing arguments.

### C. *Conclusion*

 North does not make out any of the components of substantial prejudice resulting from the prosecutor's closing argument. The District Court found that the reference to Hitler plainly was not prejudicial, and we have no reason to disagree. Furthermore, while a verdict of not guilty on Count 10 would not have been irrational, in light of North's own testimony about the scope of Secord's and Hakim's arms dealings, it appears virtually certain that the jury would have convicted North on this Count in the absence of the prosecutor's reference to the size of their profits. Finally, the prosecutor's misconduct was at most marginal, limited to a few lines in a closing statement; and the trial judge offered clear curative instructions.[33]

---

**33.** We do not hold that a general instruction

describing the nature of closing argument is

This Court reverses a conviction on the grounds of a prosecutor's summation in only the rarest and most prejudicial circumstances. *See, e.g., United States v. Doe,* 903 F.2d 16 (D.C.Cir.1990) (reversing conviction on grounds of prosecutor's racially inflammatory summation). We have not reversed a conviction in over twenty years on the grounds of a prosecutor's reference during closing argument to facts outside the record.[34] Reversing North's conviction for a single inappropriate remark of this nature in the prosecutor's closing argument is not only inconsistent with our past application of the substantial prejudice standard but would set a precedent requiring us to overturn virtually every conviction even marginally tainted by such a prosecutorial miscue. We therefore deny North's appeal for reversal on this ground.

## VII. CIPA CLAIMS

North argues that the District Court's application of the Classified Information Procedures Act, 18 U.S.C. App. (1988) ("CIPA"), violated his right to due process by compelling him to reveal to the IC before trial a 162–page summary of anticipated classified defense testimony, and by not imposing a reciprocal burden on the IC. Although the District Judge did not hew precisely to CIPA's procedural outline, we believe that his balancing of the obligations imposed by CIPA on both parties does not warrant reversal of North's conviction.

### A. *Statutory Framework*

At issue here is the District Court's application of CIPA sections 5 and 6. Section 5 requires the defense to notify the prosecution, before trial, of all classified information that the defense "reasonably expects to disclose or to cause the disclosure of" at trial. CIPA, 18 U.S.C. App. § 5(a). If the defendant fails to comply with section 5(a), the court may preclude his disclosure of classified information not properly

noticed and may prohibit him from examining witnesses with respect to that information. *Id.* § 5(b).

Section 6 is the "heart" of CIPA. S.Rep.No. 823, 96th Cong., 2d Sess. 7, *reprinted in* 1980 U.S.Code Cong. & Admin. News 4294, 4300. Under section 6(a), the government may move for a hearing to determine, before further proceedings, the "use, relevance, or admissibility" of the classified information that the defense expects to disclose. CIPA, 18 U.S.C.App. § 6(a). Although section 6(a) does not specify that it is limited to classified information that the defense has noticed under section 5(a), the statutory structure and legislative history suggest that interpretation. S.Rep.No. 823, at 7, *reprinted in* 1980 U.S.Code Cong. & Admin.News at 4300 ("Once the Government learns that the defendant may disclose or cause to be disclosed classified information, it may move for a hearing."). *See United States v. Collins,* 720 F.2d 1195, 1200 (11th Cir. 1983) (similar interpretation).

Before a section 6(a) hearing, the government "shall provide the defendant with notice of the classified information that is at issue." CIPA, 18 U.S.C. App. § 6(b)(1). This provision obligates the government, if it moves for a section 6 hearing, to notify the defense of those items in the defense's section 5 submission whose disclosure it will contest in the section 6(a) hearing. The government meets this burden either by specifically identifying the classified information that it has already made available to the defense, or by generically describing the classified information that it has not yet provided. *Id.* In addition, at the defendant's request, the court may order the prosecution to provide the defense with such details of the indictment "as are needed to give the defendant fair notice to prepare for the hearing." *Id.* § 6(b)(2).

---

sufficient in every case of curable prosecutorial misconduct. It may be that in particularly egregious cases, specific curative instructions are required. In the present case, however, the general instruction appears to us to be quite sufficient.

**34.** We last reversed a conviction on the basis of a prosecutor's reference to "extra-record facts" during closing argument in *Garris v. United States,* 390 F.2d 862, 866 (D.C.Cir.1968).

 If the government's motion for a section 6(a) hearing is timely filed, the court must determine the use, relevance, and admissibility of the classified information noticed by the defense before further proceedings ensue. Hearings are held *in camera* if the Attorney General certifies to the court that a public proceeding "may result in the disclosure of classified information." *Id.* § 6(a). The court must set forth in writing "the basis for its determination" as to each item of classified information at issue. *Id.* If, after an *in camera* hearing, the court determines that the classified information in question should not be disclosed, the hearing record is sealed. The defendant may seek reconsideration before or during trial of the court's determination not to disclose the classified information. *Id.* § 6(d).

If the court authorizes disclosure of specific classified information by the defendant, the prosecution may move the court to order, in lieu of that classified information, either an admission of relevant facts or a summary of the information. *Id.* § 6(c)(1). The court must grant the government's motion if it finds that the admission or summary will leave the defendant in substantially the same position as would disclosure. *Id.* In connection with its motion under section 6(c)(1), the government may submit to the court an affidavit from the Attorney General explaining the basis of the government's classification and certifying that disclosing the classified information requested by the defendant would damage United States national security. *Id.* § 6(c)(2).

If the court denies the government's motion under section 6(c), and the government files an affidavit objecting to the defendant's release of classified information, the court "shall order that the defendant not disclose or cause the disclosure of" that information. *Id.* § 6(e)(1). At that point, however, the court must either dismiss the indictment or, if it determines that such a

drastic step would not serve the "interests of justice," take more limited measures. *Id.* § 6(e)(2). These remedies do not take effect until the government has had an opportunity for interlocutory appeal and, thereafter, a chance to withdraw its objection to the defense's use of classified information. *Id.*

Finally, if the court determines, pursuant to a section 6(a) hearing, that the defense may disclose classified information at trial or in a pretrial proceeding, "the court shall, unless the interests of fairness do not so require, order the United States to provide the defendant with the information it expects to use to rebut the classified information." *Id.* § 6(f). The court may impose a continuing duty on the government to disclose such rebuttal information. If the government does not comply with its obligation under section 6(f), the court may prohibit both its use of unrevealed classified information and its examination of witnesses with respect to that information. *Id.*

### B. *Course of Events*

In June 1988, the District Judge concluded that "strict application" of CIPA's complex procedure would be "impossible to accomplish consistent with a fair and expeditious resolution" of North's trial because of the enormous amount of classified information directly relevant to the case, including the myriad classified documents written by or sent to North. *United States v. Poindexter,* 698 F.Supp. 316, 319 (D.D.C.1988). The District Judge proposed, therefore, to focus on fulfilling CIPA's overall goal of "mak[ing] the defendant whole." To that end, Judge Gesell directed North to file a section 5 notice by July 11, 1988, preceded by an *in camera, ex parte* hearing,[35] at which North would inform the court of the relevance to his defense of key classified documents and the court would consider alternatives to full disclosure. *Id.* at 321.[36]

---

**35.** The hearing was originally scheduled for July 14, three days after North's section 5 filing, *see United States v. Poindexter,* 698 F.Supp. at 321, but was subsequently rescheduled for July 6, *see United States v. Poindexter,* Cr. No. 88–00080 (D.D.C. June 24, 1988) (scheduling order).

**36.** Several days earlier, the District Court had issued a broad discovery order, *United States v.*

In the same order, the District Court explained that it would neither monitor defense counsel's opening and closing statements, nor subject defense testimony at trial to advance scrutiny. *Id.* at 322. On July 8, in response to concerns voiced by North at the *ex parte* hearing regarding IC redactions and substitutions, the District Court postponed North's section 5 submission until August 1 to allow him to notice the redacted material that he required. The District Court also ordered the IC to release further specific information that North requested. *United States v. North,* 698 F.Supp. 322, 325 (D.D.C.1988).[37]

The CIPA issues were not resolved as the court had anticipated, however. Judge Gesell rejected North's August 1 section 5 submission as "wholly insufficient" because it lacked "necessary particularization" as to the relevance and materiality of the documents noticed. Nonetheless, the District Judge invited a new section 5 submission by November 14, 1988, without prejudice to North. *United States v. North,* Cr. No. 88–0080–02, 1988 WL 148514 (D.D.C. Aug. 5, 1988) (order). On October 31, the District Court denied North's motion, made pursuant to CIPA § 6(b)(2), for the IC to provide further details about the indictment in order to assist North in preparing his new section 5 notice. CIPA's structure, according to the District Judge, required North's section 5 submission to precede section 6(b)(2) notice by the IC. *United States v. North,* Cr. No. 88–0080–02, 1988 WL 148504 (D.D.C. Oct. 31, 1988) (order).

North's second section 5 submission again failed to break the logjam. The District Court found North's November 14 filing unacceptable because it sought disclosure of large amounts of classified material "which under no conceivable version of a defense could have any utility whatsoever." *United States v. North,* 708 F.Supp. 389, 395 (D.D.C.1988). Consequently, the District Judge precluded North from using during trial any of the classified information in the documents noticed on November 14; he did, however, allow North until January 3, 1989 to identify 300 documents containing classified information, roughly the same number as the government expected to use in its case-in-chief. Under this plan, North would explain the relevance and materiality of disputed classified items at an *in camera* hearing. *Id.* at 398–99.[38]

Meanwhile, beginning on November 30, the District Court conducted *in camera* hearings pursuant to CIPA § 6 to consider redactions in the classified documents that the IC intended to offer in his case-in-chief. Although North opposed nearly all proposed redactions and substitutions in those documents, the District Judge approved a series of edits in order to assure that the trial could be kept open to the public. *United States v. North,* Cr. No. 88–0080–02, 1988 WL 148481 (D.D.C. Dec. 12, 1988) (memorandum and order).[39]

---

*Poindexter,* Cr. No. 88–80, 1988 WL 150849 (D.D.C. June 14, 1988) (discovery order), that ultimately gave North access to some 900,000 pages of government documents, a list of government trial witnesses, designation of the documents in the government's case-in-chief, as well as other records, documents, and effects. *See United States v. North,* Cr. No. 88–0080–02, 1988 WL 148494 (D.D.C. Nov. 8, 1988) (order).

**37.** North was to receive documentation concerning the funding of Contra support activities, and the IC was also to relate each document in its case-in-chief to the counts in the indictment for which the document would be offered as proof. *United States v. North,* 698 F.Supp. at 325.

**38.** On November 23, the District Judge ordered North to file by December 19, initially *in camera* and *ex parte,* a section 5 notice of all doc-uments and testimonial information relevant and material to the defense that he intended to disclose or cause to be disclosed at trial. *United States v. North,* Cr. No. 88–0080–02, 1988 WL 129692 (D.D.C. Nov. 23, 1988) (order re CIPA). It is unclear whether the District Judge had already considered North's November 14 filing when he issued this order.

**39.** The District Judge amended his December 12 order, 708 F.Supp. at 389, on December 22 to require the IC to identify the documents in North's January 3, 1989 filing that would not be treated as classified and, further, to furnish proposed substitutions and redactions to the documents containing classified information. In addition, North would have one opportunity to notice the same number of additional classified documents as the IC determined to be unclassified in the first notice. *United States v. North,*

On December 19, 1988, pursuant to the court order of November 23, *see supra* note 38, North filed *ex parte* and *in camera* a 162–page "narrative summary" of the classified information that he expected to use or elicit at trial. *See United States v. North*, 708 F.Supp. 399, 400 (D.D.C. 1988). Four days later, the District Court ordered North to transmit this document to the prosecutor because it contained relevant and material information that, at least in part, had not previously been brought to the IC's attention, *id.* at 401; a panel of this Court subsequently denied North's petition for a writ of mandamus to prevent the transmission. *In re Oliver L. North*, No. 88–5438 (D.C.Cir. Jan. 4, 1989) (order).

Together with or shortly after submitting his narrative statement, North noticed 300 classified documents; at subsequent *in camera* section 6 hearings, however, he provided only "generalized" explanations as to the documents' relevance and materiality. *United States v. North*, 713 F.Supp. 1436, 1438 (D.D.C.1989). At this point, to overcome "legal gridlock," *id.*, the District Judge laid out general categories of classified information that the defense could introduce at trial, and made specific rulings concerning particular documents that North had noticed. *See id.* at 1438–41. Finally, the District Court denied North's motion for notice by the IC pursuant to section 6(b)(1), *United States v. North*, Cr.No. 88–0080–02, 1989 WL 12036 (D.D.C. Jan. 19, 1989), and did not respond to North's motion under section 6(f) for disclosure of the information that the prosecution expected to use in rebutting his classified information, *see* Brief for Appellant at 53 n. 91.

### C. *Merits of North's Challenges Under CIPA*

North suggests that by requiring the transmission of his narrative statement to the IC, by denying his motions for notice under sections 6(b)(1) and (2), and by ignoring his motion for notice under section 6(f), the District Court violated the fundamental principle of reciprocity in pretrial disclo-

sures, laid down by the Supreme Court in *Williams v. Florida*, 399 U.S. 78, 90 S.Ct. 1893, 26 L.Ed.2d 446 (1970), and *Wardius v. Oregon*, 412 U.S. 470, 93 S.Ct. 2208, 37 L.Ed.2d 82 (1973). We do not believe, however, that the District Judge's lack of strict adherence to CIPA's sequential directives is a ground for reversing the convictions in this case.

We agree with North that the District Judge did not move straightforwardly down the procedural path set out in section 6. Nevertheless, on appeal, North points to no actual injury or prejudice to his trial preparation or presentation that resulted from the District Judge's application of CIPA. The section 6 hearings on the IC's classified information, together with documentation provided to North through discovery, *see supra* note 36, appear to have provided North, in large part, with the information he would have received had his section 6(b)(1) motion been granted. Although North contends that he learned "nothing about the substance of the IC's case" because that motion was denied, he acknowledges that the IC informed him of "what information was classified in particular documents." Reply Brief for Appellant at 21 n. 38. Since section 6(b)(1) required the IC to provide North only "with notice of the classified information that is at issue," CIPA, 18 U.S.C.App. § 6(b)(1), North in effect concedes that he suffered no cognizable injury from the denial of his section 6(b)(1) motion.

After his November 14 and December 19 section 5 submissions, North did not make a section 6(b)(2) motion for notice of "such details as to ... the indictment ... as are needed to give the defendant fair notice to prepare for the [section 6(a)] hearing." *Id.* § 6(b)(2). The lack of a timely section 6(b)(2) filing, coupled with the substantial information transmitted to North through discovery, *see supra* note 36, suggest that North had sufficient information about the indictment without further notice.

Nonetheless, we believe that the District Court erred in its handling of

Cr. No. 88–0080–02, 1988 WL 148479 (D.D.C. Dec. 22, 1988) (order).

North's section 6(f) motion. Without explanation, the District Court neither required the government to specify "the information it expect[ed] to use to rebut [North's] classified information," *id.* § 6(f), nor found explicitly that the "interests of fairness" did not warrant accession to North's request.[40] In our view, ignoring a statutorily sanctioned claim for reciprocal disclosure, without a finding that the interests of fairness do not require that disclosure, is error.

■■■ North, however, has adduced no evidence of prejudice resulting from the District Court's error. Despite the benefit of a full trial record, North fails to demonstrate how he was surprised or prejudiced by prior unawareness of any of the evidence presented by the IC at trial to "refute" his defenses. Thus, North does not identify any hitherto IC's attempt to rebut his contention that high executive branch officials knew of and authorized his conduct. *See* Reply Brief for Appellant at 21 n. 38. North also does not claim that he was surprised by the government's evidence refuting his defense under Count 10 that he accepted the home security system in order to protect his family. *See id.* Absent any such showing of surprise at trial, therefore, we conclude that the trial judge committed only nonreversible harmless error by ignoring North's section 6(f) motion.[41]

In several instances, moreover, the District Judge provided North with more procedural safeguards than CIPA requires. For example, at the *ex parte* hearing in July 1988, North was able to explain to the District Judge, outside the IC's presence, the significance of classified documents to his case; as a result of that hearing, North received additional relevant classified information from the IC. *See United States v. North*, 698 F.Supp. at 325. Further, CIPA contains no requirement that the judge permit a defendant to refile his section 5 notice after finding his first filing inadequate. CIPA also does not seem to mandate a section 6(a) hearing on redactions made by the prosecution in classified information to be used in its case-in-chief. Finally, after finding North's second section 5 filing unacceptable, the District Judge imposed only a circumscribed preclusion on North's use of classified information. *See United States v. North*, 708 F.Supp. at 398–99.

North states that the District Court's transmission of his narrative statement to the IC "confirmed" or "made clear" various aspects of his defense, Reply Brief for Appellant at 21 n. 37, and denied him the advantage of surprise at trial. Although CIPA enables the government to investigate "facts crucial to the determination of guilt or innocence," *Wardius*, 412 U.S. at 474, 93 S.Ct. at 2212 (quoting *Williams*, 399 U.S. at 82, 90 S.Ct. at 1896), and to tailor its arguments accordingly, the defendant's rights remain intact, provided that the defense has similar, though not necessarily identical, discovery opportunities. North enjoyed broad discovery before implementation of CIPA began, *see supra* note 36, and the government's statements during the section 6 hearings on classified material in its case-in-chief gave North insight not required by CIPA into the prosecution's trial strategy. *United States v.*

**40.** We disagree with the IC's apparent contention that section 6(f) requires disclosure only of information that the government intends to use in its rebuttal case. Brief for Appellee at 53 n. 101. Clearly, a defendant can be equally prejudiced by "peremptory rebuttal" in the government's case-in-chief.

**41.** CIPA was specifically designed to minimize the need to "forego[ ] prosecution of conduct [the government] believed to violate criminal laws in order to avoid compromising national security information." S.Rep. No. 823 at 4, *reprinted in* 1980 U.S.Code Cong. & Admin.News at 4297. Discovery proceedings under CIPA, therefore, entail the kind of strong state interest that may justify an exchange of information between the prosecution and the defense that is not entirely reciprocal. *Wardius*, 412 U.S. at 475, 93 S.Ct. at 2212. In these circumstances, the Dissent's repeated invocations of *Wardius*, *id.* at 473–76, 93 S.Ct. at 2211–13—in which the Court considered a state rule precluding reciprocal discovery by the defense without any countervailing state interest—are misplaced. Here, unlike the situation in *Wardius*, the "State's inherent information-gathering advantages," *id.* at 475 n. 9, 93 S.Ct. at 2212 n. 9, are matched by the defendant's opportunities for engaging in "greymail" to derail legitimate prosecutions.

*North*, 708 F.Supp. at 401. As the District Court observed, the IC gained little tactical advantage from receiving North's narrative statement because prosecution witnesses were already "committed under oath and otherwise to their positions." *Id.* Since North's narrative statement shed important, if limited, light on his section 5 documentary notice, *id.* at 400, the judge's decision to transmit the statement was appropriate.[42]

In sum, the District Court's implementation of CIPA ultimately required each side to reveal substantial aspects of its arguments to its opponents. This result was envisioned by Congress, *see Collins*, 720 F.2d at 1200, and is consistent with the "salutary" development of "a system of liberal discovery which gives both parties the maximum possible amount of information with which to prepare their cases and thereby reduces the possibility of surprise at trial." *Wardius*, 412 U.S. at 473–74, 93 S.Ct. at 2211. In the absence of any showing by North of actual injury, we find no constitutional violation arising out of the application of CIPA in this case. *Cf. id.* (finding unconstitutional state rule requiring that defendant provide prosecution with notice of alibi but not allowing for reciprocal discovery by defendant); *Mauricio v. Duckworth*, 840 F.2d 454 (7th Cir.) (due process violated when prosecution deliberately leaves name of its alibi rebuttal witness off witness list provided, after court order, to defense), *cert. denied*, 488 U.S. 869, 109 S.Ct. 177, 102 L.Ed.2d 146 (1988).

## VIII. JUROR DISHONESTY

North contends that he was denied his Sixth Amendment right to an impartial jury because a trial juror lied under oath, on both a pretrial jury questionnaire and in a post-trial hearing, about her immediate family's involvement in judicial proceedings. We are not persuaded by North's argument.

### A. Background

Before trial, jurors were asked several questions, including whether they or any member of their immediate family had "ever been involved as a party to or appeared as a witness in any court proceeding (civil or criminal) or in any investigation by a federal or state authority or by an official legislative body or agency." JA at 3050 (Tara King hearing exhibit). Tara King, who was eventually selected as a trial juror, checked the box marked "No" even though several of her brothers had been charged with criminal conduct, one was sent to prison, and King herself had testified before the grand jury investigating a robbery allegedly committed by one of her brothers. After trial, upon obtaining evidence that King had improperly completed her pretrial questionnaire, North moved for an *in camera* hearing concerning King's qualifications and for a mistrial. *See United States v. North*, 716 F.Supp. 652, 653–55 (D.D.C.1989).

At the hearing, King testified that she had "forgotten" about one of her brothers' guilty plea, conviction, and time in jail. *See* Transcript of Evidentiary Hearing, June 28, 1989, at 13, 16, 26. Although the District Judge did not "credit" King's testimony of forgetfulness, he denied North's motion for a mistrial because North had not demonstrated any resultant bias against him "by fact or implication." *United States v. North*, 716 F.Supp. at 655, 656.

---

**42.** The Dissent's argument that our decision rests on an inapposite test for "surprise" is curious because the Dissent itself cites *Wardius'* express concern about "subjecting [a defendant] to the hazard of surprise concerning refutation of the very pieces of evidence which he disclosed to the State." 412 U.S. at 476, 93 S.Ct. at 2213; *see also id.* at 473, 93 S.Ct. at 2211 (approving liberal discovery rules that minimize "possibility of surprise at trial"). As we read *Wardius*, "surprise," rather than an undifferenti-

ated claim of "harm" unsupported by any evidence of prejudice, *is* critical to whether a discovery rule is prejudicial to a defendant, particularly when "strong ... state interests" are at stake. Understandably, then, the Dissent provides no support for its assertion that "[s]tatutes requiring defendants to disclose elements of their cases to prosecutors are inherently suspect and are permissible if and *only* if defendants receive the corresponding refutation evidence." Silberman Dissent at 937 (emphasis in original).

B. *Analysis*

At issue is whether deliberate concealment of information at *voir dire* is sufficient to require a mistrial, absent a showing of actual bias. The Supreme Court has laid down the following standard for overturning a conviction when a juror withholds critical information on *voir dire:*

> [A] party must first demonstrate that a juror failed to answer honestly a material question on *voir dire*, and then further show that a correct response would have provided a valid basis for a challenge for cause. The motives for concealing information may vary, but only those reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial.

*McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548, 556, 104 S.Ct. 845, 850, 78 L.Ed.2d 663 (1984). Although *McDonough* involved a "mistaken, though honest, response" to a *voir dire* question in a civil case, *id.* at 555, 104 S.Ct. at 850, the test it lays out has been applied in criminal cases as well. *See, e.g., United States v. Aguon*, 851 F.2d 1158, 1170 (9th Cir.1988) (en banc); *United States v. Casamayor*, 837 F.2d 1509, 1515 (11th Cir.1988) (per curiam), *cert. denied sub nom. Barker v. United States*, 488 U.S. 1017, 109 S.Ct. 813, 102 L.Ed.2d 803 (1989).

■ Read along with the concurrences of five Justices, *McDonough* suggests that an aggrieved party must show that the juror's correct response at *voir dire* would have demonstrated actual bias. Three Justices explained that while "in most cases, the honesty or dishonesty of a juror's response is the best initial indicator of whether the juror in fact was impartial," a trial court retains the option of ordering a posttrial hearing "at which the movant has the opportunity to demonstrate actual bias or, in exceptional circumstances, that the facts are such that bias is to be inferred." 464 U.S. at 556–57, 104 S.Ct. at 850 (Blackmun, J., joined by Stevens and O'Connor, JJ., concurring). Two other Justices argued even more explicitly that a deliberate lie, without more, is insufficient evidence of

juror bias: "Whether the juror answered a particular question on *voir dire* honestly or dishonestly, or whether an inaccurate answer was inadvertent or intentional, are simply factors to be considered in this latter determination of actual bias." *Id.* at 558, 104 S.Ct. at 851 (Brennan, J., joined by Marshall, J., concurring in the judgment).

■ Judge Gesell found that a truthful answer by King might have led either side to strike her. *United States v. North*, 716 F.Supp. at 655. Under *McDonough*, however, a "valid basis for a challenge for cause," 464 U.S. at 556, 104 S.Ct. at 850, absent a showing of actual bias, is insufficient justification for a mistrial.[43] King's concealment, then, is only one factor—albeit an important one—in the critical test for actual bias. As to this broader question, the District Court found that "[n]o proof was presented indicating that [she] was unfair or that she failed in any way to serve conscientiously." *United States v. North*, 716 F.Supp. at 655. While King may have felt that full disclosure "would prevent her being considered for jury service ... she had no desire to help or to hurt North or the prosecutor." *Id.* On appeal, North adduces no evidence of actual bias to call into question the District Court's findings. Although King apparently wanted to serve as a juror at North's trial, *id.*, North offers no argument why her omissions on the questionnaire indicated that she was biased against him.

North argues on the basis of *United States v. Colombo*, 869 F.2d 149 (2d Cir. 1989), that King's deliberate concealment on the pretrial questionnaire was *per se* evidence of her lack of impartiality. In *Colombo*, the Second Circuit considered the partiality of a juror who wanted to serve on a RICO trial and, therefore, allegedly concealed her brother-in-law's employment as a government attorney. *Id.* at 150. Noting that the juror's alleged concealment effectively discouraged the magistrate and defense counsel from asking follow-up questions or from dismissing her peremptorily, *id.* at 151, the court concluded that if

---

**43.** We do not intend to suggest that a blood relationship to a convicted felon necessarily constitutes cause for challenge to a prospective juror in an unrelated case.

the juror deliberately and willingly lied about her relationship with her brother-in-law, she "exhibited an interest strongly suggesting partiality." *Id.* at 152. The court remanded for a finding as to whether the juror's brother-in-law actually was a government attorney; if he was, the defendant's conviction would be vacated.

We decline to follow *Colombo* insofar as it stands for the proposition that juror dishonesty at *voir dire* is *per se* evidence of the juror's partiality and therefore compels a mistrial. In our view, such a rule is inconsistent with the Supreme Court's instruction that juror dishonesty does not, without more, prove actual bias. Nor are we persuaded, as a policy matter, that the Second Circuit's more stringent approach increases in a constructive manner the incentives for either side to investigate vigorously the possibility of concealment by jurors at *voir dire*. Even without a *per se* rule, the defense is motivated to ask searching questions during *voir dire* in order to exercise its peremptory challenges effectively. A *Colombo*-type rule further encouraging defendants to investigate jurors in a criminal case might, indeed, produce a backlash effect by inducing prospective jurors to evade service. Under present practice, moreover, the defense has a substantial incentive to investigate leads on juror *voir dire* misstatements throughout the trial because of the possible "reward" of a mistrial if bias can also be shown.

By doing away with the need for any showing of actual bias, a *per se* rule would, of course, lighten the defense's burden in obtaining a mistrial. A mere showing of dishonesty would suffice. Fear of such an eventuality might at least theoretically induce the prosecution to question prospective jurors more thoroughly at *voir dire*.

Nevertheless, we believe that a *per se* rule's effect on prosecutorial behavior would be marginal at best. Under *McDonough*'s standard, the prosecution is motivated to examine potential jurors carefully

enough to avoid seating a biased juror. Furthermore, as an officer of the court, the prosecution must turn over any information that it uncovers concerning juror lies or concealments. Even with a *Colombo*-type rule in place, the prosecution is unlikely to have the time or resources to investigate every juror statement at *voir dire* for bias or perjury. In fact, since a discovery of untruthfulness would necessitate a mistrial, the *per se* rule might actually discourage prosecutorial investigations. On balance, then, since a *per se* rule would likely have only a minimal effect on either prosecution or defense conduct, we decline to follow the Second Circuit's course rather than the approach drawn from the Supreme Court's opinions in *McDonough*.[44]

In sum, the District Court applied the correct legal standard in addressing North's claim of juror misconduct. Seeing no evidence that the District Judge's factual findings concerning King's lack of bias were clearly erroneous, *United States v. Manner*, 887 F.2d 317, 327 (D.C.Cir.1989), *cert. denied,* — U.S. —, 110 S.Ct. 879, 107 L.Ed.2d 962 (1990), we affirm his denial of North's motion for a mistrial.

IX. VIDEOTAPE

After the prosecution had rested its case and on the eve of the presentation of defense evidence, North, by motion, sought leave of the District Court to introduce a three-to-four-hour excerpted version of John Poindexter's thirty hours of immunized testimony before the congressional committees investigating the Iran/Contra affair. The District Court denied the motion in *United States v. North*, 713 F.Supp. 1450 (D.D.C.1989) (hereafter *"Videotape Memo"*). North now contends that the District Court erred in not admitting the videotape under the prior testimony exception to the hearsay rule, Fed.R.Evid.

---

**44.** In any event, the grounds for suspecting King of bias are far weaker than the alleged bias in *Colombo*, a criminal case where the juror in question was related to a government attorney. By contrast, there was no apparent reason why King was likely to favor one side or the other. Consequently, applying *Colombo*'s *per se* rule here would be particularly inappropriate.

804(b)(1),[45] or under the "catch-all" exception to the hearsay rule, Fed.R.Evid. 804(b)(5).[46] We disagree. The District Court acted well within its broad discretion over evidentiary matters in its denial of the motion to introduce the Poindexter videotape.

As the District Court noted, "[t]here can be no dispute that the videotape is hearsay." *Videotape Memo*, 713 F.Supp. at 1451.[47] Therefore, the testimony is not admissible unless it comes within some exception provided by the Rules of Evidence or other controlling authority. Fed.R.Evid. 802. North asserts that the videotape comes within the prior testimony exception created by Rule 804(b)(1). However, as the language of the rule, *see* note 45, *supra*, makes plain and as the District Court correctly held, this exception only applies where "the party against whom the testimony is ... offered ... had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination." Fed.R.Evid. 804(b)(1).[48] North flatly asserts that "[t]he IC and Congress ... constitute the same 'party' for purposes of Rule 804(b)(1)" because "[e]ach is part of the United States Government...." Brief for Appellant at 49. However, we agree with the District Court that "[t]he Independent Counsel is not the Congress...." *Videotape Memo*, 713 F.Supp. at 1451. The Supreme Court recognized the distinction between the entities in *Morrison v. Olson*, 487 U.S. 654, 108 S.Ct. 2597, 101 L.Ed.2d 569 (1988). In that case, the High Court recognized the IC as functionally within the executive branch and observed that Congress has "no powers of control or supervision over an independent counsel." 487 U.S. at 694, 108 S.Ct. at 2620. Obviously, the IC has no powers of control over the Congress. The IC took no part in the examination of Poindexter, or any other examination in the congressional hearings. Indeed, as we noted in our discussion of the *Kastigar* issues, *supra* at Part I, Congress acted over the vigorous objection of the Independent Counsel in granting immunity to its witnesses, and the IC not only did not conduct the examination but was at pains to avoid exposure to any part thereof.

Further, as the District Court noted, there are no prior decisions of this or any other court holding that a congressional committee is the same party as an executive branch prosecutor for purposes of the prior testimony exception. *See Videotape Memo*, 713 F.Supp. at 1451. Such limited parallel authority as does exist does not support North's claim that the District Court committed reversible error in not finding the IC and the Congress to be the same party. In a civil action applying a California Rule of Evidence paralleling Rule 804(b)(1), for example, the Ninth Circuit held that the Federal Deposit Insurance Corporation was not the same party as the United States, the prosecutor in the

---

**45.** The prior testimony exception reads as follows:

Testimony given as a witness at another hearing of the same or a different proceeding, or in a deposition taken in compliance with law in the course of the same or another proceeding, [is not excluded by the hearsay rule] if the party against whom the testimony is now offered, or, in a civil action or proceeding, a predecessor in interest, had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination.

**46.** Fed.R.Evid. 804(b)(5) states in relevant part:
A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, [may not be excluded by the hearsay rule] if the court determines that ... the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party [the proponent's intention to offer the statement] sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it....

**47.** North has never contended to the contrary, either at trial or before this Court. Plainly, the videotaped testimony is within the definition of "hearsay" set forth in Fed.R.Evid. 801(c).

**48.** A further exception where a "predecessor in interest" had such an opportunity and motive is not relied on by North and may be inapplicable to criminal cases in any event. *See generally United States v. McDonald*, 837 F.2d 1287, 1290–93 (5th Cir.1988).

criminal action in which the prior testimony had been taken. *FDIC v. Glickman*, 450 F.2d 416, 418 (9th Cir.1971). *See also State v. Freeman*, 440 P.2d 744, 759 (Okla. 1968) (excluding from a state criminal trial evidence taken at a legislative hearing).

North argues, however, that the requirements of the Rule 804(b)(1) exception should not be construed narrowly to exclude key evidence offered by a defendant as the requirements are, in North's view, "primarily designed to protect the Sixth Amendment confrontation rights of criminal defendants...." Brief for Appellant at 49. This assertion is open to much question as the hearsay rule and its exceptions, like the rest of the Federal Rules of Evidence, govern both civil and criminal "proceedings in the courts of the United States and before United States bankruptcy judges and United States magistrates...." Fed.R.Evid. 101. Whatever the strength of North's basic assumption, the District Court's decision here comports with other applications of the same-party requirement in criminal cases. In *United States v. McDonald*, 837 F.2d 1287, 1291–93 (5th Cir. 1988), the Fifth Circuit held that the district court had not erred in refusing to admit under the prior testimony exception depositions taken in a civil action between the criminal defendant and the alleged victim of the fraud which the United States was prosecuting. Likewise, in *United States v. Kapnison*, 743 F.2d 1450, 1458–59 (10th Cir.1984), *cert. denied*, 471 U.S. 1015, 105 S.Ct. 2017, 85 L.Ed.2d 299 (1985), the Tenth Circuit found the exception unavailable to a defendant attempting to offer depositions taken in a civil case arising from the same facts as the criminal prosecution. We find no more reason to relax or dispense with a requirement fixed by the plain words of the rule than did our sister circuits.

In short, we find no error in the District Court's determination that North's proffered videotape does not meet the same-party requirement, particularly as we apply the abuse-of-discretion standard of review. *United States v. Williams*, 738 F.2d 172, 178 (7th Cir.1984); *United States v. MacDonald*, 688 F.2d 224, 233 (4th Cir.1982),

*cert. denied*, 459 U.S. 1103, 103 S.Ct. 726, 74 L.Ed.2d 951 (1983); *United States v. Poland*, 659 F.2d 884 (9th Cir.), *cert. denied*, 454 U.S. 1059, 102 S.Ct. 611, 70 L.Ed.2d 598 (1981).

■ We further agree with the District Court that even if Congress and the IC were the same party, the proffered videotape does not meet the further requirement of Rule 804(b)(1) that the occasion of the prior testimony must have presented the opposing party with "an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination." The IC in North's case is a prosecutor seeking to lay before a jury those facts which he contends will support a criminal conviction. Although Congress in authorizing and conducting the Iran/Contra hearings may have had an intent to determine whether illegal conduct had occurred, and to identify government officials who might have engaged in illegal activity, the political and legislative goals of Congress are far different from the prosecutorial commission of the IC. Even where congressional questioners *sound* like prosecutors, the goals, methods, restraints and results of the former are different from those of the latter, and they are subject to different influences and motives, as the District Court observed. Not only did the IC not have an opportunity to cross-examine witnesses before the committees, but, because of his concern for the strength of his criminal case he did not even want some of them, including Poindexter, to be immunized or examined. Witnesses before the committees often gave long, rambling statements more like speeches than answers to interrogatories. Witnesses were allowed to consult with counsel before responding—a practice recently criticized by the Supreme Court even in a situation where cross-examination actually took place:

> Permitting a witness, including a criminal defendant, to consult with counsel after direct examination but before cross-examination, grants the witness an opportunity to regroup and regain a poise and sense of strategy that the un-

aided witness would not possess.... [C]ross-examination of a witness who is uncounseled between direct examination and cross-examination is more likely to lead to the discovery of truth....

*Perry v. Leeke*, 488 U.S. 272, 109 S.Ct. 594, 601, 102 L.Ed.2d 624 (1989).

As the District Court observed, "[c]ongressional examination was shaped in part by the demands of television and electoral politics, rather than by the rules of evidence and the norms of a fair adversary proceeding. Indeed, there was no fact finder in the process." *Videotape Memo*, 713 F.Supp. at 1451. We concur, and readily affirm that the District Court's conclusion evidenced no abuse of discretion.

▆ North further contends that the District Court's exclusion of the videotape violated his constitutional rights, citing *Chambers v. Mississippi*, 410 U.S. 284, 302, 93 S.Ct. 1038, 1049, 35 L.Ed.2d 297 (1973), for the proposition that "where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice." Certainly, this states a constitutional rule as announced by the Supreme Court. But, as the District Court found, *Chambers* is inapposite. As an initial matter, *Chambers* limited itself to its own facts and circumstances. *See Chambers*, 410 U.S. at 302–303, 93 S.Ct. at 1049–50. *Chambers* involved an extremely strict application of state evidentiary rules and the consequent exclusion of key pieces of defense evidence in the capital trial of a black man for the alleged murder of a white police officer. The facts in North's case are not nearly so extreme, and even North does not argue that the Poindexter videotape is the key piece of evidence upon which his case stands or falls. Also, unlike the testimony that the defendant desired to present in *Chambers*, the videotape here was the subject of an 11th–hour request by North to admit a tape that his lawyers had edited in a fashion, presumably, not unfavorable to North's case. Nor does the record here present the hallmarks of procedural arcana, racial prejudice and fundamental un-

fairness that characterized the record in *Chambers*. *See id.* at 285–94, 93 S.Ct. at 1041–45. For these reasons, we see no need to review the videotape ourselves, despite the District Court's "hasty" review. The District Court was undoubtedly correct when it concluded that North "simply relies on a broad general claim of relevance, which in this context is not enough, since relevance in a case of this nature has no particular focus." *Videotape Memo*, 713 F.Supp. at 1451–52. In light of our conclusions concerning North's authorization defense, *see supra* Part III(A), Poindexter's testimony in any form can hardly be considered as the key piece of exculpatory evidence, unlike the crucial testimony at issue in *Chambers*. Again, we find no error in the exclusion of the videotape.

North's final claim that the District Court erred in failing to admit the videotape under the catch-all exception, Fed.R. Evid. 804(b)(5), is entirely without merit. That exception allows the admission only of hearsay statements "having equivalent circumstantial guarantees of trustworthiness" to the express exceptions in the foregoing rule. Fed.R.Evid. 804(b)(5). It permits the exceptional admission of such hearsay only where the trial court has determined that "the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence." *Id.* Even then, such "a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, the proponent's intention to offer the statement and the particulars of it...." *Id.*

▆ The necessity for the exercise of a broad discretion by the trial judge is evident from the language of the rule and is underlined by the facts of this case. The indicia of trustworthiness of a potentially self-serving declaration in the context of the televised congressional hearings; the consistency of the admission of the testimony with the purposes of the rules; the service of the interests of justice by the

admission of the proposed evidence; and the adequacy of the notice are all matters which do not readily lend themselves to review as matters of law. We agree with the Eleventh Circuit that an appellate court should be "particularly hesitant to overturn a trial court's admissibility ruling under the residual hearsay exception absent a 'definite and firm conviction that the court made a clear error of judgment in the conclusion it reached based upon a weighing of the relevant factors.'" *Balogh's of Coral Gables, Inc. v. Getz,* 798 F.2d 1356, 1358 (11th Cir.1986) (en banc) (quoting *Page v. Barko Hydraulics,* 673 F.2d 134, 140 (5th Cir.1982)). *Accord Huff v. White Motor Corp.,* 609 F.2d 286, 291 (7th Cir. 1979). Here, we are far from such a "definite and firm conviction," and find no error in the District Court's denial of North's motion to admit the Poindexter videotape.

## X. JURY SELECTION

The Jury Selection and Service Act ("JSSA"), 28 U.S.C. §§ 1861 *et seq.* (1988), sets out two fundamental principles governing jury selection in federal courts. First, it establishes that litigants in federal court entitled to a trial by jury "shall have the right to grand and petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes." *Id.* § 1861. In addition, the JSSA provides that disqualifications, exemptions, and excusals from jury service may be granted only for certain objective reasons, such as a showing of undue hardship or extreme inconvenience, inability to render impartial jury service, peremptory challenge, or good cause. *See id.* § 1866(c). *See also United States v. Savides,* 787 F.2d 751, 754 (1st Cir.1986). North argues that the District Court injected an "improper nonrandom criterion" into the selection process by excusing, without further inquiry, all prospective jurors who noted their exposure to North's immunized

testimony on the pretrial questionnaire while individually questioning prospective jurors who denied exposure on the questionnaire. Some of these latter jurors were excused for cause; others were selected for the jury. Brief for Appellant at 56; Affidavit of Barry S. Simon, Feb. 7, 1989, JA at 2416–17.[49]

North overstates the JSSA's mandate for randomness. As the House of Representatives Judiciary Committee Report on the JSSA bill explained,

> If the voter lists are used and supplemented where necessary, and if the procedures outlined in the bill are otherwise rigorously followed it is no departure from the standards of the legislation that the qualified jury wheel, the venire or array, or the jury itself, may not reflect a community cross section. The act ... does not require that at any stage beyond the initial source list the selection process shall produce groups that accurately mirror community makeup.

H.R.Rep. No. 1076, 90th Cong., 2d Sess. 5 (1968), 1968 U.S.Code Cong. & Admin. News 1792, 1794. Since North challenges neither the jury list from which the venire was selected nor the venire itself, the JSSA's randomness mandate is not germane to his claim. *Compare, e.g., United States v. Kennedy,* 548 F.2d 608, 610 (5th Cir.) (prohibiting use of volunteers to fill out jury list pursuant to JSSA), *cert. denied,* 434 U.S. 865, 98 S.Ct. 199, 54 L.Ed.2d 140 (1977); *United States v. Branscome,* 529 F.Supp. 556 (E.D.Va.) (dismissing indictment handed down by grand jury panel composed, in part, of volunteers), *aff'd,* 682 F.2d 484 (4th Cir.1982).

More properly, North's claim requires us to consider whether the District Judge's differential treatment of jurors based on their written answers on the pretrial questionnaire constituted an abuse of his discretion to excuse jurors for inability

**49.** The District Judge initially interviewed the jurors who denied exposure on the questionnaire, while keeping the jurors who had noted some exposure on the form "subject to call." Voir Dire Transcript at 341. Subsequently, he excused for cause all the jurors who had noted their exposure on the questionnaire, along with several unselected jurors who admitted exposure after questioning. *United States v. North,* Cr. No. 88–0080–02, 1989 WL 13416 (D.D.C. Feb. 9, 1989) (order).

to render impartial jury service. We do not find the District Judge's approach problematic. In light of the legitimate concern about juror exposure to North's immunized testimony, the District Court stated that "anybody who affirmatively says that they have heard the testimony of Col. North at the congressional hearing should not be called." Voir Dire Transcript at 342. Underlying the District Court's conclusion is the reasonable presumption that jurors who noted their exposure on the questionnaire had such significant recollections of North's immunized testimony that they would be unlikely to render an impartial verdict. Those jurors were, therefore, properly dismissed "for cause." See United States v. North, Cr. No. 88–0080–02, 1989 WL 13416 (D.D.C. Feb. 9, 1989) (order).[50] The District Judge's individual interrogation of jurors who denied exposure on the written form further guarded against seating jurors who had been substantially exposed to North's immunized testimony. Although some jurors in this latter "exposed" group were seated while others were excused, we defer to the District Judge's determination that the minimal exposure of the selected jurors did not render them partial to either party. See United States v. Anderson, 509 F.2d 312, 322 (D.C.Cir.1974) (noting trial judge's discretion in jury selection), cert. denied, 420 U.S. 991, 95 S.Ct. 1427, 43 L.Ed.2d 672 (1975); City of Cleveland v. Cleveland Electric Illuminating Co., 538 F.Supp. 1240, 1256–57 (N.D.Ohio 1980) (judge to determine at voir dire whether individual jurors made out sufficient claim of undue hardship under § 1866(c)).

Accordingly, we find that the District Court's "for cause" dismissals were justified and that no "substantial failure to comply" with the JSSA resulted. 28 U.S.C. § 1867(a). We do not reverse North's convictions on this ground.

## XI. Verdict Form

■■■■ The jury's verdict form on Counts 6 and 9 read as follows:

**50.** The judge did not specify to which "cause," among those listed in section 1866(c), his dismissal referred. In the context of the case, it

### Count Six

*Obstruction of Congress in November 1986.* 18 U.S.C. § 1505:

Guilty ____ Not Guilty ____

If, but only if, you have found the defendant Not Guilty, answer the following:

*Aiding and Abetting.* 18 U.S.C. § 2:

Guilty ____ Not Guilty ____

\* \* \* \* \* \*

### Count Nine

*Concealing, Removing, Mutilating, Obliterating, Falsifying and Destroying Official Documents.* 18 U.S.C. § 2071(b).

Guilty ____ Not Guilty ____

If, but only if, you have found the defendant Not Guilty, answer the following:

Aiding and Abetting. 18 U.S.C. § 2:

Guilty ____ Not Guilty ____

JA at 691–92. North maintains that we must reverse his conviction on these Counts because the verdict form required the jury, in effect, to return "special verdicts" and, as a result, deprived North of his "right" to a general verdict. Brief for Appellant at 60–61. We agree that as a general matter in criminal cases, the preferable practice is to require the jury to come to one general verdict as to each count. See Fed.R.Crim.P. 8(a) (implying that two or more offenses charged in same indictment must be charged in separate count for each offense); Gray v. United States, 174 F.2d 919, 923 (8th Cir.) (reversing conviction because verdict form allows jury to find defendant guilty several times in single count), cert. denied, 338 U.S. 848, 70 S.Ct. 90, 94 L.Ed. 519 (1949). Judicial distaste for "special verdicts" in criminal cases results from a concern "that the jury [will be] led to its conclusion '[b]y a progression of questions each of which seems to require an answer unfavorable to the defendant.'" United States v. Desmond,

seems most likely that the "cause" was the juror's inability to render impartial jury service. 28 U.S.C. § 1866(c)(2).

670 F.2d 414, 419 (3d Cir.1982) (verdict form requiring jury to determine each element of three counts not plain error) (quoting *United States v. Spock*, 416 F.2d 165, 182 (1st Cir.1969) (jury required to answer ten separate questions on one conspiracy count)). On the other hand, courts may employ special verdict forms when the finding of an overt act is constitutionally necessary to conviction, *see Kawakita v. United States*, 343 U.S. 717, 72 S.Ct. 950, 96 L.Ed. 1249 (1952), or when the defendant requests or approves a special verdict as a means of more precisely determining an appropriate and fair punishment, *see United States v. Dennis*, 786 F.2d 1029, 1041 (11th Cir.1986), *cert. denied*, 481 U.S. 1037, 107 S.Ct. 1973, 95 L.Ed.2d 814 (1987); *see also United States v. Ogull*, 149 F.Supp. 272, 275–78 (S.D.N.Y.1957).

Our case falls between these extremes. Since 18 U.S.C. § 2 makes an aider and abettor "punishable as a principal," the special verdict form did not aid North by mitigating his punishment under Count 6. At the same time, the verdict form did not guide the jury towards a guilty verdict by requiring them to find either the elements of the crime charged or a series of facts from which criminal activity would naturally be inferred. Nor did the form allow the jury to find North guilty twice on a single count.

The form provided the jury two alternative theories for finding North guilty of a single count. The First Circuit has called such practice "error," *United States v. Southard*, 700 F.2d 1, 16 (1st Cir.), *cert. denied sub nom. Ferris v. United States*, 464 U.S. 823, 104 S.Ct. 89, 78 L.Ed.2d 97 (1983), presumably because it gives the jury two chances to reach a guilty verdict in one count. That determination, however, was not controlling in the outcome of the case, so it was "dictum." Defense counsel in *Southard* had approved the form at trial and the court of appeals, applying a "plain error" standard on review, refused to overturn the conviction. *Id.*

As Judge Gesell instructed the jury, the evidence on Counts 6 and 9 was susceptible to a finding of guilt either on the principal statutes in issue—18 U.S.C. § 1505 or § 2071(b)—or on the aiding and abetting statute, 18 U.S.C. § 2. JA at 678. The verdict form would have been unobjectionable had it asked the jury one question in both Counts 6 and 9: whether North was guilty of either the principal offense or of aiding and abetting. The form that was employed merely broke this disjunctive question into its component parts. We see no reason, therefore, to reverse his convictions on Counts 6 and 9 because of the verdict form. We do suggest, however, that in the future, absent good cause for employing the kind of form used at North's trial, district judges ask for general verdicts that cover both the "primary" offense, such as a violation of 18 U.S.C. § 1505 or § 2071(b), and aiding and abetting, 18 U.S.C. § 2. Such general verdicts will be less likely, in the ordinary run of cases, to generate disputes.

## XII. VENUE

North contends that the District Court committed error in denying his motion for directed verdict or judgment n.o.v. on Count 10 of the indictment because the venue for this offense did not lie in the District of Columbia. 18 U.S.C. § 201(c)(1)(B) applies to "[w]hoever ... receives, accepts, or agrees to receive ... anything of value personally for or because of any official act...." Count 10 charged that North violated this statute by "accept[ing], receiv[ing] and agree[ing] to receive" a security system for his Virginia home from Richard Secord. As North's brief reminds us, venue for an offense lies in the district in which the defendant committed unlawful acts.[51] Venue for Count 10 was therefore proper in a district in which North received or accepted the security system, or agreed to receive it. *See,*

---

**51.** This principle is of constitutional genesis: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed...." U.S. Const.Amend. VI.

*e.g., United States v. White*, 887 F.2d 267, 272 (D.C.Cir.1989).

■ Invoking both the Sixth Amendment and the language of section 201(c)(1)(B), North contends that the evidence supports venue only in the Eastern District of Virginia, the location of his residence. If he "accept[ed]" or "agree[d] to receive" the home-security system anywhere, he argues, then it must have been in Virginia. We cannot agree.

Although North's statements of the law are incontrovertible, his argument ignores a substantial portion of the evidence in the case. As the trial court found, the record contains ample evidence from which "[a] reasonable jury could find by a preponderance of the evidence that while in Washington, D.C. North accepted or agreed to receive the security system for his home." *United States v. North*, 716 F.Supp. 644, 647 (D.D.C.1989). Specifically, the witness Robinette testified that he and Secord met with North in North's office in the Old Executive Office Building in Washington, D.C. after Robinette had visited North's home in Virginia. Some initial discussion of the security fence had taken place in Virginia before Robinette's visit to the residence and the Robinette/Secord/North meeting. Robinette testified that during the meeting in the District of Columbia he offered North certain information concerning the system. North gave Robinette approval to continue with work on the system by saying " 'It sounds like you're on the right track.' " *United States v. North*, 716

F.Supp. at 648 (quoting the testimony of Robinette).

■ While venue in the Eastern District of Virginia may no doubt have been proper, venue in Washington, D.C. was proper as well. Venue may lie in more than one district. *See, e.g., United States v. DeLoach*, 654 F.2d 763, 765–67 (D.C.Cir. 1980), *cert. denied*, 450 U.S. 933, 101 S.Ct. 1395, 67 L.Ed.2d 366 (1981). In fact, we long ago applied this principle to a claim paralleling the one advanced by North. In *Goodloe v. United States*, 188 F.2d 621 (D.C.Cir.1950), *cert. denied*, 342 U.S. 819, 72 S.Ct. 35, 96 L.Ed. 619 (1951), we held that venue here was proper in a bribery case if "the attempt to bribe was commenced, continued or completed here, even though most of the acts relied upon to constitute the crime were committed in Baltimore." *Id.* at 622. The Washington meeting suffices to bring the present case within the rule of *Goodloe*.

■ *United States v. White*, 887 F.2d 267 (D.C.Cir.1989), relied upon by North, is not to the contrary. Although we held in *White* that venue would not lie in Washington, D.C. when an agreement to pay and accept a bribe had occurred elsewhere and only the effects of the bribe were felt in the District, that is no parallel to the present case. Here acts of offering and accepting a gratuity occurred both in Washington, D.C., and elsewhere, according to the evidence before the jury. In short, we conclude that North's assignment of error is without merit.[52]

---

**52.** North also asserts in a footnote to his venue argument that the District Court erred in instructing the jury to apply a preponderance-of-the-evidence standard, rather than a beyond-a-reasonable-doubt standard, to the question of venue. This assertion is made without citation of authority and is contrary to the unanimous holding of all circuits which have considered the question. *United States v. Taylor*, 828 F.2d 630, 633 (10th Cir.1987); *United States v. Griley*, 814 F.2d 967, 973 (4th Cir.1987); *United States v. Lewis*, 797 F.2d 358, 366 (7th Cir.1986), *cert. denied*, 479 U.S. 1093, 107 S.Ct. 1308, 94 L.Ed.2d 162 (1987); *United States v. Potamitis*, 739 F.2d 784, 791 (2d Cir.), *cert. denied*, 469 U.S. 918, 105 S.Ct. 297, 83 L.Ed.2d 232 and 469 U.S. 934, 105 S.Ct. 332, 83 L.Ed.2d 269 (1984); *United States v. Rivamonte*, 666 F.2d 515, 517 (11th Cir.1982);

*United States v. Durades*, 607 F.2d 818, 820 n. 1 (9th Cir.1979); *United States v. Black Cloud*, 590 F.2d 270, 272 n. 2 (8th Cir.1979). We, therefore, reject North's marginal argument and relegate it to a footnote as did the author of his brief.

North also argues that the District Court's instructions on Count 10 were erroneous in that they allowed the jury to find North guilty on Count 10 without concluding that North knew that Secord was paying him "compensation for an official act." Brief for Appellant at 66–67. The District Court instructed the jury that, in order to convict, it would have to find that "the gratuity was received by the defendant for his personal benefit, because of an official act or acts already performed or to be performed in the future...." JA at 652. North's argument on this point is without merit: the instruction

## XIII. AIDING AND ABETTING: SECTION 2

North raises an allegation of error applicable only to Count 6. On Count 6, the jury acquitted North as a principal but convicted him as an aider and abettor. He contends that the District Court erred in denying his motion for a bill of particulars. Specifically, he asserts that he was entitled to such a bill (1) stating whether he was charged with violating 18 U.S.C. § 2(a) by aiding, abetting, counseling, commanding, inducing, or procuring the violation of section 1505, or was instead charged with violating 18 U.S.C. § 2(b) by willfully causing another to violate section 1505; (2) specifying the manner in which he allegedly aided, abetted, etc.; and (3) identifying the alleged principals. North's contention that it was error to deny his motion has no merit on any of the three asserted bases.

As to the first claim, North cites no authority in support of his proposition, and we have found none. It is well established that the government need not elect between charging a defendant as a principal and as an aider or abettor. *United States v. Pollack*, 534 F.2d 964, 970–71 (D.C.Cir.), *cert. denied*, 429 U.S. 924, 97 S.Ct. 324, 50 L.Ed.2d 292 (1976). As we have previously not required the government to opt between guilt as a principal and guilt under section 2 as an aider and abettor, it follows that we will not require an election between the two subsections of section 2.

As to the second specification, North relies principally on a Tenth Circuit case, *Cefalu v. United States*, 234 F.2d 522 (10th Cir.1956), which stands for the unremarkable proposition that where an indictment "fails to inform the accused with sufficient particularity of the charges against which he will have to defend at the trial, the remedy is to move for a bill of particulars." *Id.* at 524 (citations omitted). In the present case, Count 6 provides a rather detailed recitation of the charge the government proposed to prove at trial. It is the law, as recognized in the *Cefalu* case relied upon by North, that "a motion ... obviously satisfied the terms of the statute, and

for a bill of particulars enlarging upon the indictment is addressed to the sound judicial discretion of the trial court, and the denial thereof will not be disturbed on appeal unless there was an abuse of discretion." *Id.* (citations omitted). Here, we find no abuse of discretion and do not disturb the trial court's ruling.

As to North's third argument, in the context of reviewing the sufficiency of evidence we have long rejected the proposition that the principal must be specifically identified in order for the conviction of the aider and abettor to stand. In *United States v. Staten*, 581 F.2d 878, 887 (D.C. Cir.1978) (citations omitted), we held that "[i]t was not essential that the principal in the operation be identified so long as someone had that status." We see no reason why the same rule should not apply at the pleading stage.

In sum, we find no reversible error in the District Court's denial of a bill of particulars as to Count 6, especially given the abuse-of-discretion standard which applies in this context.

WALD, Chief Judge, dissenting as to Parts I, II, and III(B)(2):

Oliver North's was a case of epic proportions, massively publicized, for many weeks engaging the rapt attention and emotions of the nation. The panel today reverses his convictions on three separate grounds, including a remand for an "item-by-item, line-by-line" hearing on whether any bit of evidence, as yet unidentified, may have reflected exposure to North's immunized testimony before Congress.

After studying for months the thousands of pages of transcripts and hundreds of documents produced for the grand jury and trial, I, on the other hand, am satisfied that North received a fair trial—not a perfect one, but a competently managed and a fair one. As in all trials of this magnitude, a few errors were made, but in analyzing and researching North's claims, including the three grounds on which the Per Curiam reverses, I do not find, singly or cumula-

the District Court committed no error.

tively, that any of them rose to the status of reversible error. I am convinced that the essentials of a fair trial were accorded North, and that his conviction on the three Counts of which the jury found him guilty should be affirmed.

## I. Use of Immunized Testimony

I dissent from the majority's dismissal of North's conviction on the ground that his fifth amendment right not to incriminate himself was violated by the grand jury and trial proceedings. According to my colleagues, *Kastigar v. United States,* 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972), compels a "witness-by-witness[,] if necessary, ... line-by-line and item-by-item" inquiry into every piece of testimony presented to the grand and petit juries to insure that the prosecution in no way employed or relied on North's immunized congressional testimony in obtaining his conviction, a process that would have consumed countless extra weeks or months of trial to little or no avail. In my view, a careful analysis of the *Kastigar* inquiry that Judge Gesell actually undertook demonstrates that North received all of the constitutional protections to which he was entitled.

### A. *Legal and Factual Background*

#### 1. The *Kastigar* Standard

*Kastigar* prohibits prosecution based on "information directly or indirectly derived" from compelled testimony. 406 U.S. at 453, 92 S.Ct. at 1661. The prosecution may not "us[e] the compelled testimony in *any* respect," *id.* (emphasis in original), and bears "the affirmative duty to prove that the evidence it proposes to use is derived from a legitimate source wholly independent of the compelled testimony." *Id.* at 460, 92 S.Ct. at 1665. Since "we may not infer findings favorable to [the prosecution]" as to whether its evidence was "free

of taint and independently derived," we require the district court to "make specific findings on the independent nature of this proposed evidence." *United States v. Rinaldi,* 808 F.2d 1579, 1583–84 (D.C.Cir. 1987).

*Rinaldi* also indicates, however, that when the prosecution locates and elicits the testimony of a witness without any resort to immunized testimony, no breach of *Kastigar* occurs even if the witness has, in fact, been exposed to immunized statements, but testifies only according to his personal knowledge. *See Rinaldi,* 808 F.2d at 1583. Furthermore, according to *Rinaldi,* even evidence presented to a grand or petit jury that is derived from immunized statements does not pose a *Kastigar* problem if it is "essentially irrelevant to the government's case." *Id.* at 1584.[1] The pragmatic *Rinaldi* approach is widely accepted in the circuits; appropriate "prophylactic measures ... which, as a practical matter, as distinguished from absolute theoretical certainty, ensure that the evidence to be used at trial was untainted" are deemed sufficient to meet *Kastigar's* standards. *United States v. Poindexter,* 727 F.Supp. 1488, 1492 (D.D.C.1989); *see, e.g., United States v. Serrano,* 870 F.2d 1, 17 (1st Cir.1989); *United States v. Crowson,* 828 F.2d 1427, 1430 (9th Cir.1987), *cert. denied,* 488 U.S. 831, 109 S.Ct. 87, 102 L.Ed.2d 63 (1988); *United States v. Byrd,* 765 F.2d 1524, 1529 (11th Cir.1985).

Use of immunized material that the trial court finds to be harmless beyond a reasonable doubt is also, in many circuits, consistent with *Kastigar's* strictures; indeed, a trial judge's finding of such harmless use will be upheld if substantial untainted evidence is presented to the jury and the reference to immunized material is only tangential to the indictment or conviction. *Serrano,* 870 F.2d at 16 (citing cases). This court, like other courts of appeal, af-

---

**1.** The majority contends that I ignore *Rinaldi's* "primary teaching ... that the government *always* bears the burden of proof and that we may not infer findings favorable to the government." Per Curiam Opinion ("Per Curiam") at 867 (emphasis in original). Not so. The crucial point is that once the government has demonstrated that

a witness' testimony is "free from taint and independently derived," *Rinaldi,* 808 F.2d at 1583, *Kastigar* and *Rinaldi* impose no constraint on the prosecution's use of that witness' testimony. They do not automatically preclude the prosecution's use of evidence from witnesses exposed to immunized testimony.

fords trial judges substantial latitude in selecting procedures to ensure that a defendant receives his full *Kastigar* protections. *United States v. De Diego*, 511 F.2d 818, 824 (D.C.Cir.1975); *see also United States v. Dynalectric*, 859 F.2d 1559, 1578–80 (11th Cir.1988), *cert. denied*, —— U.S. ——, 109 S.Ct. 1642, 104 L.Ed.2d 157 (1989). In general, the options at the judge's disposal include a pretrial evidentiary hearing; a taint hearing during trial if questionable evidence is offered; a post-trial taint hearing; or a combination of the foregoing. *De Diego*, 511 F.2d at 824.

2. *Kastigar* Procedures Followed in This Case

The grand jury in this case began hearing testimony on February 4, 1987. North received his immunity order on June 3, 1987, and testified before Congress from July 7 to July 14, 1987. The grand jury recessed from June 29 to September 2, 1987, and concluded taking testimony on March 14, 1988. North was indicted on March 16, 1988.

After North's indictment, Judge Gesell first conducted a "preliminary" *Kastigar* hearing on April 25, 1988 into the "administrative procedures" implemented by the Independent Counsel ("IC") to avoid exposure by the IC staff to immunized testimony. Transcript of Pretrial Hearing, Apr. 12, 1988, at 3; Transcript of Pretrial Hearing, Apr. 25, 1988, at 372. In his Memorandum Opinion of June 16, 1988, Judge Gesell explained that after this hearing, he reviewed *in camera* grand jury transcripts and exhibits; precautions taken by the IC to avoid taint from exposure of the prosecution to publicity and immunized testimony; exhibits illustrating the implementation of these precautions; and two bound volumes establishing the IC's independent "leads" to all significant witnesses. *United States v. Poindexter*, 698 F.Supp. 300, 307–08 (D.D.C.1988) (hereinafter cited as *Kastigar Memo* ). Judge Gesell's description of these volumes as "leads" is far too

modest, for they actually consist of summaries, often quite detailed, of interviews conducted by FBI agents in late 1986 and early 1987—well before North's immunized testimony—with over eighty key players in the Iran–Contra Affair. *See* Oral Argument Transcript ("Oral Arg. Tr.") 72. In many instances, these summaries present a comprehensive precis of the witnesses' subsequent grand jury testimony. These volumes, then, provided Judge Gesell with the necessary documentation demonstrating that the prosecution knew the vast bulk of the substance of its case before the grand jury began sitting, and certainly well before congressional immunity grants were issued. Even more extensive evidence compiled by the IC before North's immunized testimony was "separated and sealed to ensure a full record of [the IC's] independent development of facts and witnesses should that be necessary in more detail at a further post-trial *Kastigar* hearing." *Kastigar Memo*, 698 F.Supp. at 313.[2] Judge Gesell also examined the *voir dire* of two replacement grand jurors; interviews of Richard Secord conducted by the IC between April 29, 1987 and March 12, 1988; correspondence between the IC and Congress with regard to use immunity; and redacted newspaper clippings and congressional committee testimony made available to the IC's staff. *Id.* at 315–16.

The court's review of the grand jury transcripts focused on

(1) The nature and extent of the instructions given the grand jurors designed to prevent exposure to defendants' immunized testimony.

(2) Any departure from these instructions suggested by questions or comments of counsel or jurors.

(3) Safeguards and techniques adopted by Independent Counsel to prevent inadvertent or derivative exposure of immune testimony by witnesses appearing before the grand jury.

*Id.* at 308–09. The court cited at some length the warnings against exposure to

---

**2.** These last materials appear to constitute the "canned" evidence discussed at oral argument and in the Per Curiam at 871–872.

immunized testimony given by the IC to the grand jury, including Independent Counsel Walsh's own statement to the grand jury on July 1, 1987 that

> [Y]ou must, at really great expense and great inconvenience, avoid learning what Colonel North said.... I am asking you to impose on yourself the instructions you have imposed on yourselves ever since Mr. Hakim testified, but I want to reassert its importance now of avoiding reading anything about this investigation.

*Id.* at 310. At the time of Hakim's immunized testimony, the IC had instructed the grand jurors not to read any newspaper or magazine articles, or listen to any television or radio reports that mentioned Hakim. *Id.* at 309. Judge Gesell cited several illustrations of the grand jurors' attentiveness to these precautions and of their "tenacious desire to avoid ... exposure." *Id.* at 311–12.

The judge found that "the great bulk of the evidence was clearly known to Independent Counsel before any defendant received use immunity." *Id.* at 311. Nonetheless, he pointed out that the Associate Independent Counsel gave the following specific instruction to all grand jury witnesses appearing after North's immunized congressional testimony:

> Certain witnesses have testified under Congressional grants of limited immunity before House and Senate Committees investigating the Iran/Contra matter. These witnesses include ... Oliver North.... Our Office is avoiding exposure to the immunized testimony of these witnesses I have just named. Please make sure that your answers to our questions are based solely on your own personal knowledge and recollection of the events in question. Do not relate to us anything which you learned for the first time as a result of listening to or reading or hearing about immunized testimony.

*Id.* at 311–12. Furthermore, the trial judge noted that the prosecution was careful to avoid rambling questions inviting generalized answers, and grand jury witnesses were temporarily excused while the IC previewed grand jurors' questions for the witnesses, in order to ensure that their inquiries would not inadvertently elicit immunized testimony. *Id.* at 312.

Judge Gesell also reviewed the "administrative steps" taken by the IC to avoid exposure to immunized testimony, including the so-called Douglass File, in which all incidents of exposure involving members of the IC's staff were recorded. The judge found that nearly all of those occurrences were inadvertent or unimportant, and concluded that "the file reflects a scrupulous awareness of the strictures against exposure and a conscientious attempt to avoid even the most remote possibility of any impermissible taint." *Id.* at 313.

Judge Gesell thus concluded that North's immunized testimony "was not submitted to the grand jury in any form"; the grand jurors were "effectively warned" not to expose themselves to the immunized material; the immunized testimony "did not serve to enhance the focus of Independent Counsel's investigation"; and the IC and his staff were not exposed to the immunized materials and had already learned the identities and prospective testimony of all significant witnesses long before the immunized testimony was given. *Id.* at 314–15. On that basis, Judge Gesell reported before trial that:

> Nothing has developed in the Court's preliminary inquiry into *Kastigar* and related problems which suggests the defendants who received use immunity have had their Fifth Amendment rights impaired in a manner that significantly affects their right to a fair trial.

*Id.* at 314.

In preparation for North's trial, Judge Gesell excused on *voir dire* all prospective jurors who had any substantial recollection of North's immunized testimony. He also warned the jurors not to read or listen to news about the case until their service was complete. *Voir Dire* Transcript at 4. During the trial, he instructed each witness that his or her testimony had to be based solely on personal knowledge, and should in no way be influenced by incidental expo-

sure to North's congressional testimony. He directed witnesses who were unsure whether they could distinguish personal recollection from the immunized material not to answer the question posed. *See, e.g.*, Trial Transcript ("Tr.") 1978–79, 3268. After the trial, he instructed the jury to base its verdict solely on record evidence. Joint Appendix ("J.A.") 596–97.

The judge denied North's post-trial motion for another *Kastigar* hearing on the grounds that the motion "raises few new issues" and "seeks in most instances to relitigate issues already resolved by the Court...." *United States v. North*, Cr. No. 88–0080–02, 1989 WL 57487 (D.D.C. May 26, 1989) (order). He did, however, order the disclosure to North and his counsel of the following materials on which he had based his pretrial *Kastigar* opinion: nontestimonial portions of grand jury proceedings transcribed at the court's request; the Douglass file; the two volumes of materials establishing the IC's independent "leads," including summaries of interviews with witnesses it planned to call in its case-in-chief; the transcript of *voir dire* of two replacement grand jurors; and an index of subpoenas issued during the investigation. In addition, he ordered the three Associate Independent Counsels who conducted the trial to "file an affidavit stating what steps each took before and during trial to avoid direct or indirect knowledge of North's immunized testimony and [to] identify any significant exposure that may have occurred inadvertently or otherwise." *Id.* Finally, Judge Gesell denied North's motion to reconsider his decision not to hold a post-trial *Kastigar* hearing. *United States v. North*, Cr. No. 88–0080–02 (D.D.C. June 30, 1989) (order).

3. Proper Scope of Inquiry on Review

This court's task on appeal is to determine whether Judge Gesell committed clear error in finding that there was no use of North's immunized testimony made by the IC that infringed North's fifth amendment rights. *See Serrano*, 870 F.2d at 16. We must decide whether the extensive measures taken by Judge Gesell to comply with *Kastigar* effectively ensured that the IC

made no significant direct or indirect evidentiary use of North's immunized testimony. *See Byrd*, 765 F.2d at 1529. This, not the absence of a "witness-by-witness ... line-by-line and item-by-item" *Kastigar* hearing, should be the crux of our inquiry.

B. *Grand Jury Proceedings*

The majority expends enormous time and effort attempting to validate North's claim that the prosecution's wrongful use of immunized testimony caused "the grand jury no longer to be a grand jury," *Midland Asphalt Corp. v. United States*, 489 U.S. 794, 109 S.Ct. 1494, 1499–1500, 103 L.Ed.2d 879 (1989), because such use constituted the kind of "fundamental" defect in the grand jury process that could ultimately require quashing the indictment. *See* Per Curiam at 871. If such use had occurred in any purposeful or even accidentally harmful way, I would not disagree with the majority's legal premise: The "rule" that "a facially valid indictment need not be dismissed solely because the grand jury has considered evidence that would be inadmissible at trial" does not apply to use of immunized testimony. *Id.* at 869. *See United States v. Calandra*, 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974); *United States v. Blue*, 384 U.S. 251, 86 S.Ct. 1416, 16 L.Ed.2d 510 (1966); *Lawn v. United States*, 355 U.S. 339, 78 S.Ct. 311, 2 L.Ed.2d 321 (1958); *United States v. Costello*, 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956). As my colleagues properly point out, *Kastigar*'s prohibition of the prosecution's direct or indirect "use" of immunized testimony goes to the heart of the grand jury process and renders an indictment so obtained a "constitutional and statutory transgression." Per Curiam at 869.

But nothing like that happened here. As Judge Gesell found, none of the grand jury testimony "became known" to the IC "either from the immunized testimony or from leads derived from the testimony, directly or indirectly." *Kastigar Memo*, 698 F.Supp. at 315–16. The judge examined the IC's "leads," which, as I have already explained, included substantive summaries

of FBI interviews that mirrored subsequent grand jury testimony. Thus, the judge knew from these summaries that long before North testified before Congress, the few witnesses relevant to Counts 6, 9, and 10—the Counts on which North was ultimately convicted—who appeared before the grand jury after North testified before Congress had already presented the essential elements of their eventual grand jury testimony to the IC. On the strength of those interview summaries, which documented the witnesses' personal involvement in the key events relevant to the conviction Counts, the judge properly found that the prosecution carried its burden under *Kastigar* of proving that North's indictment was not tainted by improper use of his immunized testimony.[3] It is indeed striking that North's counsel cannot point to a single instance of alleged witness testimony tainted by exposure to North's immunized testimony to challenge Judge Gesell's conclusion that no breach of *Kastigar* occurred at the grand jury stage.

### 1. Content of Witness Testimony

My colleagues' basic criticism of the trial judge's post-indictment *Kastigar* inquiry centers on "the government's possible use of compelled testimony via the grand jury and trial witnesses." Per Curiam at 872. The trial judge, however, expressly ruled that he found no such use, and we must defer to his finding, provided that it was not clearly erroneous. *See Serrano*, 870 F.2d at 16; *Crowson*, 828 F.2d at 1429. To reach his holding, Judge Gesell reviewed the content of grand jury transcripts and exhibits in light of the IC's independent prior "leads" to its witnesses, summaries of the *substance* of their likely grand jury testimony, and an index of subpoenas issued during the IC's investigation. *Kastigar Memo*, 698 F.Supp. at 315–16. This documentation strongly supported the judge's ruling. Judge Gesell also cited the

emphatic instructions given to grand jurors to avoid exposure and the warnings to all grand jury witnesses appearing after North's immunized testimony to Congress that they must testify from personal recollection only. The judge found as well that the narrow format of the prosecution's questions during the grand jury proceedings was conducive to avoiding revelations of immunized testimony.

Of decisive importance, moreover, is the fact that *nearly all of the grand jury witnesses testifying with regard to Counts 6, 9, and 10 appeared before North presented his immunized testimony to Congress.* Indeed, Judge Gesell noted in his *Kastigar Memo* "the fact ... that the great bulk of the evidence was clearly known to Independent Counsel before any defendant received use immunity...." 698 F.Supp. at 311. Corroborating this conclusion, the IC represented at oral argument that the testimony relevant to Counts 6, 9, and 10 was presented before North's immunized testimony. Oral Arg. Tr. 56. Although North's counsel correctly pointed out that "many" grand jury witnesses did not appear until after the immunized testimony, *id.* at 20, he did not dispute the IC's basic characterization of witnesses appearing after North's immunized testimony as irrelevant to the Counts on which he was convicted. And the law in this circuit is clear that even evidence derived from immunized statements does not pose a *Kastigar* problem if it is irrelevant to the prosecution's case. *See Rinaldi*, 808 F.2d at 1584.

Neither North nor the IC provided us with a precise count or description of the grand jury witnesses appearing after North's immunized testimony who testified with regard to Counts 6, 9, and 10. This is the only subset of witnesses, however, whose testimony poses even potential *Kastigar* problems. Rather than attempting to identify these witnesses, the Per Curiam

---

**3.** My colleagues erroneously say that I concede that Judge Gesell "did not ... examine the grand jury transcripts for the presence of immunized testimony in the *substance* of witnesses' testimony." Per Curiam at 867 (emphasis in original). This is not so. Although the judge

identified some particular foci in his examination of the grand jury testimony, *see Kastigar Memo*, 698 F.Supp. at 308, the trial judge clearly performed that examination, *id.* at 315 (judge "relied on ... all testimony given" to grand jury in making *Kastigar* determination).

instead relies heavily on papers filed by the defense indicating that senior officials and attorneys at the Department of Justice, the Central Intelligence Agency, the White House, and the Department of State gathered, studied, and summarized North's immunized testimony to prepare themselves and their colleagues for grand jury testimony. *See* Per Curiam at 863. My colleagues make no attempt to demonstrate to what extent the grand jury testimony of any of these individuals was relevant to the Counts at issue.[4]

A reading of the relevant grand jury transcripts reveals that only the testimony given by two highly placed Justice Department officials, relevant to Count 6 alone, could possibly raise *Kastigar* difficulties. Each witness' testimony was essentially cumulative of the other's, and both concerned a key meeting that they attended critical to North's role in preparing a false chronology for CIA Director Casey's testimony to Congress. One of the two witnesses, however, had *already* described North's actions in developing the false chronology in similar terms in his FBI interview recorded in the volumes of the IC's "leads" examined by Judge Gesell. The judge expressly stated in his *Kastigar Memo* that he "relied on" the two bound volumes of "leads" containing the summary of this interview.[5] Thus, the district court knew that the critical evidence had been conveyed by at least one witness before North's immunized testimony, regardless of the timing of the witnesses' grand jury appearances.[6] Furthermore, the content of these witnesses' grand jury testimony provides the necessary basis for concluding that they testified from personal recollection; indeed, their recollection of this meeting corroborated North's own trial testimony about his role in preparing the false chronology. *Cf. Rinaldi*, 808 F.2d at 1583 (no breach of *Kastigar* if witness testifies solely based on personal recollection, despite exposure to immunized testimony). Neither witness contradicted North's own account in any significant way; and it strains credulity to say that by calling these witnesses, the IC used North's immunized testimony "against" him. Those officials, moreover, like all other grand jury witnesses, were directly warned by the IC to answer questions solely on the basis of personal knowledge, without relying in any way on immunized testimony.

Having established the independent derivation and lack of taint of this evidence, the IC met its obligation under *Kastigar*. 406 U.S. at 460, 92 S.Ct. at 1664 (prosecution must demonstrate that "*evidence* it proposes to use is derived from a legitimate source wholly independent of the compelled testimony" (emphasis supplied)). Thus, while a "line-by-line, item-by-item" adversary *Kastigar* hearing might have

4. My colleagues contend that a post-trial *Kastigar* hearing must encompass even witnesses "who happened to testify concerning matters not directly related to the conviction counts" because their testimony may have compromised North's own credibility as a witness and may have influenced North's decision to waive his right not to testify. Per Curiam at 868 n. 4. This view is quite astonishing in that it implies that the jury may have discredited North's defense to conviction Counts on the basis of testimony that it necessarily discounted in acquitting North on other Counts. In light of North's acquittal on nine of the twelve Counts of his indictment, witnesses whose testimony was marginal or even entirely unrelated to Counts 6, 9, and 10 could hardly have had any effect on North's credibility as to those Counts.

5. I see absolutely no basis, therefore, for my colleagues' concern that Judge Gesell's apparent decision not to examine the *additional* "canned" materials may have prejudiced North. *See* Per Curiam at 871–72. With respect to the meeting critical to Count 6, Judge Gesell saw everything he needed to see in the IC's submission of its independent "leads," which, to underscore my earlier point, contained summaries of the *content* of witnesses' interviews with the FBI and, as a result, previewed their expected grand jury testimony.

6. The majority is concerned that even assuming the consistency of the first witness' testimony with his prior FBI interview, "we are still left with the other witness." Per Curiam at 867. This apprehension is unwarranted. The testimony of the "other witness," also present at the meeting critical to North's conviction on Count 6, was entirely duplicative of the testimony presented by the witness interviewed by the FBI; and at trial North himself confirmed both witnesses' accounts of his role at that meeting. *See* Tr. 7631. Thus, North clearly was not prejudiced by the lack of a *Kastigar* hearing concerning the "other witness."

given North's counsel an occasion to grill these officials further on the source of their testimony, it is highly unlikely that such a hearing would have helped North's cause in light of the IC's documentation of its independent development of the substance of their testimony. As to other testimony relevant to Count 6, and testimony pertinent to Counts 9 and 10, the key witnesses with crucial firsthand knowledge, subsequently corroborated by North's own trial testimony, appeared before the grand jury *before* North presented his immunized testimony to Congress.

To sum up: The record is clear that at most only a negligible amount of testimony relevant to the conviction Counts was presented to the grand jury after North testified to Congress under immunity. One of the few witnesses presenting that testimony—which, by my reading, was relevant only to Count 6—had already revealed the key facts to the IC through the FBI interviews conducted long before North's congressional appearance. Documentation of the IC's prior knowledge of these witnesses' testimony was presented to Judge Gesell through the volumes of independent "leads." Additionally, the witnesses were adequately warned by the IC not to rely on any exposure to immunized testimony, and they testified about events in which they were personally and directly involved. And their testimony merely confirmed North's own, neither adding anything new nor contradicting his account of a critical meeting. Finally, so far as I can tell, the remainder of the grand jury testimony relevant to

Count 6 and the entirety of the grand jury testimony relevant to Counts 9 and 10 were presented before North's congressional appearance.

The Per Curiam seems to argue that, nonetheless, it is necessary to vacate North's convictions because the trial judge did not enforce strictly enough the government's burden to show the absence of any indirect use of immunized testimony. But, there was nothing for the government to show, since the IC had already demonstrated, through its compendium of leads and through the grand jury testimony obtained before North's congressional appearance, that it had come upon the information critical to the conviction Counts well before North's immunized testimony. Although by no means determinative to the issue of whether North was prejudiced, I cannot help noting the irony of dismissing North's conviction not because the IC employed immunized testimony in locating or questioning witnesses but solely because high Justice Department officials were exposed to the testimony by their own inside counsel.[7]

In sum, the witnesses testifying before the grand jury with regard to North's conviction Counts either appeared before North's immunized testimony or had long before presented crucial evidence against North to the FBI. Consequently, I cannot accept the Per Curiam's insistence on vacating North's conviction because of any "use" of his immunized testimony before the grand jury.[8]

7. Interestingly, the majority employs the passive voice, concluding that "[a] central problem in this case is that many grand jury and trial witnesses *were* thoroughly soaked in North's immunized testimony...." Per Curiam at 863 (emphasis supplied). My criticism is not a stylistic one, however: The real "problem" in the case is that many of these witnesses, presumably aware of the *Kastigar* strictures under which the IC was operating, soaked *themselves* in the immunized testimony. In light of the substantial evidence relevant to the conviction Counts provided by witnesses to the grand jury and to the FBI before North's immunized testimony, it goes beyond reason to insist that the IC must additionally demonstrate that Justice Department officials from the same Administration as North himself did not purposefully use

North's immunized testimony in preparing for their own or their colleagues' grand jury appearances when their grand jury testimony added nothing of substance to their prior statements concerning the facts on which Counts 6, 9, and 10 of North's indictment were based.

8. Contrary to my colleagues' characterization, I am not alleging any "conspiracy" among Administration officials. *See* Per Curiam at 865. I simply note the inordinate burden that is placed on the IC to counter witnesses' intentional exposure to immunized testimony inflicted by government counsel themselves. The last portion—ignored by the majority, *see id.* at 865 —of my statement in note 7, *supra*, fully acknowledges that the critical test is whether North was prejudiced by such exposure. I believe the record shows that he was not.

## 2. Refreshment of Witness Recollection

Aside from the question of whether grand jury witnesses directly conveyed the substance of North's immunized testimony to the grand jury (they did not), the majority insists that a full-fledged *Kastigar* hearing was indispensable to establish "the use of immunized testimony ... to augment or refresh recollection...." Per Curiam at 860. I agree with my colleagues that the trial judge improperly suggested that refreshment of a witness' memory is not an evidentiary problem and can never pose *Kastigar* difficulties as long as the witness' testimony remains truthful. *See id.* at 861. The content of witness testimony, not its truth or falsity, must be our concern under *Kastigar.* The majority, however, contends that the judge's mistaken conclusion that *Kastigar* does not apply to refreshment of witnesses' recollection fatally flaws his finding that "[d]efendants' immunized testimony was not submitted to the grand jury in any form." *Kastigar Memo,* 698 F.Supp. at 314. I disagree strongly with that inference. The only harm that could have befallen North as a result of the refreshment of witnesses' recollection by immunized testimony would have had to come in the form of actual statements made by the witnesses before the grand and petit juries. Here, the judge controlled for any behind-the-scenes "refreshment" of grand jury witnesses with immunized testimony by monitoring the content of their actual testimony. He examined the "leads" containing summaries of prior FBI interviews as well as the clear warnings given to the witnesses, under oath, to testify only from personal recollection, and thereby was able to ascertain that the witnesses testifying after North's immunized testimony had informed the FBI of all of the information underlying the Counts on which North was subsequently convicted well before North's immunized testimony. Thus, the judge ensured that witnesses did not simply relay North's immunized testimony. In this context, refreshment of grand jury witnesses could have violated North's fifth amendment rights in only two possible scenarios, neither of which ever actually occurred.

First, if North's immunized testimony triggered a witness' own recollection of events that he had otherwise forgotten, North's testimony might be said to have been "used" to violate his right against self-incrimination. But the only two grand jury witnesses in this case whose testimony after North's immunity grant could even *conceivably* have raised a *Kastigar* problem testified that they attended a crucial meeting involved in Count 6; the possibility that their recollections were triggered by North's immunized testimony, rather than their own memories and records, defies credibility, especially since one of them informed the FBI—and, by extension, the IC—in detail about North's role at the meeting well before North presented his immunized testimony.

Alternatively, the IC would have violated *Kastigar* by directly presenting North's immunized testimony to grand jury witnesses in order to refresh their memories. Judge Gesell found, however, that "[p]rosecuting personnel were sealed off from exposure to the immunized testimony itself and publicity concerning it." *Kastigar Memo,* 698 F.Supp. at 312. The Per Curiam itself affirms the judge's finding. Per Curiam at 859. Nothing suggests that the IC at any time showed the immunized testimony to witnesses to refresh their recollections.

Thus, my colleagues vacate North's convictions on the speculative basis that witnesses' recollection may have been refreshed with his immunized testimony even though those witnesses had long before presented the same evidence they later gave the grand jury or at trial. This ruling is inconsistent with this court's prior teaching that *Kastigar* does not necessarily require the reversal of a conviction merely because a grand jury witness was exposed to immunized testimony. *Rinaldi,* 808 F.2d at 1583. Indeed, it turns the properly "heavy" burden of proof imposed by *Kastigar* into an impenetrable hurdle that the prosecution can never overcome.

## 3. Grand Juror Exposure

The only remaining *Kastigar* problems at the grand jury stage revolve around

possible exposure of grand jurors or members of the Independent Counsel staff to North's immunized testimony. The majority itself, however, upholds the trial judge's findings vis-a-vis the precautions taken by the IC "to prevent untoward exposure or use by his staff." Per Curiam at 860. As to the grand jurors, the majority says that its concern about their exposure to North's congressional testimony "underscore[s] our conclusion" that a *Kastigar* hearing is necessary. *Id.* at 872. Fortunately, the majority does not "extend [its] holding [to] require an unprecedented *Kastigar*-type hearing concerning possible exposure of individual grand jurors through the media," *id.*, for Judge Gesell's findings show beyond the shadow of a doubt that any incidental grand juror exposure to immunized testimony did not infringe North's constitutional rights.

The original grand jurors were seated long before North appeared before Congress. They were duly warned to avoid exposure to North's immunized testimony; Judge Gesell found that they tried diligently to adhere to these instructions. Only one of the replacement grand jurors seated after North's testimony said at *voir dire* that she saw "some but not a lot" of North's immunized testimony, J.A. 3277 (classified appendix); she also stated, however, that she had no "fixed opinions" and had reached no conclusions that would make it difficult for her to analyze fairly the evidence before the grand jury, *id.* The repeated warnings given to all of the grand jurors, together with evidence of the grand jurors' "attentive[ness]" to those instructions, *Kastigar Memo*, 698 F.Supp. at 311–12, support the trial judge's determination that North's immunized testimony "played no part in the grand jury's unanimous decision to indict," *id.* at 315; certainly, that determination was not clearly erroneous.

Thus, we all agree that no reason has been given or necessity shown for a *Kastigar* remand as to grand juror exposure.

### C. Trial Stage

My colleagues and I are also in agreement that the trial judge has substantial discretion in fashioning procedures to determine whether the prosecution's evidence at trial conforms to *Kastigar*. North's counsel cites no case in which a court has required a trial judge to follow a specific procedure for compliance. Thus, while a judge who holds a pretrial hearing is not excused from guarding against taint during trial, no precedent compels that judge to conduct another full-blown post-trial hearing. The judge is responsible only for ensuring that the government bears its burden of proving that "the evidence it proposes to use is derived from a legitimate source wholly independent of the compelled testimony." *Kastigar*, 406 U.S. at 460, 92 S.Ct. at 1665.

As indicated in Part A(2), *supra*, the trial judge here took vigorous precautions to ensure that the IC carried his burden of showing lack of taint at trial. Through written and oral questioning, Judge Gesell inquired into the exposure of prospective trial jurors to North's immunized testimony, and instructed trial witnesses either to testify from personal knowledge or, if they were unsure of the source of their recollection, not to answer the questions put to them. *See supra*, at 916. After presiding at the twelve-week trial, Judge Gesell found that North's motion for a post-trial *Kastigar* hearing "present[ed] no new information that would justify changing the Court's [*Kastigar Memo*]." *United States v. North*, Cr. No. 88–00080–02, 1989 WL 57487 (D.D.C. May 26, 1989) (order). The judge reasonably concluded that the trial testimony of witnesses substantially mirrored their grand jury testimony, which he had previously read and which, so far as the conviction Counts were concerned, had been given almost entirely—and was in substance fully known to the IC—prior to North's immunized testimony.[9] Absent, then, any significant difference in content between witness testimony given at the

---

9. North's counsel conceded at oral argument that North "did receive grand jury material with respect to witnesses at trial." Oral Arg. Tr. 20.

grand jury and at trial, Judge Gesell understandably felt that a post-trial *Kastigar* hearing would serve no purpose. While North, of course, did not bear the burden of proof on the *Kastigar* issue, it is striking that his counsel does not cite to even a single line of trial testimony that indicates either a change from the witness' grand jury testimony or any other evidence of taint. Although the majority now throws down the gauntlet of a "line-by-line and item-by-item" *Kastigar* hearing, it is difficult to conceive that in the absence of a specific challenge by North, the IC could not easily have met its burden by simply submitting a post-trial statement certifying that the substance of the trial testimony did not differ from the substance of the grand jury testimony, which the trial judge had found to be untainted after a substantial inquiry. That the trial judge did not insist that the IC take such *pro forma* action should not require dismissal of North's conviction.

"[I]ndulg[ing] assumptions favorable to the government" is improper in the *Kastigar* context; for that reason, we direct trial judges to make specific findings as to the admissibility of the allegedly tainted evidence. *Rinaldi*, 808 F.2d at 1584. But here, the district court had already made an omnibus finding that the "[d]efendants' immunized testimony was not submitted to the grand jury in any form." *Kastigar Memo*, 698 F.Supp. at 314. As I have already pointed out, *see supra* at 921, that finding is legally sound because the judge acted affirmatively to ensure that the witnesses did not transmit North's immunized testimony to the grand jury. He ascertained that the witnesses themselves had already provided the FBI with the evidence critical to the conviction Counts before North's testimony and that they were testifying about personal involvement in all of the events that were critical to those Counts. Additionally, the IC had been sealed off from exposure to the immunized testimony. Given that comprehensive finding of no taint in the grand jury proceedings, the judge's post-trial determination that "no new information" was presented at trial does not "indulge assumptions favorable to the government"; rather, it affirms an earlier factual finding in a new context. Having passed muster at the grand jury phase, the government simply has nothing left to prove once the trial judge finds that the trial record contains no evidence of direct or indirect evidentiary use of immunized testimony. In that context, my colleagues' conclusion requiring a full-blown post-trial *Kastigar* hearing for every jot and tittle of every witness' testimony strikes me as not only unnecessary but as an absolute deterrent to any prosecution after a grant of immunity in a high-profile case.

It is especially puzzling that the Per Curiam points to the trial testimony of Robert McFarlane as "emblematic of ... the necessity of further *Kastigar* inquiry." Per Curiam at 864. McFarlane testified twice before Congress, revising his original testimony after North presented his own immunized testimony. In determining that the trial testimony presented "no new information" vis-a-vis the grand jury testimony, Judge Gesell obviously compared the substance of McFarlane's presentations before the grand jury and at trial.[10] So long as McFarlane's trial testimony was consistent with his grand jury testimony, presented *before* North testified in Congress, what McFarlane told Congress subsequently, on either his first or second appearance, is totally irrelevant to the *Kastigar* question. McFarlane's two-step conduct before Congress may bear on his credibility, but it provides no support for the Per Curiam's *Kastigar* argument.

My colleagues apparently do not reach North's contention that petit juror exposure to the immunized testimony also violated *Kastigar*. In fact, the record indicates that the trial judge conducted an oral

---

**10.** Contrary to my colleagues' suggestion, the judge could not have determined that North's post-trial claim presented "no new information" without comparing the trial and grand jury proceedings. *See* Per Curiam at 866. The judge's finding was a substantive one, and there is no justification for the majority's attempt to read *less* into the trial judge's words than they necessarily imply.

*voir dire* on the heels of an exhaustive written questionnaire to prospective jurors, and that the trial jurors who had seen or heard North's immunized testimony were exposed only minimally. The record thus supports the trial judge's conclusion that their exposure was harmless to North.

### D. *Conclusion*

The Per Curiam's insistence on a "line-by-line, item-by-item" *Kastigar* hearing represents an overblown interpretation of the *Kastigar* case that is totally unnecessary to protect North's constitutional rights. Requiring a new and comprehensive *"Kastigar* hearing" this late in the game ignores the many other reasonable avenues used by Judge Gesell to protect North from any aftereffects from his congressional immunization, including his review of the prodigious efforts by prosecutors and grand and petit jurors to avoid exposure, his comparison of the substance of grand jury and trial transcripts, and his attention to the actual sources of prosecution leads and interviews with key witnesses obtained before North's immunized testimony. The majority effectively cuts off the trial judge's discretion in choosing the most practical means of ensuring a defendant's *Kastigar* rights, and in so doing it makes a subsequent trial of any congressionally immunized witness virtually impossible.

While national television coverage should not be allowed to impinge on North's statutory and constitutional rights, neither does it entitle North to escape zealous but fair prosecution. *Kastigar*'s strictures must be applied in a manner that protects a defendant's constitutional rights, but also preserves the public's interest in conducting prosecutions of officials whose crimes have far-flung implications for national policy. We require trial judges to conduct fair trials, not perfect ones, *McDonough Power Equipment, Inc. v. Greenwood,* 464 U.S. 548, 553, 104 S.Ct. 845, 848, 78 L.Ed.2d 663 (1984). North has failed to identify a single suspected *Kastigar* violation in the thousands of pages of grand jury and trial testimony, other than the misguided efforts of in-house Justice Department officials to use his immunized testimony to brief witnesses who essentially corroborated his own version of events, and who swore under oath that their ultimate testimony was derived from personal recollection only. When an "ex parte review in appellate chambers," Per Curiam at 867, yields a clear result that is entirely consistent with the trial court's own findings, a remand for further lengthy hearings is unjustified. I cannot conclude that Judge Gesell's prodigious and conscientious efforts to protect North's fifth amendment rights were in any way so ineffectual as to require a reversal on the formalistic grounds that the majority advances.

I can find no basis for vacating North's conviction on self-incrimination grounds.

## II. NECESSITY FOR A SPECIFIC UNANIMITY INSTRUCTION

I do not believe that the trial judge committed reversible error by refusing to accede to defense counsel's request to instruct the jury on the need for unanimity on the specifics of Count 9, under which North was convicted of willfully destroying, altering, and removing official documents.

As a rule, a general instruction on unanimity, advising the jury that its members must agree unanimously on all of the essential facts necessary to a guilty verdict, sufficiently protects the defendant's right to a unanimous jury decision, "even when an indictment count provides two or more factual bases ... upon which a conviction could rest." *United States v. Duncan,* 850 F.2d 1104, 1113 (6th Cir.1988), *cert. denied sub nom. Downing v. United States,* — U.S. —, 110 S.Ct. 732, 107 L.Ed.2d 751 (1990) (citing cases); Fed.R.Crim.P. 31(a) (establishing right to unanimous verdict). Although this court has "urge[d]" trial judges to employ particularized instructions on specific unanimity when one charge encompasses several distinct incidents, *United States v. Mangieri,* 694 F.2d 1270, 1281 (D.C.Cir.1982), we have never found the absence of such an instruction to

be error.[11] Indeed, we have stressed the need to consider jury instructions "as a whole, rather than as isolated passages." *Id.* at 1280 (quoting *United States v. Martin*, 475 F.2d 943, 947 (D.C.Cir.1973)); *United States v. Hubbard*, 889 F.2d 277, 279 (D.C.Cir.1989).

When jury instructions are otherwise appropriate, a particularized instruction has been found to be necessary only when

(1) the nature of the evidence is exceptionally complex or the alternative specifications are contradictory or only marginally related to each other; or (2) there is a variance between indictment and proof at trial; or (3) there is tangible indication of jury confusion, as when the jury has asked questions or the court has given regular or supplementary instructions that create a significant risk of nonunanimity.

*Duncan*, 850 F.2d at 1114; *see also United States v. Beros*, 833 F.2d 455, 460 (3d Cir. 1987) (describing situations requiring specific unanimity instruction). This case, however, involves neither (3) a tangible indication of jury confusion, *compare Duncan*, 850 F.2d at 1114 (jury request for clarification illustrates error in failure to provide specific unanimity instruction), nor (2) insufficient evidence as to an act charged, *compare United States v. Natelli*, 527 F.2d 311, 325 (2d Cir.1975), *cert. denied*, 425 U.S. 934, 96 S.Ct. 1663, 48 L.Ed.2d 175 (1976) (general unanimity instruction improper in face of possibility that guilty verdict based on specification backed by insufficient evidence). North's claim of error, therefore, must rest on (1) the supposed complexity of the evidence surrounding the three instances of document destruction, alteration, and removal at issue in Count 9.

Yet the evidence concerning these incidents was entirely of one piece and in no way likely to produce conflicting fact determinations by the jury members. As North admitted that he destroyed, altered, and removed all of the official documents as charged, individual jurors hardly could have believed that North did not actually commit any one of those acts. Furthermore, as to each of the alleged illegal acts, North raised some form of an "authorization defense"—Casey's order to destroy the Contra operating fund ledger, Tr. 7138–39, McFarlane's order to alter the official National Security Council ("NSC") System IV documents, Tr. 6903–07, and Secord's counsel's advice to remove the documents from the NSC, Tr. 7109–13—in order to prove that he did not consider his actions unlawful. The similarity of these defenses makes it highly improbable that individual jurors would have found any one of them exculpatory but not the others.

Thus, unlike complex charges requiring the jury to consider allegations of separate criminal acts committed by several people in widely differing circumstances, *see, e.g., United States v. Payseno*, 782 F.2d 832, 836–37 (9th Cir.1986) (requiring specific unanimity instruction when indictment alleges three different acts of extortion committed by different people in two different states over nine-month period), Count 9 compelled the jury to judge only a single individual who admitted performing interrelated criminal acts over a relatively short timespan. As general unanimity instructions have regularly sufficed in similar circumstances, *see, e.g., United States v. Schiff*, 801 F.2d 108, 114–15 (2d Cir. 1986), *cert. denied*, 480 U.S. 945, 107 S.Ct. 1603, 94 L.Ed.2d 789 (1987) (single defendant concedes he filed no tax returns for three years; since only issue is his intent, general unanimity charge sufficed); *United States v. Frazin*, 780 F.2d 1461, 1468 (9th Cir.), *cert. denied*, 479 U.S. 844, 107 S.Ct. 158, 93 L.Ed.2d 98 (1986) (general instruction suffices when indictment alleges "one unified scheme to defraud"), I do not believe that the trial judge's refusal to provide a specific unanimity instruction on Count 9 at North's request was reversible error. Indeed, in discussing other Counts involving multiple bases for conviction, the judge told the jury earlier in the charge

---

**11.** In both *Mangieri* and *United States v. Hubbard*, 889 F.2d 277 (D.C.Cir.1989), we applied the "plain error" standard of review; this court has not yet confronted a case raising the issue of a particularized unanimity instruction in the "harmless error" context.

that it must decide with specific unanimity on which acts formed the basis of its verdict. It is unlikely that his silence on this one Count would be construed to mean that such particularized unanimity was not necessary. *See* J.A. 620 (Count 1), J.A. 627 (Counts 2, 3, and 4). Nonetheless, in light of *Mangieri*'s "urg[ing]," I agree with my colleagues that particularized instructions should be given in a retrial of Count 9, if one takes place.

### III. AUTHORIZATION

North was convicted on Count 9 of violating 18 U.S.C. § 2071(b) by destroying, altering, and removing government documents. His primary defense was that his superiors, including President Reagan, authorized him to take the alleged actions and that such authorization negated any other proof or inferences of criminal intent.

North contends that the trial judge erred first by not instructing the jury as to a fully exculpatory "authorization defense," and, second, by restricting the jury, in determining whether North had the requisite criminal intent, to considering evidence of authorization that showed (1) North "was specifically ordered and directed by a superior to act contrary to the law," (2) "no alternative was available to him to comply with the order by other lawful means," and (3) "under the facts and circumstances [North] reasonably believed the order was legally proper." J.A. 674–75. My colleagues correctly reject North's first claim, but support North's second claim with regard to Count 9 on the grounds that the district court committed error by preventing the jury from fully considering "whatever evidence of authorization exists in the record as it bears on the jury's determination of whether North had subjective knowledge of unlawfulness." Per Curiam at 885.

I believe the majority's reversal of Count 9 based on the judge's failure to permit the jury to consider without limit any evidence of North's superiors' authorization of his illegal actions is without basis in the law. It permits a jury to excuse those "specific intent" crimes requiring knowledge of unlawfulness on the basis of a superior's suggestion or broad directive, unaccompanied by any assurances of its legality.[12] That result fatally undermines my colleagues' own proper and correct conclusion that our criminal law does not recognize a "following orders" or "Nuremberg" defense. I therefore dissent with respect to the reversal of North's conviction on Count 9.

### A. North's Purported "Authorization Defense"

We all agree that the trial judge did not err by failing to instruct the jury that authorization was a complete defense. *See* Per Curiam at 878–81. North argues alternatively, however, that he did not have the requisite criminal intent if he believed that his superiors authorized his illegal conduct and that the authorization was lawful. Brief of Appellant 37–38. Thus, he contends that he properly relied on the instructions of superior officers, who had apparent authority to order him to take certain actions.

Although North frames neither argument in terms of "justifications" or "excuses," his basic claim resembles, but is actually much broader than, the limited excuse of reliance on an official misstatement of law, which our law does recognize. *See* Per Curiam at 881 n. 10. Defendants advancing an official misstatement defense must demonstrate that they (1) reasonably relied on (2) a misstatement of law provided by (3) a superior officially responsible for defining the relevant legal principles under which the actor must operate. This

---

12. My concern about the Per Curiam's implications beyond the statute at issue is not "wholly irrelevant," and I am well aware that Count 9 does not involve a "generic 'specific intent' requirement," whatever that means. *See* Per Curiam at 884 n. 13. First of all, while knowledge of unlawfulness is not a common specific intent standard, it is certainly not unique, *see Babb v.*

*United States,* 252 F.2d 702, 707 (5th Cir.1958) (discussing "knowingly and willfully" requirement of 18 U.S.C. § 545), and in any event, the principles developed in the context of this case may well be applied to lower intent thresholds. *See* Dissent of Silberman, J., at 937–46 (linking finding of error on Count 9 instructions to alleged error on Count 6 instructions).

excuse, moreover, is an exculpatory affirmative defense, and requires that the defendant bear the burden of persuasion by establishing the defense through a preponderance of the evidence. *See* MODEL PENAL CODE ("MPC") § 2.04(3), (4) (1985); Criminal Code Reform Act of 1977, S.Rep. No. 1437, 95th Cong., 1st Sess. 121–25 (1977); 2 P. Robinson, *Criminal Law Defenses* § 183 & n. 1 (1984) (listing state statutes incorporating this defense).

There are three critical differences between the official misstatement excuse and North's claimed defense. First, the official misstatement excuse is available only to defendants who have been assured by their superiors that the actions in question are *legal;* the defendant is not exonerated merely by a supervisor's directive to perform certain actions. Second, the supervisor must have the expertise and responsibility qualifying him to promise his subordinate that the actions he is authorizing are legal. Third, and perhaps most important, the defendant's reliance on his superior's authorization must be objectively reasonable. North does not accept any of these conditions as applying in his case.

In short, North's proposed authorization defense strips away all of the restraints that prevent the reliance on an official misstatement excuse from turning into a mere following orders defense. But while purporting to reject his proffered authorization defense, my colleagues go on to insist that the jury should have been told that it could consider *any* evidence of purported authorization, without limitations, as it might bear on North's specific intent in committing the criminal act of altering, destroying, or removing official records with the knowledge that his conduct was illegal. Indeed, they reverse North's conviction on Count 9 because of the trial judge's attempt to confine the jury's consideration to the kind of authorization evidence recognized by the official misstatement of law doctrine. The perplexing result of their ruling is that a jury could acquit North for lack of *intent* on the basis of the very same evidence that they reject when raised in the guise of an authorization *defense.* Their formulation not only undermines established doctrines governing criminal intent but also frustrates the criminal law's ability to restrain illegal conduct by government officials.

B. *The Majority's Improper Incorporation of Authorization Into the Determination of North's Criminal Intent*

The criminal law recognizes that some individuals who engage in illegal conduct are not genuinely "free agent[s] confronted with a choice between doing right and doing wrong and choosing freely to do wrong." *Morissette v. United States,* 342 U.S. 246, 250 n. 4, 72 S.Ct. 240, 243 n. 4, 96 L.Ed. 288 (1952) (quoting R. Pound, Introduction, F. Sayre, Cases on Criminal Law (1927)). Consequently, without calling into question the communal morality it embodies, the criminal law recognizes the right of a defendant in certain limited circumstances to introduce certain kinds of evidence negating or overriding what would otherwise be assumed to be a specific intent to commit a crime. But rather than opening the door to any and all assertions of individual motives and morality, the law has established circumscribed justifications or excuses for what would otherwise be intentional crimes. Evolved over the centuries, these specific defenses provide a measured contrast to my colleagues' reformulation of the jury's deliberative role, which countenances no limits or control on the kinds of authorization evidence relevant to the specific intent of knowledge of unlawfulness.

In some cases, the *actor himself* may be unable to conform to governing principles of conduct. This may occur not only in cases of disability, such as insanity, intoxication, or immaturity, but also in cases of ignorance or mistake, concerning law or fact, or in a case of reliance on an official misstatement of law. Such situations may give rise to recognized excuses. *See* 1 P. Robinson, *Criminal Law Defenses* § 25(b).

Alternatively, *external circumstances,* limiting an actor's choice to one between two legal wrongs, may prevent a person from acting lawfully, or justify otherwise

unlawful conduct under certain extraordinary circumstances when society "encourage[s] or at least tolerate[s]" it. *Id.* § 25(d); *see also* Note, *Justification: The Impact of the Model Penal Code on Statutory Reform*, 75 Colum.L.Rev. 914, 916 (1975). Thus, a firefighter may be justified in setting fire to a field located between a raging inferno and an unsuspecting town in order to create a firebreak. A homeowner may be justified in assaulting a burglar. A policeman may be justified in breaking into a private house in order to execute a search warrant. *See generally* 1 P. Robinson, *Criminal Law Defenses* § 24(a). But such defenses are, in the main, limited to well-defined fact situations or to emergencies where in order to serve an uncontroverted and commonly-agreed upon higher good, a violation of law must be excused.

The majority's rule allowing a jury to consider whatever evidence of authorization bears on North's knowledge of the unlawfulness of his conduct would quickly outdistance and overtake the criminal law's controlled evolution of narrow exceptions to a basic principle that the reasons why one intentionally violates the law are irrelevant. As described above, the reliance on an official misstatement excuse exculpates only those defendants whose illegal conduct was the result of a specific, official instruction accompanied by assurances that it was legal. The reliance on an official misstatement excuse represents society's toleration point as to when its government servants may violate the law, even unwittingly. By contrast, the majority's approach would allow any government official accused of a crime requiring knowledge of unlawfulness to plead any tacit or implicit approval of his superior as an excuse for violating his legal duties. This result would put our criminal law at the mercy of every corrupt government supervisor. If nothing else, the past two decades should have alerted us to the dangers of such a reworking of the law of intent.

As a nation, we have experienced too often the havoc wreaked by zealous government personnel carrying out their personal—sometimes well-motivated, sometimes not—policy agendas with the acquiescence, authorization, or approval of equally zealous superiors in defiance of laws promulgated by our official lawmaking bodies.

In my view, therefore, Judge Gesell was not overrestrictive to North when he instructed the jury that it could "weigh ... authorization ... in determining [North's] specific intent," J.A. 674–75, only if the evidence met criteria bringing the authorization roughly within the boundaries of the official misstatement of law defense. He properly refused to allow an uncontrolled intrusion of evidence of putative authorizations into the jury's consideration of North's intent. Yet, my colleagues reverse North's conviction on Count 9 on the grounds that the judge's definition of what kind of authorization evidence could be considered under intent was *too confining:* they object to his requirements of (1) a specific directive, (2) the absence of another clearly legal means of complying with the directive, and (3) the defendant's reasonable belief under the circumstances that the order was legal. In my view these restrictions were essential to prevent the dangerous potential of authorization evidence from escaping the bounds of the traditional official misstatement of law excuse.[13]

Thus, the issue on which my colleagues and I diverge is whether the trial judge's strictures on the kind of authorization evidence the jury could consider prevented the jury from considering testimony legitimately relevant to North's intent to alter, destroy, and conceal documents in knowing violation of the law. I believe the answer is "No," and that the record in this case bears out my conclusion. If we compare the standard of criminal intent in the statute underlying North's conviction on Count 9 with the authorization evidence he actual-

**13.** I believe that many of the same arguments apply even in the case of "specific intent" statutes that do not require knowledge of unlawfulness for criminal intent. Nevertheless, despite my general concerns about the relationship between authorization and specific intent, I agree fully with the Per Curiam's narrower argument that evidence of authorization did not bear on whether North had the "corrupt" intent required by 18 U.S.C. § 1505.

ly submitted at trial, the lack of any prejudicial effect on North from the judge's instructions becomes clear.

### C. Appropriateness of Limitations Placed by Judge Gesell on Authorization Evidence

#### 1. Requisite Degree of Intent—18 U.S.C. § 2071(b)

18 U.S.C. § 2071(b) prescribes a fine or imprisonment for a person, having custody of an official document, who "willfully and unlawfully conceals, removes, mutilates, obliterates, falsifies, or destroys the same." 18 U.S.C. § 2071(b) does not require a "bad purpose," and the "willfulness" criterion "is satisfied if the accused acted intentionally, with knowledge that he was breaching the statute." *United States v. Moylan*, 417 F.2d 1002, 1004 (4th Cir.1969), *cert. denied*, 397 U.S. 910, 90 S.Ct. 908, 25 L.Ed.2d 91 (1970) (discussing "willfulness" criterion of companion 18 U.S.C. § 2071(a)). Even a highly "moral" purpose does not dilute the criminal intent of a person who intentionally destroys or alters an official document with the knowledge that he is breaking the law. *Id.* For conviction under 18 U.S.C. § 2071(b), then, it is sufficient that the government prove (1) that a defendant intends to deprive the government of the use of its records, *see United States v. Rosner*, 352 F.Supp. 915, 921 (S.D.N.Y.1972), and (2) that the defendant knows that his actions are unlawful or—what is in effect the same thing—lacks a reasonable belief that his actions are not unlawful, *see generally* Perkins, *Ignorance and Mistake in Criminal Law*, 88 U.Pa.L.Rev. 35, 49 (1939) (generally discussing "willful" intent).[14]

#### 2. Application of Intent Requirements to Facts—18 U.S.C. § 2071(b) (Count 9)

North testified that he did not consider any of the activities charged in Count 9

unlawful because of his superiors' authorization. That purported authorization related to three specific criminal acts with which North was charged: Casey's instruction to destroy the Contra operating fund ledger, Tr. 7138–39, and to "start cleaning ... up" other documents relating to the Iran initiative and the Iran–Contra connection, Tr. 7553; McFarlane's instruction to "fix" the NSC System IV documents, Tr. 6903–07; and Secord's counsel's advice to remove documents from the NSC, Tr. 7109–13.

#### a. Specific Instruction

The trial judge told the jury that it could consider only evidence of a "clear, direct instruction[ ] to act at a given time in a given way." J.A. 675. The instruction had to be "sufficiently precise to assure a reasonable person that it was intended to apply in the given circumstances that develop subsequently which were not otherwise stated." *Id.* I cannot conclude, as my colleagues do, that this instruction unfairly prevented the jury from considering relevant evidence that bore on North's knowledge that he was breaking the law by altering, destroying, and concealing official documents.

The only kinds of authorizations that the criminal law recognizes in any context as exculpatory are official misstatements of law that, by definition, are specific enough for the "authorizee" to apply them confidently in the relevant circumstances. *See* MPC § 2.04(3) comment 3, at 278 (official misstatement defense contemplates reliance on official misstatement contained in statute, judicial decision, administrative order, or other official interpretation of law). Allowing the jury to exculpate North on the grounds of authorizations that were not, in its view, even intended to control his conduct, but were mere suggestions or vague permissions to commit illegal acts if

---

14. Absent a defendant's admission that he knew his actions were unlawful, the government will ordinarily be able to show only that the defendant's belief that his actions were not unlawful lacked any reasonable basis. Judge Gesell instructed as much, charging the jury not only

that "the defendant must have known his conduct was unlawful," J.A. 649, but also that the jury could acquit for authorization only if North "reasonably believed the order was legally proper," J.A. 675. *See infra* Part C(2)(c). *Cf.* Per Curiam at 885–886.

he felt like performing them goes beyond the pale of any interpretation of intent with which I am familiar. It lifts from any official below the President even the most minimal burden of finding out what the law is and what authority his superior has to countenance its violation. It literally invites an "aura of lawlessness" where officials infer that they need not obey the law, even when they are not under actual instructions to disobey it. If the jury interpreted North's evidence of authorizations as only vague suggestions to "clean up" or "fix" key documents, then that evidence could not have had any legitimate effect on North's knowledge that he was breaking the law by altering and destroying official documents. If the jury interpreted them—as North did—as orders to do these acts, then Judge Gesell's specificity limitation would have been met.[15] Either way, North was not prejudiced.

### b. No Alternative Means of Compliance

Judge Gesell also told the jury to consider evidence of authorization only "if no alternative was available to [North] to comply with the order by other lawful means...." J.A. 674. The judge added that if "an authorization can be satisfied by two different courses of action, one clearly legal and one of dubious legality, and a person chooses the illegal or dubious course when other, legal action would comply," the jury could not consider the authorization evidence. J.A. 675. This instruction, of course, assumes that the jury has found that he was under specific orders in the first place. If that is the case, to

comply North had to destroy, alter, and remove the documents. There were no alternative lawful means that could have accomplished that end; certainly none was brought up at trial. This aspect of Judge Gesell's instruction, then, was incidental to the first condition and, by its nature, could not have independently excluded any evidence of purported authorization submitted by North.[16]

### c. Reasonable Belief in the Legal Propriety of the Order

The judge's instructions allowed the jury to consider evidence of a specific directive "provided under the facts and circumstances [North] reasonably believed the order was legally proper." J.A. 675. North testified that he did believe his actions were legally proper. He stated that he "had always regarded as [his] personal files" the documents in his office that he destroyed pursuant to Casey's request. Tr. 7560. Moreover, "[i]t never occurred to" North that altering the documents pursuant to McFarlane's instructions was unlawful because "I had written those documents. I had prepared them for him. They were his documents." Tr. 6907. North also testified that he believed that removing the documents was legal because Secord's counsel was "at that point the only legal advice that I had." Tr. 7110.

Judge Gesell's instructions were, as a matter of law, correct in precluding the jury from considering evidence of authorization on which North relied unreasonably. Acknowledgedly, some courts have dis-

---

**15.** My colleagues' implication that the jury was not supposed to "interpret" the putative authorizations, see Per Curiam at 887 n. 19, makes no sense. Presented with evidence of supposed authorizations, the jury had to decide whether the authorizations met the trial judge's threshold conditions of specificity. How the jury was supposed to undertake that task without some cogitation and interpretation escapes me.

**16.** The Per Curiam argues that this aspect of the trial judge's instructions was prejudicial because "these instructions require the jury to determine whether a course of action is legal, illegal, or of dubious legality ... without considering the evidence of authorization." Per Curiam at 888

(emphasis in original). I believe my colleagues have misunderstood the trial judge's charge. As I read it, the point of the instruction is that the jury should not absolve North on the basis of an order to commit an otherwise illegal act if North could have achieved the same result in a clearly legal way. In considering whether a separate legal alternative was available, the jury would have no need to consider any authorization, since authorization comes into play only when a course of action is otherwise illegal. Thus, I do not credit the circularity that my colleagues fear, although for other reasons I find the instruction largely meaningless. See text accompanying, supra.

puted the legitimacy of a reasonableness requirement in showing lack of specific intent. *Compare United States v. Rhone,* 864 F.2d 832, 835 (D.C.Cir.1989) (even unreasonable mistakes of law exculpatory) *with United States v. Aguilar,* 883 F.2d 662, 674–75 nn. 4 & 5 (9th Cir.1989) (criticizing *Rhone* ); Note, *Ignorance of the Law as an Excuse,* 86 Colum.L.Rev. 1392, 1416 n. 123 (1986) (pointing out that without reasonableness requirement, exculpation results from the most "bizarre and incredible mistakes of law").[17] But the consensus is overwhelming that a defendant's mistake of law must be reasonable to be exculpatory. *See Aguilar,* 883 F.2d at 675 n. 5; *United States v. Kelley,* 539 F.2d 1199, 1204 n. 9 (9th Cir.), *cert. denied,* 429 U.S. 963, 97 S.Ct. 393, 50 L.Ed.2d 332 (1976); *United States v. Barker,* 514 F.2d 208, 235 n. 39 (D.C.Cir.) (Bazelon, C.J., concurring), *cert. denied,* 421 U.S. 1013, 95 S.Ct. 2420, 44 L.Ed.2d 682 (1975); Note, *Ignorance of the Law,* 86 Colum.L.Rev. at 1414–16; 2 P. Robinson, *Criminal Law Defenses* § 181(b)(2) (all arguing that preferable rule is to find mistakes of law exculpatory only when they are reasonable). This reasonableness requirement for mistakes of law should also be applied in the context of statutes requiring knowledge of unlawfulness for conviction, and at least one court

has already done so. *Aguilar,* 883 F.2d at 671 n. 2 (statute at issue allowed for conviction of defendant "knowing that he is in the United States in violation of law").[18] To instruct that unreasonable reliance on a superior's authorization for an illegal act (*i.e.,* the superior was known to be incompetent or venal) can negate knowledge of unlawfulness introduces a novel and mischievous element into our criminal law.[19]

As for the part of the challenged instruction that required North to believe in the legality of his own actions, that seems an uncontrovertedly necessary component of any kind of evidence going toward intent. I cannot fathom on what basis the majority objects to it. Actually, no evidence at all was presented at trial that any of North's putative "authorizers" ever told him that destroying, altering, or concealing documents was *legal,* and North himself apparently failed to take even the most minimal steps to determine what the law required.[20] Nonetheless, evidence that he believed orders to destroy or alter documents were legal—as he testified—could be freely considered by the jury under the judge's instruction, so long as his reliance was reasonable. On the other hand, to have permitted the jury to acquit North if he *unreasonably* believed that his superiors' instructions were lawful *or if he did not*

**17.** While my colleagues find my concern about exculpation resulting from "bizarre and incredible mistakes of law" to be "exaggerated," Per Curiam at 886, they themselves cite the case of *Aitken v. United States,* 755 F.2d 188 (1st Cir. 1986), *see* Per Curiam at 886, in which the First Circuit found that the trial judge erred in failing to allow the jury to consider the claim of a defendant accused of "willful" failure to pay income taxes that he did not believe his wages constituted income because they constituted an exchange of time for money, with no gain for him. In my view, as well as others', *see* Note, 86 Colum.L.Rev. at 1416 n. 123, that mistake of law was "bizarre and incredible."

**18.** Neither Judge Gesell's reasonableness requirement—nor, for that matter, his other limitations—precluded the jury from considering North's claim that the advice of Secord's counsel to remove official documents after he was fired from the NSC led him to believe that the removal was lawful.

**19.** My colleagues are concerned that Judge Gesell's requirement that North had to have a

reasonable belief that his authorizers' orders were legal is inconsistent with the "indisputabl[e]" conclusion that 18 U.S.C. § 2071(b) "requires *subjective* knowledge of unlawfulness for conviction." Per Curiam at 886 (emphasis in original). As explained in the accompanying text, I do not believe that even in the case of statutes such as 18 U.S.C. § 2071(b), the criminal law requires a jury to acquit a defendant whose claim that he lacked knowledge of unlawfulness is unreasonable. Indeed, without a reasonableness requirement like the judge's here, simply following orders that a defendant considered lawful just because they were "orders"—no matter how unreasonable—would excuse a defendant from responsibility for what would otherwise be a knowing violation of the law—a result my colleagues claim to find as distasteful as I do.

**20.** Of course, Judge Gesell's strictures on authorization evidence did not affect the jury's consideration of North's testimony that he independently presupposed the legality of his conduct.

*believe that they were lawful at all* would make hash out of our criminal law. It would have been tantamount to an outright endorsement of the "following orders" defense from which my colleagues rightfully recoil.[21]

In sum, then, Judge Gesell's limitations on the jury's consideration of authorization evidence under Count 9 were entirely consistent with appropriate law interpreting 18 U.S.C. § 2071(b) and with the actual evidence proffered. North suffered no cognizable harm from them.

### D. *Conclusion*

Simply following orders cannot transform illegal acts into legal ones. *See* Per Curiam at 880. My colleagues nonetheless insist that a jury be allowed to consider any and all varieties of authorization as exculpatory evidence showing lack of knowledge of unlawfulness. *See id.* at 885–86. This open-ended invitation for juries to exonerate defendants who simply follow orders runs counter to a most fundamental tradition of our criminal law, which is based on the notion that citizens, big and small, insider and outsider, have some independent responsibility to find out and conform to what the law requires of them. The trial judge's authorization instructions here were more than generous to North's right to demonstrate his lack of knowledge of unlawfulness and there was nothing in his charge that remotely prejudiced North in such a way as to constitute reversible error. I dissent from the reversal of Count 9.

### IV. CONCLUSION

I would affirm North's convictions on all three Counts. I am satisfied that he re-

ceived a fair trial before a jury of his peers and that no reversible error was committed.

---

SILBERMAN, Circuit Judge:
Concurring dubitante as to Part VI, and dissenting as to Parts III(B)(1), IV, V, and VII.

### I. CLOSING ARGUMENT

Unlike my colleagues, I find the issue whether the IC's improper statement at closing argument that Secord and Hakim were making a "killing" and "millions" requires reversal of Count 10 quite troubling and therefore choose this unorthodox form—concurring dubitante—to register my opinion.

We must consider this issue as if appellant's acceptance of the security fence was the only allegation in the case, and North had been only an unknown functionary somewhere in the national security apparatus. Of course, some might say that is wholly artificial because it is unlikely, perhaps inconceivable, that such a person would actually have been prosecuted for accepting a security fence soon after his life had been publicly threatened by a Palestinian terrorist group. Nevertheless, to be scrupulously fair to the IC and appellant, I think we must look at the question just that way.

As the Majority correctly points out, where, as here, timely objection is made, we reverse a conviction on the basis of an improper closing argument only if it "sufficiently prejudiced appellant[ ] to call for

---

**21.** Judge Gesell's "reasonableness" limitation did not make it *"unreasonable as a matter of law* to believe that one's superiors in the NSC ... could authorize the destruction of internal NSC documents...." Per Curiam at 887 (emphasis in original). Under the instruction, the jury clearly had the option of deciding *whether* North's reliance on the purported authorizations was reasonable or not, and—not surprisingly, in light of the absence of any evidence that North was told his conduct was lawful—they decided that his reliance was not reasonable. Nothing in Judge Gesell's instruction prevented the jury from "credit[ing] North's claim that he did not

think he was acting unlawfully," Per Curiam at 887; insofar as that claim was based on purported authorizations, the instructions merely required the jury to find the claim reasonable in order to be exculpatory. North points to no record evidence of authorization that was excluded by the judge's instructions (indeed, he argues "there *was* evidence of specific authorization," North Reply Br. 9 (emphasis in original)) and the majority fails to identify what, if any, "evidence of authorization in the record ... was excluded by the district court's instructions." Per Curiam at 887.

reversal." *United States v. Fowler,* 608 F.2d 2, 12 (D.C.Cir.1979) (quoting *Gaither v. United States,* 413 F.2d 1061, 1079 (D.C. Cir.1969)). Of course, the circular phrase "sufficiently prejudiced ... to call for reversal" is no help at all to an appellate court trying to decide in a particular case whether there was enough prejudice to reverse. The Supreme Court once explained the proper inquiry as whether we can say, "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error.... [I]f one is left in grave doubt, the conviction cannot stand." *Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946).[1] And while the existence of that "grave doubt" is the dispositive question, in this context, as the Majority notes, we have traditionally examined four factors to help us answer it: (1) the closeness of the case, (2) the centrality of the issue affected by the error, (3) the steps taken to mitigate the effects of the error, and (4) the severity of the misconduct. *See Fowler,* 608 F.2d at 12 (quoting *Gaither,* 413 F.2d at 1079); *United States v. Monaghan,* 741 F.2d 1434, 1443 (D.C.Cir.1984), *cert. denied,* 470 U.S. 1085, 105 S.Ct. 1847, 85 L.Ed.2d 146 (1985); *United States v. Andrade,* 788 F.2d 521, 530–31 (8th Cir.), *cert. denied sub nom. Riley v. United States,* 479 U.S. 963, 107 S.Ct. 462, 93 L.Ed.2d 408 (1986). It is in the weighing of these factors that I see the issue differently than the Majority does.

I consider the improper comments in the IC's closing argument to be egregious prosecutorial misconduct because they were deliberate rather than inadvertent. The Majority raises the possibility that the IC's statements were "slips of the tongue in the heat of oral argument," Maj. Op. at 896, but I have no doubt that these improper statements were intentional. The notion that the IC's counsel somehow *forgot* about the colloquy at the bench in which he promised not to introduce evidence of the

amount of profits, *see* Maj. Op. at 896, or that he did not grasp the difference between the existence of profits and the size of profits is too fanciful for serious consideration. Indeed, the IC's brief does not assert the benign motive that the Majority raises as a possibility. Surely the IC knew perfectly well that North's defense, that he took the fence solely to protect his wife and children, would tug powerfully at the jurors' hearts and therefore the IC wished, even to the extent of violating the agreed upon "rules of engagement" of the trial, to impugn North's motives. None of the cases relied upon by the Majority involved deliberately improper prosecutorial statements. *See Donnelly v. DeChristoforo,* 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974) (no suggestion of deliberate misconduct); *United States v. Monaghan,* 741 F.2d 1434 (D.C.Cir.1984) (same), *cert. denied,* 470 U.S. 1085, 105 S.Ct. 1847, 85 L.Ed.2d 146 (1985); *United States v. Modica,* 663 F.2d 1173, 1185 n. 7 (2d Cir.1981) ("improper remarks ... were not instances of deliberate misconduct."), *cert. denied,* 456 U.S. 989, 102 S.Ct. 2269, 73 L.Ed.2d 1284 (1982).

The Majority opinion appears to hold that a single "misstatement" in closing argument cannot constitute severe prosecutorial misconduct. *See* Maj. Op. at 897. Perhaps that is the proper approach for improper arguments that are indeed "misstatements," but *intentionally* improper arguments seem to me to approach misconduct that is *per se* severe. To be sure, as the Majority points out, the Supreme Court has said that, absent special circumstances, "[i]solated passages of a prosecutor's argument, billed in advance to the jury as a matter of opinion not of evidence, do not reach the same proportions [as the consistent and repeated misrepresentation of a dramatic exhibit in evidence.]" *Donnelly v. DeChristoforo,* 416 U.S. 637, 646, 94 S.Ct. 1868, 1873, 40 L.Ed.2d 431 (1974) (internal quotations omitted). The Court im-

---

1. The standard for reversal when the complained of error is a violation of the federal Constitution is whether "the court [is] able to declare a belief that it was harmless beyond a reasonable doubt." *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967).

mediately goes on, however, to explain that:

> Such arguments, like all closing arguments of counsel, are seldom carefully constructed *in toto* before the event; improvisation frequently results in syntax left imperfect and meaning less than crystal clear. While these general observations in no way justify prosecutorial misconduct, they do suggest that a court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning ...

*Id.* at 646–47, 94 S.Ct. at 1873. The impropriety in this case had nothing to do with imperfect syntax or less than crystal clear meaning—instead, the prosecutor coolly crafted a jury argument cleverly designed to convey information to the jury that he had told the District Judge would help establish "a powerful motive on both sides," but had, as a strategic matter, agreed not to put into evidence. That is severe misconduct.[2]

The Majority also places significant weight on the curative measures that the District Judge supposedly took to mitigate the impact of the IC's argument. It is beyond dispute that corrective instructions *can* preserve "a defendant's interest in being free from undue prejudice." *United States v. Perholtz*, 842 F.2d 343, 361 (D.C. Cir.), *cert. denied*, 488 U.S. 821, 109 S.Ct. 65, 102 L.Ed.2d 42 (1988). But the curative instructions here that the Majority discusses, *see* Maj. Op. at 897, consisted entirely of the standard boilerplate cautions given to all juries that the arguments of counsel are not evidence. And, as we have previously stated, that standard judicial caution is not a "cure-all" for improper arguments. *See Gaither v. United States*, 413 F.2d 1061, 1079 (D.C.Cir.1969). While the Majority is concerned that reversal in this case

"would set a precedent requiring us to overturn virtually every conviction even marginally tainted by such a prosecutorial miscue," Maj. Op. at 898—gross hyperbole in my view—I fear the converse problem: that by relying on ostensibly "curative" instructions that are, after all, given in every case, we may immunize prosecutorial misconduct during closing argument from any meaningful appellate review. When a defendant timely objects to a closing argument that is, like this one, improper, the District Judge should give a curative instruction that focuses particularly on the improper argument, *see, e.g., Donnelly*, 416 U.S. at 641, 94 S.Ct. at 1870 (denying *habeas corpus* relief where trial judge told the jury that there was no evidence to support prosecutor's statement and that they are to ignore it), not a general disclaimer buried in an introductory portion of an enormously complicated jury charge that covered a full ninety-five pages. Of course nothing more was done to ameliorate the problem here since the District Judge erroneously did not consider the IC's argument to be improper at all, which is in part why this case is unusual.

The Majority's conclusion ultimately rests on its determination that "it appears *virtually certain* that the jury would have convicted North on this count in the absence of the prosecutor's reference to the size of [Secord's and Hakim's] profits." Maj. Op. at 897 (emphasis added). I wish I shared my colleagues' confidence. North did freely admit that he accepted the security fence from Secord, but in order to convict, the jury had to find that he accepted it *for or because of* an official act. The kind of profits earned by Secord and Hakim was certainly relevant to the question of North's motive—even the IC candidly admitted to the District Judge that, "the

---

**2.** While I view this factor—the severity of the misconduct—quite differently than does the Majority, I confess that I am not sure whether severity *itself* should necessarily militate toward reversal. After all, severity in the sense of intentionally bad behavior does not inexorably correlate with prejudice to the defendant. The Second Circuit, in *United States v. Modica*, 663 F.2d at 1182–86, thoughtfully discussed the possibility of sanctions besides reversal for prose-

cutorial misconduct. Of course, one of the premises of that analysis is that prosecutors employed by United States Attorneys work in something of an ongoing relationship with federal judges so that a message sent by one disciplinary action would act as a deterrent to other prosecutors, *see id.* at 1184–85. Whatever the merit of the Second Circuit's views, they are obviously inapplicable here due to the nature of the prosecutorial unit.

amount certainly gives a powerful motive on both sides." (J.A. 1136).[3] The IC's improper argument was, it seems to me, deliberately designed to sway the jury on precisely that central issue. North testified that he believed that the fence was offered by Secord, and that he accepted it, out of a legitimate and genuine concern for the safety of North's family, not, as the IC alleged, in return for directing business to Secord and Hakim. Given that North accepted a security fence rather than a car or cash, and that Abu Nidal's terrorist group publicly threatened North's life in April 1986, soon before Secord gave him the security fence, it was not so hard to credit North's explanation, or at least to believe that North himself believed it. That latter belief would have been sufficient grounds for acquittal. According to the District Judge's instructions, in order to convict, the jury had to find that North specifically intended to receive the security system for an official act, "not for reasons wholly unrelated to his official employment." (J.A. 653).

Still, there was plenty of evidence in the case tending to establish that North did take the fence for or because of an official act. Most obvious, of course, is the inherent suspiciousness of a government official accepting a $14,000 gift from someone to whom he has directed millions of dollars of business (without regard to the amount of profit). In addition, there was evidence that, in December of 1986, after the public disclosure of the Iran/Contra affair and North's discharge from the NSC, and apparently after consulting with legal counsel, North made it appear as though he had purchased the security system, which may have raised the inference in the jurors' minds that North thought it was improper to accept the system from Secord.[4] I think the evidence was such that the jury probably would have convicted on this Count

regardless of the improper arguments, though it is by no means "virtually certain." Because I therefore believe that the outcome was probably not "substantially swayed by the error," *Kotteakos*, 328 U.S. at 765, 66 S.Ct. at 1248 and because the Majority is correct that we treat reversal as an extraordinary step in this context, I concur in the result, albeit with considerable doubt that I am correct.

## II. CIPA

I believe that the district judge committed reversible error in the way he decided, or more accurately, refused to decide, the CIPA issue. Buried within the Majority's exhaustive and, frankly, impenetrable discussion of the "Statutory Framework" and "Course of Events" is the following simple and discrete issue. Prior to trial, North was forced to disclose to the IC a 162–page "narrative summary" of all the classified evidence he expected to reveal at trial, pursuant to the CIPA statute. As might be expected, whenever a defendant is compelled to disclose aspects of his case prior to trial, the statute directs the district court to "order the United States to provide the defendant with the information it expects to use to rebut the classified information," 18 U.S.C.App. § 6(f), "unless the interests of fairness do not so require."[5] Even though North filed a motion praying for the reciprocal discovery guaranteed him by the statute, the district court *ignored* the motion and the IC never had to reveal the information it used to rebut the evidence disclosed in North's 162–page narrative summary.

The Majority describes that course of events as "the judge's lack of strict adherence to CIPA's sequential directives," further noting that the judge "did not move straightforwardly down the procedural path set out in CIPA § 6." Maj. Op. at

---

**3.** I therefore wonder how the IC can now argue in its brief that the issue of the amount of profits was a "marginal" one. (IC Br. at 58 n. 110).

**4.** Of course, the jury could also have concluded that North developed doubt as to the legality of his actions long after he accepted the fence.

**5.** As the Majority correctly notes, no such determination was made in this case. *See* Maj. Op. at 901. I doubt whether it could be done constitutionally.

901. I do not think that this deprivation of the defendant's rights can be obscured by euphemism. The trial court's behavior quite obviously contravened the statute, but more importantly, it violated the Constitution, see *Wardius v. Oregon*, 412 U.S. 470, 93 S.Ct. 2208, 37 L.Ed.2d 82 (1973). In *Wardius*, the Supreme Court held that it was a violation of due process for an Oregon statute to require defendants to disclose alibi defenses to the prosecution unless reciprocal discovery—that is, revealing the evidence the prosecution expects to use to refute the defendant's alibi—were mandated. The Court noted that, "if there is to be any imbalance in discovery rights, it should work in the defendant's favor." 412 U.S. at 475 n. 9, 93 S.Ct. at 2212 n. 9. It is crystal clear, then, that disclosure provisions of CIPA would be unconstitutional if the reciprocity section were not part of the Act. Therefore, if the district judge "amends the statute" by simply refusing to enforce that portion he renders it unconstitutional. North was required to disclose an enormous portion of his case, under a regime where he got nothing in return. *Wardius* forbids forced disclosure by defendants under those circumstances.[6]

The Majority would appear to circumvent *Wardius*, by relying on a placebo; that North got a great deal of miscellaneous discovery from the IC in this case, see Maj. Op. at 900 n. 36 ("some 900,000 pages of government documents") and that the district judge "provided North with more procedural safeguards than CIPA requires," on issues that seem to me to be totally removed from the issue before us, see *id.* at 902.[7] But *Wardius* does not stand for the proposition that a defendant can be required to disclose details about his case

so long as the defendant receives a certain amount (obviously unquantifiable) of "bonus" discovery about issues unrelated to the evidence he had to disclose. Rather, *Wardius* holds that the defendant cannot be forced to disclose elements of his case unless he receives from the prosecutor the evidence to be used to refute *the disclosed elements*. See *Wardius*, 412 U.S. at 476, 93 S.Ct. at 2213. ("It is fundamentally unfair to require a defendant to divulge the details of his own case while at the same time subjecting him to the *hazard* of surprise concerning *refutation of the very pieces of evidence which he disclosed to the State*.") (emphasis added).

Given this error of constitutional dimension, the conviction must be reversed unless we can say it was harmless beyond a reasonable doubt. See *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). I do not see how we can say the defendant was not harmed when he is forced, over his objection, to disclose a 162–page summary of the evidence he intends to put on at trial and is denied information from the prosecution about how that evidence will be rebutted at trial. It is surely indisputable that North was "harmed" by having to turn over his 162–page summary. As the District Court found, North's CIPA narrative "contains references to many pertinent facts and circumstances which the Court believes are likely to alert Independent Counsel to aspects of issues not previously brought to his attention." (J.A. 459). Indeed, the IC does not dispute that North's proffer was valuable for planning his trial strategy, see IC Br. at 52 n. 100 (conceding "North's notice was ... 'partially revealing'"), nor

---

**6.** The Majority is off the mark when it asserts that "discovery proceedings under CIPA ... entail the kind of strong state interest that may justify an exchange of information between the prosecution and the defense that is not entirely reciprocal." Maj. Op. at 902 n. 41. The overall importance of CIPA is irrelevant. The Majority surely cannot claim that there is *any* state interest, let alone a strong one, in the government's refusal to turn over the evidence it uses to refute a defendant's compelled disclosure.

There is also no basis whatsoever for the Majority's claim that CIPA allows defendants to

"greymail" the government out of pursuing legitimate prosecutions. If the defendant cannot make use of classified but exculpatory evidence at a public trial, then the prosecution is *not* legitimate.

**7.** There is no warrant for the Majority's treatment of all the discovery issues that involved the CIPA statute as one undifferentiated unit. *See* Maj. Op. at 903 ("In sum, the District Court's implementation of CIPA ultimately required each side to reveal substantial aspects of its arguments to its opponents.").

could he in good faith.[8] Since the IC was not entitled to North's proffer unless it revealed its refuting evidence, any use he made of North's proffer to strengthen its case (and it is preposterous to believe that he did not do so by, for example, fine-tuning arguments, pursuing new lines of questioning and dropping others) was an unfair advantage traceable to the error. Once that is understood, the prejudicial effect of the error committed here is clear.

The Majority nonetheless holds that the error was not prejudicial, asserting that "North ... has adduced no evidence of prejudice resulting from the court's error. Despite the benefit of a full trial record, North fails to demonstrate how he was *surprised or prejudiced by prior unawareness* of any of the evidence presented by the IC at trial." Maj. Op. at 902 (emphasis added). The flaw in that reasoning is obvious. The Majority artificially focuses solely on the prejudice *vel non* of not receiving the IC reciprocal disclosure, as if that issue were entirely separate from North's having to disclose his case. As I argued above, that is just not so—the two steps cannot be separated. Statutes requiring defendants to disclose elements of their cases to prosecutors are inherently suspect and are permissible if and *only* if defendants receive the corresponding refutation evidence. When the statute lacks such a provision, it is a due process violation to require disclosure by the defendant, and in such a case, a court must determine whether the *compelled disclosure* was harmless to the defendant. North was effectively subject to just such a statute. He cannot be made worse off merely because the statute happens to contain a reciprocity provision which the judge refused to enforce. That is equivalent to arguing the same statute would be unconstitutional on its face but not as applied to North—surely a new approach to interpreting the Constitution. It was error to require North to divulge evidence to the IC *because* North did not receive the refuting evidence. In such a situation prejudice is measured both

from North's disclosure to the IC (as to which North was surely harmed) and from the failure of the IC to make the required disclosures.

But even measuring the harm to North without regard to his disclosure, the Majority's approach is mistaken in that it assumes that the only value of a reciprocal proffer from the prosecution is that it would reveal that the prosecution *had* evidence that the defendant did not know that it had. That is incorrect. Suppose the reciprocal proffer that the IC should have made here would have indicated that the IC was *not aware* of a powerful piece of evidence that North had thought the IC was aware of. Surely that proffer would have been enormously useful to North, yet it is obviously impossible for him to prove, or even allege, prejudice of that type when the IC did not reveal any refutation evidence.

It is particularly disturbing that the Majority rests its decision on this important issue on a basis not even argued by the IC. It was never claimed that the judge, at worst, committed harmless error, still less, that "harm" could be measured, as does the Majority, by asking only whether North had shown he was "surprised" by the evidence presented by the IC. In fact, if North could have known beforehand that "surprise" was the key to show prejudice, it would have been rather easy for his counsel to meet that test since virtually all evidence put in by one's opponent at trial surprises counsel to some extent. For that reason, the only defendant who could ever suffer because of the Majority's newly adopted prejudice standard is Oliver North. Some surprise.

\* \* \* \* \* \*

For the foregoing reasons, I would reverse North's convictions on this ground.

### III. AUTHORIZATION AND INTENT

I disagree with my colleagues on the question whether the District Judge's in-

---

**8.** The IC does state, somewhat implausibly, that "it would [not] be prejudicial if the Government had altered its proof in response to North's notice." *See* IC BR. at 52 n. 100. Not surprisingly, the IC has no support for, and does not attempt to develop, that assertion.

structions were also erroneous regarding the relevance of North's evidence of his superior's instructions or communications as to Count 6. I do not see the sharp distinction the court does between how those instructions bear on Count 6 and 9; I think on *both* Counts the District Judge was in error.

North was convicted under Count 6 of aiding and abetting John Poindexter and/or William Casey in their obstruction of a congressional inquiry, in violation of 18 U.S.C. § 1505. That section, in relevant part, provides:

> Whoever corruptly, or by threats or force, or by any threatening letter or communication influences, obstructs, or impedes or endeavors to influence obstruct, or impede ... the due and proper exercise of the power of inquiry under which any inquiry or investigation is being had by either House, or any committee of either House or any joint committee of the Congress [commits a crime].

The indictment alleged that North's role in Casey's and Poindexter's endeavor to obstruct consisted of two distinct activities. First, he allegedly helped to prepare a false chronology—to be used by Casey and/or Poindexter when they testified before congressional committees—that concealed the United States' role in arms shipments to Iran in November of 1985. Second, the indictment charges that North destroyed, altered, and removed NSC records concerning both the arms sales to Iran and U.S. efforts to aid the Contras, the same conduct that underlies Count 9.

The District Judge instructed the jury that section 1505 required the prosecution to show that North acted with what the district judge called "specific corrupt intent." [9] That phrase was apparently meant to convey a level of mental culpability somewhere in between what is required in ordinary "specific intent" crimes and subjective knowledge of unlawfulness. In its jury charge, the District Court explained specific intent as follows:

> Specific intent requires ... something more than ... a mere general intent.... Specific intent requires that a person not only acted knowingly, voluntarily and deliberately, but that he acted with a bad purpose, having decided in his mind what he would do, and that he then did something prohibited.

(J.A. 672–73). Later, the court elaborated on the phrase "bad purpose," saying that the defendant had a bad purpose "if he specifically intended to do something the law prohibits, whether he knew of the law or not." (J.A. 674). It is unclear whether that instruction means that the jury was to find (1) that North specifically intended to do something that the law happens to prohibit or (2) that he was subjectively aware that the thing he intended to do was illegal.

That the District Judge intended to convey the first meaning was made clear in the subsequent discussion focused particularly on Count 6, where the District Court attempted to give meaning to the word "corruptly" in the statute by charging:

> [T]he obstruction count[ ] involve[s] not only the element of specific intent but [also that the] defendant must have acted corruptly.... [A] deliberate, knowing bad purpose is not enough to convict. He must be shown beyond a reasonable doubt to have had *the bad purpose to act in the precise manner a statute was intended to prevent, that is, to obstruct or try to obstruct an inquiry* .... To find that the defendant acted with specific corrupt intent in the obstruction counts, he must be shown to have also acted with the *bad purpose of doing the thing prohibited by the particular statute.* A person who has this purpose and does an act knowingly and intentionally, with the deliberate purpose to conduct himself in a manner prohibited by the statute, acts with specific corrupt intent.

(Emphasis added). [J.A. 676–77].

North argues that these instructions are reversible error, even apart from the autho-

---

**9.** Even though he was actually convicted only of aiding and abetting others in their violation of section 1505, aiders and abettors must possess the same criminal intent as the principals. Section 1505 thus provides the appropriate threshold for North's criminal intent on Count 6. *See United States v. Sampol,* 636 F.2d 621, 676 (D.C. Cir.1980).

rization issue, because the prosecution should have had to show that he acted with the subjective knowledge that his acts were *unlawful*. If North were correct on this point, there would be no doubt that the jury should have been free to consider all evidence of authorization in the record when it determined whether North knew he was acting unlawfully. *See* Maj. Op. at 885 (reversing Count 9 on this ground). In support of his position, North cites *United States v. Haldeman*, 559 F.2d 31, 114 n. 226 (D.C.Cir.1976) *(per curiam) (en banc)*, *cert. denied*, 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977), where we said that the government, to establish specific intent in a prosecution for violating 18 U.S.C. § 1503: [10]

> must prove that the defendant knowingly did an act which the law forbids, *purposely intending to violate the law*. This is not to say, however, that the accused must have known he was violating a specific statute, but only that he knew he was acting wrongly or violating the law in general when he acted.

(citations and internal quotations omitted, emphasis in original). That language does lend support to North's position, but I am not entirely sure that the *Haldeman* court meant what it said in that footnote. The definition of specific intent given by the district court in *Haldeman* provided that "[a] person who knowingly does an act which the law forbids intending with bad purpose *either to disobey or disregard the law*, may be found to act with specific intent." *Id.* at 113 (emphasis added). That formulation of specific intent might be satisfied, it seems, without any subjective awareness by the defendant that he was violating the law, if he had the purpose to *disregard* the law. To be sure, that is a subtle distinction since a person who "intend[s] with bad purpose to ... disregard the law," must have some inkling that his behavior is in that range of bad conduct

that might be prohibited by law. Still, the formulation of specific intent as meaning "bad purpose either to disobey or disregard the law," is apparently the normal specific intent instruction given in this circuit, and we have never before held that it required proof of the defendant's subjective knowledge of unlawfulness. (I note, however, that the district court here did *not* give the usual "bad purpose to disobey or disregard the law" instruction which I discuss above.) And in any event, my answer to the question whether the jury was improperly constricted in its consideration of evidence of authorization turns less on the proper definition of specific intent *per se* than on the closely intertwined issue of the proper reading of section 1505, and the word "corruptly" in particular.

North's primary rationale for arguing that knowledge of unlawfulness was required for Count 6 was that, absent such knowledge, there was no assurance that the individuals involved "were on notice that the conduct at issue [was] 'corrupt' in the eyes of the law." [N.Br. at 63]. For this argument, North relied for support principally on *United States v. Reeves*, 752 F.2d 995, 1001–02 (5th Cir.), *cert. denied*, 474 U.S. 834, 106 S.Ct. 107, 88 L.Ed.2d 87 (1985), which held that 26 U.S.C. § 7212(a) [11]—which forbids "corrupt[ ]" endeavors to obstruct or impede the administration of the tax laws—requires the proof that the defendant intended to secure improper benefits or advantages for himself or others. The Fifth Circuit thought that interpretation was required in order to ensure that potential violators would know that their conduct is corrupt. Courts generally avoids constructions of criminal statutes that would render punishable behavior that would not be obviously wrongful to potential violators. *See, e.g., Liparota v. United States*, 471 U.S. 419, 426–27, 105 S.Ct. 2084, 2088–89, 85 L.Ed.2d 434

---

**10.** Section 1503 makes it a crime to "corruptly, or by threats or force, or by any threatening letter or communication, endeavor[ ] to influence, intimidate, or impede [a judicial proceeding]."

**11.** Section 7212(a) makes it a crime to "corruptly or by force or threats of force (including any threatening letter or communication) ... endeavor[ ] to obstruct or impede the due administration of [the tax laws]."

(1985);[12] *Morissette v. United States,* 342 U.S. 246, 250 n. 4, 72 S.Ct. 240, 243 n. 4, 96 L.Ed. 288 (1952) ("our substantive criminal law is based upon a theory of punishing the vicious will. It postulates a free agent confronted with a choice between doing right and doing wrong and choosing freely to do wrong.") (quotations omitted). While I would decline to hold here that section 1505 requires knowledge of unlawfulness (even *Reeves* did not go that far for section 7212(a)), I do think that a fair reading of section 1505 sustains North's objections to strictures placed on the jury's consideration of the evidence of authorization in the record.

Section 1505, it will be recalled, makes it a crime to "corruptly, or by threats or force, or by any threatening letter or communication ... endeavor[ ] to influence, obstruct, or impede [a congressional inquiry]." Construing the statute would appear to be rather simple when the government alleges that someone has endeavored to influence, obstruct, or impede a congressional inquiry by threats or by force or by a threatening communication. The problem arises where, as here, someone is accused of *corruptly* endeavoring to influence or obstruct a pending congressional inquiry. What does "corruptly" mean in that context?

I start from the rather unremarkable proposition that the word "corruptly" in section 1505 means *something.* That is, the word "corruptly" modifies the word "endeavor"—by describing either the defendant's means or his motive or both—and thereby adds something substantive to the statute. And, in general, where, as here, Congress does not indicate otherwise, we should give statutory terms their common or popular meanings. *See Perrin v. United States,* 444 U.S. 37, 41–45, 100 S.Ct. 311, 313–15, 62 L.Ed.2d 199 (1979). According to WEBSTER'S THIRD NEW INTERNATIONAL

DICTIONARY, "corruptly" is the adverbial form of the adjective "corrupt," meaning "depraved, evil: perverted into a state of moral weakness or wickedness ... of debased political morality: characterized by bribery, the selling of political favors, or other improper political or legal transactions or arrangements...." Also instructive is the definition in BLACK'S LAW DICTIONARY at 311 (5th ed. 1979) that the word corruptly "[w]hen used in a statute, ... generally imports a wrongful design to acquire some pecuniary or other advantage."

It is hard to believe that anyone could quarrel with that last paragraph,[13] but there are cases—primarily dealing with section 1503—which interpret "corruptly" to refer to the defendant's motive but then inconsistently say that the bad or evil motive denoted by the word "corruptly" means nothing more than an intent to obstruct the proceeding. *See, e.g., United States v. Laurins,* 857 F.2d 529, 536–37 (9th Cir.1988) ("The specific intent required for obstruction of justice under sections 1503 and 1505 is that defendant must have acted 'corruptly,' i.e., that the act must be done with the purpose of obstructing justice."), *cert. denied,* —— U.S. ——, 109 S.Ct. 3215, 106 L.Ed.2d 565 (1989); *United States v. Jeter,* 775 F.2d 670, 679 (6th Cir. 1985) (section 1503's *"mens rea* requirement that a person must 'corruptly' endeavor to interfere with the due administration of justice ... [dictates that one must act with] *the specific intent of purpose to obstruct.")* (emphasis in original); *United States v. Ogle,* 613 F.2d 233, 238 (10th Cir.1979) (stating, in section 1503 case, that "an endeavor to influence a juror in the performance of his or her duty or to influence, obstruct or impede the due administration of justice is per se unlawful and is tantamount to doing the act corruptly."), *cert. denied,* 449 U.S. 825, 101 S.Ct.

---

**12.** In *Liparota,* the Court held that conviction of food stamp fraud under 7 U.S.C. § 2024(b)(1)—which makes it a crime to "knowingly ... transfer[ ], acquire[ ], ... or possess[ ] coupons ... in any manner not authorized by [the statute] or regulations"—requires a showing that the defendant knew his actions were *unlawful,* because any other construction would

render criminal a variety of actions undertaken with no evil or improper intent. The Court declined to reach such a result without clear indication that Congress so intended.

**13.** It is not clear whether the Majority, in fact, does.

87, 66 L.Ed.2d 28 (1980).[14] The interpretation described in those cases reads the word "corruptly" out of the statute.[15] If the statute says that it is a crime if one "corruptly endeavors to obstruct [an inquiry or proceeding]" it simply makes no sense to construe that to mean only that one must do it with the intent to obstruct the inquiry or proceeding. Indeed, the word "endeavor" in the statute already requires that the defendant intend to obstruct the inquiry or proceeding. The Majority goes through the exercise of defining the word corruptly, *see* Maj. Op. at 881–882, but then appears to ignore it in exactly the way I describe.

That is not to say that I believe that all of those courts necessarily reached wrong results, since those opinions can be taken to express the view that *any* endeavor to obstruct a judicial proceeding is inherently—that is, as a matter of law—corrupt. Indeed, some of the cases say as much. *See, e.g., Ogle,* 613 F.2d at 239 (the term corruptly "is directed to the effort to bring about a particular result such as affecting the verdict of a jury or the testimony of a witness.... This is *per se* an obstruction of justice.... [I]f the jury believed the evidence in this case, the [defendant's] motives were inherently evil."). And at least for the conduct covered by section 1503 that legal presumption might be warranted since, after all, very few noncorrupt ways to or reasons for intentionally obstructing a judicial proceeding leap immediately to

mind. The Fifth Circuit has made similar observations:

> Although the special considerations surrounding a criminal trial have caused courts interpreting section 1503 to impute "corrupt" intent to many practices, the independent significance of this term has not been suppressed.... [W]here a defendant has endeavored to obstruct a criminal proceeding, the "advantage inconsistent with the duties and rights of others" is so clear that courts have often been willing to impute the desire to obtain such advantage on a *per se* basis.... [S]ection 1503 presupposes a proceeding the disruption of which will almost necessarily result in an improper advantage to one side in the case.

*United States v. Reeves, supra,* 752 F.2d at 999.

But to import that legal presumption to section 1505—and thus to assert that all endeavors to influence, obstruct or impede the proceedings of congressional committees are, as a matter of law, corrupt—would criminalize a range of innocent behavior. Unlike courts of law covered by section 1503, congressional committees are part and parcel of a political branch of government and therefore serve wide-ranging political functions not limited to a search for truth in accordance with formal rules. They may also have a far-flung investigative scope and evoke legitimate political jousting between the executive and legislative branches. No one can seriously question that people constantly attempt, in

**14.** I am unsure whether to place *United States v. Mitchell,* 877 F.2d 294 (4th Cir.1989) in this same category. In that 1505 case, the defendants had taken $50,000 in return for using their influence with their uncle, a congressman, to squelch a congressional investigation of the Wedtech corporation. Rejecting the argument that appellants' behavior was not covered by section 1505 because they did not use any means of influence that were in themselves illegal, such as bribing the congressman, the court stated that "the proper inquiry is whether a defendant had the requisite corrupt intent to *improperly* influence the investigation." *Id.* at 299; *see also id.* ("any endeavor, including the promised exploitation of a special relationship with the chair of the investigating committee, when done with the requisite intent to *corruptly* influence a congressional investigation, violates

§ 1505."). (emphasis added). The presence of the adverbs "improperly" and "corruptly" before the word "influence" in those quoted passages suggests that the *Mitchell* court did not fully embrace the view of the cases cited in the text.

**15.** The Majority argues that these cases do *not* read the word "corruptly" out of the statute, stating that "these cases have recognized that 'constitutionally unprotected and purportedly illicit' conduct—behavior that is 'not ... inadvertent, negligent, or even reckless[ly] non-purposeful'—reflects a 'corrupt endeavor to interfere with the due administration of justice.'" Maj. Op. at 882 (quoting *United States v. Jeter,* 775 F.2d 670, 679 (6th Cir.1985), *cert. denied,* 475 U.S. 1142, 106 S.Ct. 1796, 90 L.Ed.2d 341 (1986)). That is a correct quote from *Jeter,* but I have not the vaguest idea what it means.

innumerable ways, to obstruct or impede congressional committees. In addition to the examples set forth in the Majority Opinion (the call from the "executive branch official" and the "political activist") but never confronted, I suggest another example which, to my mind, rings all too true historically. Consider a Senate committee contemplating legislation that is unfavorable to trade unions. Suppose also that the committee initiated an investigation into alleged union corruption and union leaders got together and said, "Those congressmen are not interested in union affairs, they just want a justification for passing an anti-union bill. Let's not provide *any* information to the committee unless legally compelled." Is that a crime? The Majority, as far as I can detect, gives no answer to my question.

If there could be any doubt about my interpretation of "corruptly," it is eliminated by focusing on the term "influence" in section 1505, which appears in a parallel construction with "obstruct" and "impede." It is thus possible to be charged with "corruptly endeavoring to influence" a congressional inquiry. And whatever it might mean to commit that crime, it must require something more than merely acting with the purpose of influencing the congressional committee. If attempting to influence a congressional committee *by itself* is a crime, we might as well convert all of Washington's office buildings into prisons. Some might not think that such a bad idea, but I doubt that Congress so intended. That, however, is precisely the reading of the statute apparently embraced by the Majority.

I tend to agree with the Majority's statement, *see* Maj. Op. at 883, that North was "entitled only ... to a jury that applied 'corruptly' according to its usual definitions." But the Majority also claims that that requirement was satisfied by "the instruction given," an instruction the Majority does *not* quote. That instruction is the one I set out at page 938 *supra* and which I repeat here in the margin.[16] Quite clearly, that instruction does *not* permit the jury to "apply 'corruptly' according to its usual definitions," but instead instructs them that a corrupt intent means merely an intent to obstruct. That is precisely the view that the Majority, at other points in its opinion, claims to disavow. *See* Maj. Op. at 882.

I am therefore convinced that, at least when a defendant is accused under section 1505 of corruptly endeavoring to obstruct a congressional committee, the word "corruptly" in the statute requires the prosecution to show something beyond a mere intent to obstruct the committee.[17] Properly construed, section 1505 also requires the prosecution to prove that the endeavor was undertaken "corruptly," that it was depraved, evil, or wrongful. And it seems inescapable that this is a question of fact for the *jury* to determine whether an endeavor was undertaken corruptly.

Recognizing that the word "corruptly" in section 1505 should be construed to mean what it says does not end the inquiry since it is not clear from the face of the statute exactly *what* must be corrupt. While "corruptly" surely modifies the verb "endeavor," to say that someone corruptly endeavors to obstruct an inquiry might mean (1) that he does so with a corrupt purpose, or

**16.** That instruction was:

[T]he obstruction count[ ] involve[s] not only the element of specific intent but [also that the] defendant must have acted corruptly.... [A] deliberate, knowing bad purpose is not enough to convict. He must be shown beyond a reasonable doubt to have had *the bad purpose to act in the precise manner a statute was intended to prevent, that is, to obstruct or try to obstruct an inquiry....* To find that the defendant acted with specific corrupt intent in the obstruction counts, he must be shown to have also acted with the *bad purpose of doing the thing prohibited by the particular*

statute. A person who has this purpose and does an act knowingly and intentionally, with the deliberate purpose to conduct himself in a manner prohibited by the statute, acts with specific corrupt intent.
(Emphasis added). (J.A. 676–77).

**17.** The District Court's instructions on this issue—that North "must be shown beyond a reasonable doubt to have had the bad purpose to act in the precise manner a statute was intended to prevent, that is, to obstruct or try to obstruct an inquiry"—were thus erroneous.

(2) that he does so by independently corrupt means, or (3) both.

The second view seems, at first glance, to be most faithful to the grammatical structure of section 1505, the first clause of which is structured as a list of techniques, each separated by an "or," describing *how* the endeavor to influence, obstruct or impede must be undertaken in order to be illegal. Thus, the adverbial words or phrases "corruptly," "by threats or force," and "by any threatening letter or communication" are equated, suggesting that Congress meant "corruptly" to refer to the means by which the defendant endeavored to influence or impede a congressional inquiry. If the jury focuses on the means chosen by the defendant in his endeavor to obstruct, it would not necessarily need to probe the morality or propriety of the defendant's purpose—something the criminal law ordinarily eschews. *See generally People v. Roberts,* 211 Mich. 187, 178 N.W. 690 (1920) (husband who poisons terminally ill wife at her request nonetheless guilty of murder); 1 W. LaFave & A. Scott, Substantive Criminal Law § 3.6. The "means" view does seem to mitigate that problem since, for example, a defendant who bribes the chairman of a congressional committee can be said to have acted "corruptly" no matter how laudable his underlying motive.

But when the jury determines whether the endeavor was undertaken corruptly, it seems to me to be possible to ignore the defendant's purpose and consider solely his means only when those means are themselves *independently criminal*—as in the bribery example above. Whenever the means used are not independently criminal, the jury cannot avoid considering the defendant's purpose if it is to meaningfully determine whether the endeavor was corrupt or evil or depraved. Suppose, for example, that a lawyer advises his client not to testify before a congressional committee conducting an inquiry. He is intentionally obstructing the inquiry (suppose he admits as much), but can the jury really decide if he has done so corruptly by examining his means alone? It would seem that the corruptness determination would necessarily hinge on his purpose. The obstruction would not be corrupt if his purpose were solely to protect his client from possible legal difficulties. But it might well be corrupt if the lawyer's purpose were to prevent the client from divulging information that would implicate the lawyer. *Cf. United States v. Cintolo,* 818 F.2d 980 (1st Cir.1987). And even when the means used are less neutral on their face, the jury's ultimate decision on the corruptness question could depend in part on the defendant's purpose. In any event, I do not think that the courts could legitimately instruct juries as to which legal, if unsavory, means of influencing a congressional committee are corrupt and which are not. If that is so, then the jury must be permitted to consider the defendant's purpose or else they would be put in the anomalous position of having to decide whether attempting to influence a committee by advising one's client not to testify is a corrupt thing in the abstract, regardless of why one did so.

I therefore think that it is unavoidable that the jury may properly consider the defendant's purpose for endeavoring to obstruct a congressional committee in those cases where the means utilized were not independently criminal.[18] But that does

18. Indeed, while courts have not often focused on the distinction between corrupt motives and corrupt means in construing section 1505, or the identical language in 18 U.S.C. § 1503, almost all of the cases appear to take the view that the term "corruptly" refers to the defendant's motive in endeavoring to obstruct the pending inquiry or judicial proceeding. *See, e.g., United States v. Cintolo,* 818 F.2d 980, 991–93 (1st Cir.), *cert. denied,* 484 U.S. 913, 108 S.Ct. 259, 98 L.Ed.2d 216 (1987); *Haldeman,* 559 F.2d at 115 n. 229 (approving jury instruction that included statement that " 'corruptly,' as used in [section 1505] simply means having an evil or improper purpose or intent"); *United States v. Haas,* 583 F.2d 216, 220 (5th Cir.1978) ("The term 'corruptly' [in section 1503] means for an improper motive, or an evil or wicked purpose") (internal quotations and citations omitted), *cert. denied,* 440 U.S. 981, 99 S.Ct. 1788, 60 L.Ed.2d 240 (1979); *United States v. Ryan,* 455 F.2d 728, 734 (9th Cir.1972) ("The word 'corrupt' in the [section 1503] means for an evil or wicked purpose"). There is at least one cases, however, that seemed to construe "corruptly" to refer to the defendant's *means* of obstructing. *See Unit-*

not mean that its probe would be entirely open-ended. They would be interested only in whether the defendant was attempting to secure some advantage for himself or for others that was improper or not in accordance with the legal rights and duties of himself or others. If so, the defendant's underlying motive or justification, no matter how laudable, would not exonerate him. But to the extent that the jury must examine the defendant's motive or purpose, in that narrow sense, in making its corruptness determination, it must be permitted to consider, at the very least, evidence tending to show that the defendant believed that the nature of his conduct (as opposed to its underlying justification) was appropriate—that is, in accordance with the law. The Majority declares the implications of this view to be "stunning," asking whether it would permit a bigoted or otherwise biased jury to excuse a white supremacist official or a "self-styled Robin Hood" who altered documents. *See* Maj. Op. at 884. Of course, a bigoted jury might exculpate a white supremacist defendant out of sympathy for his views but, given my narrow view of the relevance of purpose, that outcome could only arise if the jury refused to follow proper instructions. Jury nullification is a problem (and it can happen even when the jury is told to ignore motive entirely), but it is not the one before us. Our concern is how the jury should be instructed and what evidence they should be told to consider.

I have used throughout this discussion the word "purpose" rather than the Majority's word "motive." I do so because "motive"—particularly as the Majority uses the term—can refer to a defendant's underlying reason for committing the act. "I stole the loaf of bread because my family is hungry" or "I bribed the Chairman of the Committee to focus the Committee's inves-

tigation toward corporate polluters rather than on the way in which certain environmental groups are financed because, in that way, environmental goals would be furthered." To be sure, intent, purpose, and motive are concepts along a continuum, but whatever the appropriate term, I do not think the jury can be barred from considering those factors that contributed to North's view of the nature of the acts he committed *under this statute.*

It seems clear to me, then, that the jury was entitled to examine purpose in this case when deliberating on Count 6. The indictment specified two separate means that North allegedly used to aid and abet the endeavor to obstruct the congressional inquiry. First was assisting in the preparation of a false chronology that Poindexter and Casey could refer to while giving testimony before the committees. The chronology was apparently designed to conceal any official United States knowledge of an involvement in a November 1985 shipment of arms to Iran, clearly a material fact to the committees' inquiries. Since purposely giving false material testimony to a congressional committee is itself unlawful (whether or not one is under oath), *see* 18 U.S.C. § 1001, North's preparation of it (which he freely admitted) could have involved the aiding and abetting the making of a false statement to Congress. Although the IC does not make this argument, perhaps because the false statements were never actually made and thus the chronology was never used (and North was not charged with this crime), I assume *arguendo* that North's aid in the preparation of the false chronology for Poindexter and Casey could constitute the basis of a jury determination of corrupt means—without regard to purpose.

The indictment also alleged, however, that North used a second means to aid the

---

ed States v. Alo, 439 F.2d 751, 754 (2d Cir.1971) ("section 1505 deals with the deliberate frustrations through the *use of corrupt or false means* of an agency's attempt to gather relevant evidence.") (emphasis added). And still other cases seem to straddle the two views. *Compare United States v. Rasheed,* 663 F.2d 843, 852 (9th Cir.1981) (Section 1503 proscribes "all manner of corrupt methods of obstructing justice"

whether or not they involve threats or intimidation, and that the question before the court was "whether concealment of documents is a corrupt means of ... obstructing ... justice.") *with id.* (holding "that the word 'corruptly' as used in the statute means that the act must be done with the purpose of obstructing justice."), *cert. denied,* 454 U.S. 1157, 102 S.Ct. 1031, 71 L.Ed.2d 315 (1982).

endeavor to obstruct, namely, that he altered, destroyed, and removed certain NSC documents. As North correctly argues, we must assume for the purposes of this appeal that the jury's guilty verdict on this count could have rested on this alleged underlying act rather than on the chronology. Indeed, it is not even unlikely that the jury's verdict on Count 6 depended on the document destruction rather than the preparation of the chronology. North's personal involvement with the documents was clear whereas the chronology was less obviously North's own venture. As North testified, the chronology "was a false statement when it arrived" on his desk. (J.A. 1678). In addition, the most misleading changes to the chronology were made personally by Robert McFarlane. Under those circumstances, it is not hard to believe that the jury was more willing to hold North responsible for the document-related "means" than for the chronology "means." The crucial point here is that, as we have recognized, see Maj.Op. at 888, destroying these documents is not a criminal act in and of itself unless it is done with subjective knowledge of unlawfulness. Indeed, we reverse the conviction on Count 9 precisely because we conclude that the jury had been improperly instructed on the issue of North's intent, therefore making illegitimate the jury's conviction on that count. (The Majority opinion on this count is inconsistent with the Majority opinion on Count 9.) Without that verdict, we are left with the mere allegation that North aided and abetted an endeavor to obstruct a congressional inquiry by destroying documents. Destroying documents (whether or not in violation of regulations) is not a crime. Government officials, particularly those who deal with security matters, often shred documents as a matter of course—to do otherwise might create serious dangers or, in some circumstances, violate the law. Therefore, when the jury decides, as it must, whether the endeavor was undertaken corruptly, it could not conclude that "destroying documents," without regard to purpose, is a corrupt means of obstructing the committee. Thus, the jury would have to consider the factual context in which the documents were destroyed—including North's purpose as I have narrowly delimited that term.

The evidence of authorization that the jury was instructed not to consider and his interaction with his colleagues in general formed part of the factual context that was central to a proper jury examination of North's purpose. North claimed that he destroyed and altered these documents— pursuant to the direct instructions of Casey, Poindexter, McFarlane, and the indirect instructions of President Reagan—in order to protect sensitive covert operations involving Iran and the Contras. The jury was not entitled to exonerate the appellant *merely* because he was "following orders" regardless of whether he thought those instructions proper. But any communication from colleagues, superiors or not, may have affected North's purpose—in the narrow sense of that term discussed above— and is therefore legitimately considered in determining whether appellant acted corruptly in a case such as this where the *means* employed were not themselves independently unlawful.

It is for the jury, not the judge, to decide whether implicit, even vague, instructions to the defendant bear significantly on the corruptness of the defendant's endeavor. And it is for the jury, not the judge, to ask whether the reasonableness of the appellant's belief in the propriety of his superiors' behavior and instructions should be considered relevant to that inquiry. I find no justification, moreover, for the judge's most damaging instruction that if a person chooses a course of action of "dubious legality" to satisfy "authorization" when a clearly legal course would comply, then "authorization *cannot* be viewed as affecting intent." Under that instruction, it is not even necessary for the defendant to be aware that the clearly legal course of action was available to him. The judge's formulation might be the wisest approach for the jury to follow, but it is not one that I can say it was obliged to take as a matter of law.

* * * * * *

The Majority appears to agree with a good deal of my analysis yet reaches the opposite result. I confess I am unsure by what logical process the Majority arrives at its destination. It would appear that the Majority's reasoning is diverted by inapposite historical analogies (Becket, Nuremberg) away from a careful parsing of the statute which we must construe.

"I was only following orders," *see* Maj.Op. at 884, resonates powerfully (and horrifyingly) in the world's collective memory—but to so describe North's defense is, in my view, an unfair characterization of it. His appeal on this count is that the District Court did not permit the jury to consider whether North thought he was acting corruptly, thus illegally. Only a short time ago in a less notorious case we said that "[t]he government's burden is to prove the requisite *mens rea* of the offense charged; if appellant did not harbor the necessary criminal intent, then she is not guilty regardless of whether her mistaken understanding of the law was objectively reasonable," *United States v. Rhone*, 864 F.2d 832, 835 (D.C.Cir.1989). We do not have to embrace that formulation to agree with North here—for this statute requires an even stronger showing of intent than was true in *Rhone*, but instead the Majority tacks in the opposite direction and, in my view, not only abandons *Rhone*, it renders the word "corruptly" meaningless.

## IV. REAGAN SUBPOENA

Appellant seeks reversal of his convictions on Counts 6 and 9 on the added ground that the district court erroneously quashed his subpoena to former President Ronald Reagan. On the basis of the record as it appears before us, I believe it was serious error to have quashed the subpoena, and therefore I dissent from the Majority opinion on this ground also.

### A.

Prior to his trial, appellant served then-President Reagan with a subpoena *ad testificandum*. Mr. Reagan, represented by the Attorney General, moved to quash the defendant's subpoena. While the record does not reveal the grounds of Mr. Reagan's motion, neither does it indicate that he formally asserted executive privilege. The District Court held the matter in abeyance until the trial was underway, by which time Mr. Reagan had left office. It then ordered the defendant to file "under seal, *ex parte*, a succinct particularized statement of facts defendant desires to elicit from President Reagan." Order, March 27, 1989, 1989 WL 57512 (J.A. 496, 497). Appellant identified thirteen subjects on which he expected to elicit favorable testimony from Mr. Reagan, many of which were primarily relevant to Counts on which he was later acquitted. In preparing that proffer, North did not have the advantage of examining the testimony that Mr. Reagan voluntarily provided to the Independent Counsel by way of sworn interrogatories or the notes prepared from Mr. Reagan's presidential diaries. The district court, after examining the appellant's proffer and comparing it with the interrogatory answers and the diary notes *in camera*, quashed the subpoena, ruling that North had failed to show that "Mr. Reagan's appearance is necessary to assure [the] defendant a fair trial." (J.A. 500).

### B.

All criminal defendants have a constitutional right to call witnesses on their behalf who can offer evidence that is both material and favorable to their defense. *See United States v. Valenzuela–Bernal*, 458 U.S. 858, 867, 102 S.Ct. 3440, 3446, 73 L.Ed.2d 1193 (1982). As the Supreme Court put it in *Washington v. Texas*,

The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law.

388 U.S. 14, 19, 87 S.Ct. 1920, 1923, 18 L.Ed.2d 1019 (1967); *see also Chambers v. Mississippi*, 410 U.S. 284, 302, 93 S.Ct. 1038, 1049, 35 L.Ed.2d 297 (1973) ("Few rights are more fundamental than that of an accused to present witnesses in his own defense.") (citations omitted). This right, like most, is not absolute. When a putative witness has a countervailing privilege allowing him to avoid testifying, a criminal defendant may indeed be deprived of calling a witness on his behalf. Most notably, we have held, as have most other circuits, that a defendant's compulsory process rights do not automatically trump a witness' Fifth Amendment right against self-incrimination. *See, e.g., United States v. Thornton*, 733 F.2d 121, 125 (D.C.Cir.1984). Absent a countervailing privilege, however, it is a violation of a defendant's Sixth Amendment rights to quash a subpoena to a prospective witness, provided of course that the defendant shows that the witness would provide testimony that is material and favorable to his defense. *See Valenzuela–Bernal*, 458 U.S. at 867, 102 S.Ct. at 3446; *see also Washington v. Texas*, 388 U.S. at 23, 87 S.Ct. at 1925; *United States v. Miller*, 904 F.2d 65 (D.C.Cir.1990); *United States v. Rubin*, 836 F.2d 1096, 1101–02 (8th Cir.1988) (no Sixth Amendment violation in quashing subpoena where defendant failed to show evidence would be favorable); *United States v. Verkuilen*, 690 F.2d 648, 659 (7th Cir.1982).

North was convicted in Count 6 of aiding and abetting John Poindexter and William Casey who, in November 1986, are alleged to have "corruptly endeavored to obstruct," 18 U.S.C. § 1505, the inquiries of three congressional committees—the Senate Select Committee on Intelligence, the House Permanent Select Committee on Intelligence, and the House Committee on Foreign Affairs—into the sale of arms to Iran and the provision of aid to the Contras. North's part in that alleged obstruction involved helping to prepare a chronology—to be used by Casey and/or Poindexter when they testified before the committees on November 21, 1986—which concealed the United States' role in the shipment of arms to Iran in November 1985. As part

of this charge, the indictment also alleges that North destroyed, altered, concealed and removed National Security Council ("NSC") records, documents and papers concerning both the arms sales to Iran *and* U.S. efforts to aid the Contras. North was convicted in Count 9 of violating 18 U.S.C. § 2071(b) by destroying, removing, and altering the same documents referred to in Count 6. As I have emphasized above, *see supra* at 945, in order for the jury to convict North under section 2071(b), the IC had to prove that North acted with knowledge that his conduct was unlawful. And as North points out, we must assume for the purposes of this appeal that his conviction on Count 6 could rest on either the chronology preparation or the document destruction. Similarly, his convictions on both counts could have stemmed from North's efforts to conceal either U.S. involvement in the Iran arms shipment or Reagan Administration support for the Contras.

According to North, Mr. Reagan's testimony would establish that, as President, he encouraged, approved, authorized, condoned, and at times directed various members of the executive branch to withhold from members of Congress information concerning the sale of arms to Iran as well as information about aid provided to the Contras during the period of the Boland Amendments. In particular, North asserts that testimony from Mr. Reagan would permit him to show that the President authorized his subordinates to withhold information about efforts to support the Contras in their correspondence and meetings with Congress in September and October 1985 and July and August 1986. As for the Iran initiative, North claims that he could elicit from Mr. Reagan testimony showing that Mr. Reagan had advance knowledge of both the September 1985 TOW missile shipment and the November 1985 HAWK missile shipment to Iran and that Mr. Reagan *directed* that these and other aspects of the Iran initiative were not to be disclosed. Finally, North represented that Mr. Reagan approved and personally participated in efforts to conceal the Iran initiative from Congress between November 7 and Novem-

ber 25, 1986, the very period in which North committed the actions underlying Counts 6 and 9.[19]

Testimony to that effect would seem to be relevant to both Count 6 and Count 9. As to Count 9, North testified at trial that he believed he was carrying out McFarlane's, Casey's, and Poindexter's instructions when he destroyed the NSC documents concerning both the arms sales to Iran and aid to the Contras. He also testified that he believed—and that Casey and Poindexter led him to believe—that concealing those initiatives comported with the President's express wishes.[20] Mr. Reagan's testimony, even if it could not aid North's claim that he was acting lawfully in fact, could certainly bear on the question whether North *thought* he was acting lawfully. And on Count 9 that was the crucial question because North could not be convicted unless the jury found that he *knew* he was acting unlawfully. When the behavior at issue is destroying NSC documents in apparent violation of an NSC regulation, it seems obvious that one's belief that the President has instructed others, including the National Security Advisor, that he wants the information contained in the documents concealed might well lead someone to *think* that destroying those documents was not unlawful, notwithstanding the regulation.[21] And, there is simply no warrant for the Majority's conclusion

that Reagan's testimony has *no* probative value unless it can be shown that he explicitly directed North to destroy the documents.[22] Particularly since only an internal NSC rule barred destruction, if Mr. Reagan implicitly or indirectly indicated his desires, that would certainly bear on *North's view* as to whether or not he was authorized *by law* to destroy the documents.[23]

I can think of no more powerful corroboration for North's claim that he believed McFarlane's, Casey's and Poindexter's efforts to conceal the Iran and Contra initiatives were authorized by the President than testimony from Mr. Reagan himself that he had indeed authorized them, either explicitly or implicitly. Corroboration of the defendant's testimony is normally important to the defense. *See, e.g., United States v. Detrich,* 865 F.2d 17, 22 (2d Cir.1988) (reversing conviction where corroborative evidence bearing on defendant's *mens rea* was erroneously excluded). In this case it was especially so. The instructions and actions of North's superiors—as well as their accounts to him of their direct meetings with the President—were critical to his main defense that he did not believe he was acting unlawfully when he destroyed the relevant documents. But on this issue, North was forced to rely at trial on his own testimony alone. Of his superiors, only McFarlane testified at trial, and he testified

---

19. For example, North testified at trial that Poindexter told him that Mr. Reagan personally withheld from congressional leaders information about the 1985 HAWK shipment in a November 12, 1986 meeting. (J.A. 1549–50, 1666).

20. According to North's testimony, his belief that this was the President's policy on the arms sales was strengthened by Mr. Reagan's statement to the press that the United States neither knew of nor condoned any shipment of arms to Iran except for those authorized by Presidential Finding on January 17, 1986. North not only knew that to be false, but he testified that he also believed that the *President* knew it to be false since North himself had seen a Finding, signed by the President, authorizing arms shipments in November of 1985. North testified that he saw Poindexter personally destroy that signed Finding.

21. The IC only attempted to prove North's knowledge of unlawfulness with reference to

the NSC regulation, not to the criminal statute, making inappropriate the Majority's suggestion, *see* Maj. Op. at 891 n. 24, that North was on notice that the statute itself prohibited the destruction of the documents. That is equivalent to deciding the question of intent as a matter of law from the court of appeals. *See also* Maj. Op. at 892–894 (upholding directed verdict on "pending inquiry" issue).

22. It seems inconsistent for the Majority to worry about encouraging a defense of "I was only following orders," and at the same time to contend that Reagan's testimony is relevant only if it can be shown that he gave direct orders so that North would be following them.

23. For that reason I think the court's resolution of the Reagan subpoena issue cannot be reconciled with our reversal of Count 9 based on the District Court's erroneous instructions on authorization.

against North pursuant to a plea agreement with the government. North was not permitted to call Mr. Reagan, Casey was deceased, and Poindexter was unavailable because of his Fifth Amendment privilege. Under those circumstances, it is hard to overemphasize the importance that corroborative testimony from Mr. Reagan may have had on the knowledge of unlawfulness question.

I also think that testimony was relevant to Count 6. In the first place, as I argue above, North's knowledge of the unlawfulness of his actions in destroying the documents at issue in Count 9 is also relevant to the question of whether North acted "corruptly" as that word is used in 18 U.S.C. § 1505. *See supra* at 944–45. Therefore, everything I said above about the relevance of Mr. Reagan's testimony to Count 9 makes it relevant to Count 6 as well. Moreover, North was acquitted as a principal on Count 6 and was convicted only of aiding and abetting Poindexter's and/or Casey's obstruction of congressional inquiries. In its brief, the IC claims that any testimony from Mr. Reagan would be irrelevant to North's authorization defense because, as the District Court noted, there is no indication that North ever received any direct instructions from Mr. Reagan. The IC's brief, however, does not directly dispute North's claim that Mr. Reagan's testimony would have been relevant insofar as it described his instructions to Poindexter and Casey. At oral argument, the IC did argue that evidence of Mr. Reagan's instructions to Poindexter and Casey would be irrelevant to North's defense since that testimony would bear only on a possible authorization defense available to Poindexter and/or Casey, not on North's intent. In order to convict North as an aider and abettor on Count 6, however, the jury had to find that he possessed the same level of intent that he would have needed to be convicted as a principal. (*See* J.A. 679).

Although we hold above that presidential authorization is not itself a defense to any of the charges against North, it seems rather obvious that if North thought that McFarlane, Casey, and Poindexter were all acting *properly* (even *lawfully*), the jury would be entitled to reject the claim that North *alone* acted "corruptly." The Majority's discussion on this point, however, makes rather clear that my colleagues believe North could be found guilty on Count 6 if the jury merely thought he acted with the intent to impede an inquiry, for there could be no other justification for calling Mr. Reagan's testimony irrelevant. As I explained above, that view is at odds with the plain language of the statute.[24]

The IC asserts that the record provides no basis for North's claim that Reagan would have testified consistently with North's predictions—especially that Mr. Reagan would say that he had instructed Casey and Poindexter to obstruct congressional inquiries. Even if the IC's characterization of the record were accurate, I would not be persuaded since the record also provides us with no reason to doubt that Mr. Reagan would have testified consistently with North's proffer. And since North was denied access to Mr. Reagan as well as to his diary notes and interrogatory answers, I think it was unfair to hold him to a rigorous standard in supporting his proffer.[25] To be sure, the District Judge examined Mr. Reagan's interrogatory answers (and accompanying documents) and the notes made from his diaries while considering North's subpoena to Mr. Reagan and observed that "[n]othing there even remotely supports an authorization claim." (J.A. 504). But the District Judge failed to consider the impact of the aiding and abetting charge and the corroborative force of Mr. Reagan's testimony to North's defense to that charge. Instead, the District Judge undertook a "limited and precise inquiry as to whether or not Mr. Reagan while Presi-

---

**24.** I reiterate, moreover, that it is simply incorrect to claim that "the jury was authorized to interpret the 'corrupt[ ]' intent requirement in 18 U.S.C. § 1505 according to the word's common meaning." Maj. Op. at 890. The jury was told nothing of the sort.

**25.** In that regard, it seems bizarre for the district court to have asked that North "demonstrate with *requisite specificity in concrete terms* further information only President Reagan could supply...." (J.A. 501 (emphasis added)).

dent, directly or indirectly, authorized Lt. Col. North to take any of the actions" underlying the indictment. (J.A. 503). Under that cramped standard for determining what testimony from Mr. Reagan would be relevant, it is hardly surprising that the District Judge found nothing in the interrogatory answers and diary notes to suggest that Mr. Reagan's testimony would be valuable to North.[26]

I conclude, therefore, that North made an adequate proffer to carry his burden of showing that Mr. Reagan's testimony would have been material and favorable to North's defense with regard to his conviction on Counts 6 and 9.

### C.

A defendant's right to call witnesses material and favorable to his defense must on occasion yield to a prospective witness' privilege to refrain from testifying. I turn, therefore, to the question whether Mr. Reagan, by virtue of his prior position as President of the United States, enjoyed a testimonial privilege sufficient to warrant the quashing of North's subpoena.

There no doubt exists an executive privilege, qualified by the legitimate needs of the judicial process, protecting the confidentiality of a President's communications in the performance of his responsibilities. *See Nixon v. Administrator*, 433 U.S. 425, 451–55, 97 S.Ct. 2777, 2794–96, 53 L.Ed.2d 867 (1977); *United States v. Nixon*, 418 U.S. 683, 707–13, 94 S.Ct. 3090, 3107–10, 41 L.Ed.2d 1039 (1974). That privilege is grounded in the public interest in the full and frank exchange between the President and his advisers that would be discouraged if left unprotected. *See Nixon*, 418 U.S. at 708, 94 S.Ct. at 3107–08. To the extent that continuing confidentiality serves these interests, moreover, the privilege survives the President's tenure. *See Nixon v. Ad-*

*ministrator*, 433 U.S. at 448–49, 97 S.Ct. at 2792–93.

Mr. Reagan, however, never asserted executive privilege in this case. He did, of course, move to quash the subpoena but he did not formally assert the privilege. Nevertheless, the District Judge apparently drew from *United States v. Nixon* the notion that since a President's private communications with his executive branch subordinates are presumptively privileged, it is unnecessary for the President even to assert the privilege when called to testify in a criminal trial in order to enjoy its benefits. That conclusion does not at all follow from *United States v. Nixon* because in that case the President did formally assert the privilege. I read the Supreme Court to have concluded in *Nixon* only that in the event a President or ex-President asserts executive privilege, the validity of the privilege is presumed; that is to say the communications over which the President asserts the privilege are presumed to implicate the interests that give rise to the privilege. As the *Nixon* Court said,

> We have earlier determined that the District Court did not err in authorizing the issuance of the subpoena. If a President concludes that compliance with a subpoena would be injurious to the public interest he may properly, as was done here, invoke a claim of privilege on the return of the subpoena. Upon receiving a claim of privilege from the Chief Executive, it became the further duty of the District Court to treat the subpoenaed material as presumptively privileged and to require the Special Prosecutor to demonstrate that the Presidential material was "essential to the justice of the [pending criminal] case." *United States v. Burr*, 25 F.Cas. [187, 192 (C.C.Va.1807) (No. 14,694) ].

---

**26.** I see nothing in those documents that establishes that North would *not* be able to elicit from Mr. Reagan relevant and material testimony along the lines discussed above (and an advocate might be able to see much more). The IC's interrogatories were naturally not designed to reveal information that would be crucial to North's defense. Even so, Mr. Reagan admits in his interrogatory answers that he had advance knowledge that Casey intended to testify falsely before Congress on November 21, 1986. In addition, the documents contain indications, which I am not free to reveal, suggesting that Mr. Reagan might well testify consistently with Mr. North's proffer.

418 U.S. at 713, 94 S.Ct. at 3110. And whenever presumptive executive privilege has been discussed in cases following *Nixon*, the President or ex-President has already asserted the privilege. *See Nixon v. Administrator*, 433 U.S. at 447–48, 97 S.Ct. at 2792–93; *Dellums v. Powell*, 642 F.2d 1351 (D.C.Cir.1980); *Dellums v. Powell*, 561 F.2d 242, 246 (D.C.Cir.1977); *see also Nixon v. Sirica*, 487 F.2d 700, 713, 716–17 (D.C.Cir.1973) (Presidential communications held presumptively privileged in case prior to *United States v. Nixon* where President interposed formal claim of privilege in response to grand jury subpoena); *but cf. United States v. Ehrlichman*, 546 F.2d 910, 931 (D.C.Cir.1976), *cert. denied*, 429 U.S. 1120, 97 S.Ct. 1155, 51 L.Ed.2d 570 (1977) (presumptive executive privilege mentioned although it is unclear whether it had been formally asserted). I therefore think that the so-called "presumptive privilege" for presidential communications has no independent legal significance unless the privilege is formally asserted.

That does not mean that any time a President or ex-President is called to testify in a criminal or civil case he must assert executive privilege to avoid testifying. If the testimony he is expected to give is not shown to be relevant and the subpoena to a President is nothing more than a harassing device, a District Judge may quite properly quash the subpoena based on irrelevance.[27] As I have argued, that is not this case. And it would be quite anomalous indeed for a witness called to give relevant evidence in a criminal trial to be permitted to avoid testifying merely because of his status. That is simply not the way our system works. Anyone who enjoys a privilege against testifying must assert it, whether the privilege be lawyer-client, priest-confessor, or husband-wife.

Even assuming *arguendo* that Mr. Reagan's motion to quash could be thought implicitly to raise executive privilege, or that executive privilege need not be asserted to be enjoyed, I do not believe the District Court was justified in quashing the subpoena. The District Court thought that, in the face of executive privilege, "[u]nder the principles established by *United States v. Nixon*, 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974), and prior precedents, the Court is required to determine whether or not defendant has established that Mr. Reagan's appearance is necessary to assure defendant a fair trial." (J.A. 500). The district court quashed the subpoena because North had failed to "demonstrate with requisite specificity in concrete terms what further information only President Reagan could supply that would be material and essential to the defense." (J.A. 501). In other words, the District Court read *United States v. Nixon* as constructing a very high barrier to a criminal *defendant* who wishes to call a President or ex-President who, it is asserted, will give evidence relevant to the defense. I think that is a dubious reading of the Supreme Court's opinion.

In *Nixon*, the Watergate Special Prosecutor sought to subpoena tapes from President Nixon that he had reason to believe contained relevant conversations between the President and various targets of the investigation. The district court in *Nixon* issued the subpoena, and, rather than comply voluntarily, President Nixon moved to quash it on several grounds, including a formal claim of executive privilege. The district court rejected his claim of privilege, and the Supreme Court agreed to hear the appeal directly. After concluding that the Court had jurisdiction and that the case was justiciable, the Court determined whether the Special Prosecutor satisfied the requirements for the issuance of a pretrial subpoena *duces tecum* under Rule 17(c) of the Federal Rules of Criminal Procedure. That portion of the Court's analysis did not place any special significance on the fact that the subpoena was served on the President. The Court said only that "[a]ppellate review, in deference to a coordinate branch of Government, should be particularly meticulous to ensure that the standards of Rule 17(c) have been correctly applied." 418 U.S. at 702, 94 S.Ct. at 3104.

**27.** Of course it is less important to protect *ex-Presidents* from subpoenas on the grounds that it would interfere with their official duties than it is to protect sitting presidents.

The Court affirmed the district court's conclusion that the Special Prosecutor had met his burden, which the Court described as consisting of three components: relevancy, admissibility, and specificity. *See id.* at 700, 94 S.Ct. at 3103. In light of my discussion above about the relevance and materiality of Mr. Reagan's possible testimony, I think it instructive to note how easily the Court was satisfied that the tapes sought by the Special Prosecutor in *Nixon* were relevant. The Court first observed that "[o]f course, the contents of the subpoenaed tapes could not at that stage be described fully by the Special Prosecutor, but there was a sufficient likelihood that each of the tapes contains conversations relevant to the offenses charged in the indictment." *Id.* As to some of the desired tapes, it was sufficient that "the identity of the participants and the time and place of the conversations, taken in their total context, permit a rational inference that at least part of the conversations relate to the offenses charged in the indictment." *Id.*

After the Court was satisfied that the Special Prosecutor had met his burden of showing relevancy, admissibility, and specificity under Rule 17(c) the Court turned to the question whether the subpoena nevertheless had to be quashed because President Nixon had asserted executive privilege. Having determined that the President does not enjoy an absolute privilege of confidentiality in his ·communications but that "the legitimate needs of the judicial process may outweigh Presidential privilege," *id.* at 707, 94 S.Ct. at 3107, the *Nixon* Court held that, at least where the President has asserted no more than a generalized interest in confidentiality, that

"generalized assertion of privilege must yield to the demonstrated, specific need for evidence in a pending criminal trial[,]" *id.* at 713, 94 S.Ct. at 3110.[28]

But it is not apparent that *Nixon* requires any special showing even after executive privilege is claimed. To be sure, the Court used the language "essential to the justice of the pending criminal case" and "demonstrated specific need for evidence" in describing what was needed to overcome the President's qualified privilege. But the Court does not appear to have meant anything more than the showing that satisfied Rule 17(c).[29] Nowhere in the opinion does the Court ever describe any offer by the Special Prosecutor other than the rather perfunctory showing of relevance I described above. *See supra* at 952. Even in the section of the opinion dealing with executive privilege, the Court stated that, "[t]he President's broad interest in confidentiality of communications will not be vitiated by disclosure of a limited number of conversations *preliminarily shown to have some bearing* on the pending criminal cases." *Id.* at 713, 94 S.Ct. at 3110 (emphasis added); *see also id.* at 712 n. 19, 94 S.Ct. at 3109 n. 19 ("We address only the conflict between the President's assertion of a generalized privilege of confidentiality and the constitutional need for *relevant evidence* in criminal trials.") (emphasis added); *id.* at 712–13, 94 S.Ct. at 3110 ("A President's acknowledged need for confidentiality in the communications of his office is general in nature, whereas the constitutional need for production· of *relevant evidence* in a criminal proceeding is specific and central to the fair adjudication of a particular criminal case....") (emphasis added).[30] These

---

**28.** *See also United States v. Burr,* 25 F. Cas. 30, 34 (C.C.Va. 1807) (No. 14,692d) ("The guard, furnished to [the President] to protect him from being harassed by vexatious and unnecessary subpoenas, is to be looked for in the conduct of a [district] court after those subpoenas have issued; not in any circumstance which is to precede their being issued." (quoted in *Nixon,* 418 U.S. at 714, 94 S.Ct. at 3110)).

**29.** Perhaps some substance could be injected into the difference between the phrases "relevancy, specificity, and admissibility" and "dem-

onstrated specific need for evidence" by postulating that the second formulation would also require a showing that the evidence is unavailable from any source other than the President (or former President). Be that as it may, whatever testimony Mr. Reagan could have provided about his instructions to and discussions with Casey and Poindexter (and possibly about other subjects as well) was plainly unavailable to North from any other source.

**30.** Because no privilege was asserted here I naturally have no occasion to consider what kind

passages suggest that the *Nixon* Court equated "demonstrated specific need" or "essential to the justice of the pending criminal case" with a showing of relevancy, specificity, and admissibility.[31]

It is not necessary in this case, however, to decide whether the *Nixon* Court envisioned a showing more substantial than is necessary to satisfy Rule 17(c) to overcome executive privilege. For here the need for disclosure is far more compelling and the executive interest in confidentiality far less substantial compared to the situation faced by the Court in *Nixon*—where the balance was nevertheless struck in favor of disclosure.

*Nixon* presented the issue whether the *prosecution* (representing the public interest) could pierce the President's privilege. Here, instead, we are faced with a *defendant* in a criminal case who wishes to gain testimony from the President that he has adequately shown to be relevant. The defendant—but not the prosecutor—may rely on the Sixth Amendment. *Cf. Wardius v. Oregon,* 412 U.S. 470, 93 S.Ct. 2208, 37 L.Ed.2d 82 (1973). It follows, therefore, that to permit a trial and conviction of a defendant while rebuffing his effort to put on evidence relevant to his defense, strains

at the utmost our system of justice. Thus, whatever weight the Supreme Court gave to the Special Prosecutor's need for disclosure in *Nixon,* as a defendant, North's claim seems on its face to be stronger.

As for the executive interest in confidentiality, it should be recalled that *Nixon* involved a subpoena to a *sitting* President rather than a former President. While Mr. Reagan may still invoke executive privilege after leaving office, *see Nixon v. Administrator,* 433 U.S. at 448–49, 97 S.Ct. at 2792–93, that privilege is less robust than that of an incumbent President, *see id.* (noting that Mr. Nixon's claim of privilege was necessarily weakened by the failure of the incumbent—who was "in the best position to assess the present and future needs of the Executive Branch"—to support it); *id.* at 451, 97 S.Ct. at 2794 ("The expectation of the confidentiality of executive communications thus has always been limited and subject to erosion over time after an administration leaves office."); *see also Public Citizen v. Burke,* 843 F.2d 1473, 1479 (D.C.Cir.1988).[32]

But most important to my conclusion that the District Court must be reversed without resolving any ambiguity in *United States v. Nixon* as to the required showing

of showing might be required to overcome the privilege if the President or ex-President asserted a higher, specific confidentiality interest, for example military, diplomatic, or national security secrets. *Cf. Nixon,* 418 U.S. at 706, 710–11, 94 S.Ct. at 3106, 3108–09.

**31.** In support of the more burdensome "necessary to assure the defendant a fair trial" standard applied by the district court here, the IC points to a portion of our opinion in *Ehrlichman,* 546 F.2d 910, in which we rejected the defendant's claim that he was entitled to a new trial because the district court had not required Richard Nixon (who was still President at the time of the trial) (1) to appear as a witness or (2) to answer detailed interrogatories propounded by the defendant rather than the ones drafted by the court. We observed that:

> [I]t would appear that if a subpoena *duces tecum* on a President may only be *enforced* where there is a "demonstrated specific need" for the testimony or the testimony is "essential to the justice of the [pending criminal] case," certainly a more burdensome subpoena *ad testificandum* would have to meet at least equal standards.

*Id.* at 932–33 (quoting *Nixon,* 418 U.S. at 713, 94 S.Ct. at 3110) (emphasis added) (footnote omitted). This formulation is not inconsistent with the reading of *Nixon* as described in the text. And in any event, the *Ehrlichman* panel's statement that the subpoena could not be enforced unless the testimony is "essential to the justice of the . . . case," *id.* at 933, was not necessary to decide the issue before them since Ehrlichman desired only Mr. Nixon's testimony about a subject that the panel had already determined to be *irrelevant* to the issues at trial. *See id.* at 931 & n. 98 (asserting that the panel is in "complete accord" with the district judge's decision that the documents relating to the concealment of the break-in were irrelevant since concealment had been dropped as part of the conspiracy charge).

**32.** It could be argued that the disclosure here is more far-reaching and intrusive than the one in *Nixon.* However, while *Nixon* focused on the order for an *in camera* inspection of the tapes, the Court made clear that the Special Prosecutor would eventually receive all portions of the tapes that would be relevant and admissible at trial. *See Nixon,* 418 U.S. at 714–16, 94 S.Ct. at 3110–11.

to surmount executive privilege is my view that Mr. Reagan could not successfully assert a privilege to avoid testifying, because virtually no presidential interest in confidentiality remains as to the matters on which his testimony is sought. Appellant asserts that Mr. Reagan has actually "waived" the privilege. I am not certain that "waiver" is the right word, or, more precisely, whether a waiver of executive privilege is to be analyzed as we do a waiver of other kinds of privileges.[33] But I agree with appellant that there remains little or no interest in presidential confidentiality to be protected. After all, Mr. Reagan's Chief of Staff, two of his former Cabinet members, and two of his former National Security Advisors have testified on national television about their private conversations with Mr. Reagan and his personal role in most, if not all, of the matters about which North seeks Mr. Reagan's testimony. In addition, former Attorney General Meese and former National Security Advisor McFarlane testified for the IC about the conversations with Mr. Reagan on those matters. These factors "substantially diminish[ ] the interest in maintaining the confidentiality" of Mr. Reagan's communications on the relevant subjects. *Nixon v. Sirica,* 487 F.2d 700 at 718. What is more, Mr. Reagan himself discussed with the Tower Commission his communications with subordinates and has even given sworn testimony, in the form of answers to the IC's interrogatories, on these matters. I completely fail to see how an ex-President can give answers to a prosecutor who is independent of any presidential supervision, and yet assert executive privilege over the same or similar material when sought by a defendant.[34]

\* \* \* \* \* \*

Presidents, even ex-Presidents, may not be called to testify capriciously or needlessly. But this is not such a case. North

worked in the White House, only one step removed from the President himself, with what appears to have been enormous responsibility. He has been convicted of violating criminal statutes (never before employed as here) and his defense is that he was *lawfully* doing the President's bidding, and doing so with regard to a substantive area of national security policy, which, whatever one's view of those policies, would have been thought at the core of the Chief Executive's constitutional responsibility. His immediate superior, Admiral Poindexter, was unavailable as a defense witness. Under these circumstances, for the trial judge to have refused to compel Reagan's testimony, was to deprive North of a fair trial.

## V. Pending Inquiry

I also dissent from the Majority's holding that it was, or could be, harmless error for the District Judge to direct a verdict against North on an essential element of Count 6.

North's conviction on Count 6 for aiding and abetting the obstruction of a congressional inquiry required the Government to prove, as an essential element of that offense, that an "inquiry or investigation is being had by either House, or any committee of either House or any joint Committee of the Congress ..." 18 U.S.C. § 1505. North contends that his fifth amendment right to due process and his sixth amendment right to a jury verdict were violated when the district judge instructed the jury, over North's explicit objection, (J.A. 1830) that "as a matter of law, ... congressional inquiries were pending" and that the jury "need only deliberate regarding the other three elements [of the crime]." (J.A. 635). I agree.

---

**33.** In the context of attorney-client communications, "a waiver of the privilege ... extends 'to all other communications relating to the same subject matter.'" *In Re Sealed Case,* 877 F.2d 976, 980–81 (D.C.Cir.1989) (quoting *In Re Sealed Case,* 676 F.2d 793, 809 (D.C.Cir.1982)). The executive privilege promotes institutional concerns different from the attorney-client privi-

lege. *Compare Nixon,* 418 U.S. at 708, 94 S.Ct. at 3107 *with In Re Sealed Case,* 877 F.2d at 979.

**34.** I therefore do not understand why North was not given a copy of Mr. Reagan's interrogatory answers—even under the District Judge's theory.

It was apparently undisputed that the existence of a pending inquiry or investigation was both a necessary element of the offense and a factual question for the jury to decide. In their suggested jury instructions, both North *and the IC* requested the issue to be submitted to the jury. (J.A. 2468–70, 2434). And even on appeal the IC does not argue that the determination of whether there was a pending inquiry is properly made by the judge rather than the jury; rather, the IC claims that other sections of the judge's instructions implicitly submitted the issue to the jury. According to the IC, the judge's instruction that the jury must find that "the defendant knew of the pending inquiry or investigation," preserved for the jury the question of whether there was in fact a pending investigation. Merely telling the jury to decide whether North knew of "the pending inquiry or investigation" implies, however, that there was a pending inquiry to know about. And in the face of the judge's outright charge that, as a matter of law, congressional inquiries were pending, the IC's argument is simply implausible. The judge prevented the jury from considering a critical element of the charge, and thus effectively directed a verdict against North on the question of whether there were inquiries pending. That is obviously error, as the Majority concedes. Since I am of the view that North's conviction on this Count should be reversed because the jury was improperly instructed on the issue of authorization, because he was denied the testimony of former President Reagan, and because his due process rights were violated by the failure of the District Court to require reciprocal discovery under CIPA, I do not think we need to go beyond identifying the error. But since my colleagues hold otherwise on all of those issues, I go on to the question of whether harm to appellant must be measured, and, if so, how.

I believe that under relevant Supreme Court decisions reversal is automatically required when the judge, as here, directs a verdict on an essential element of a crime, no matter how overwhelming—or even uncontested—the evidence is on that issue. Indeed, the IC neither argues that a harmless error test could be applied here, nor that this error was harmless in any event. Nevertheless, the Majority reaches both conclusions, in my view misreading the Supreme Court's instructions on this issue and directly contradicting the holdings of three of our sister circuits that have faced this very same issue.

The Court indicated its views on this question most directly in *Rose v. Clark*, 478 U.S. 570, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986). In *Rose*, the Court reviewed a conviction in which a district court instructed a jury in a murder trial, where malice was a necessary element of the murders charged, that "homicides are presumed to be malicious in the absence of evidence which would rebut the implied presumption." *Id.* at 574, 106 S.Ct. at 3104. The instruction was undeniably erroneous since it placed the burden of disproving malicious intent on the defendant, *see Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979), but the Court held that harmless error analysis should have been applied. *See Rose*, 478 U.S. at 579–580, 106 S.Ct. at 3106–07. The Court, however, reiterated that "some constitutional errors require reversal without regard to the evidence in the particular case" because "some errors necessarily render a trial fundamentally unfair." *Id.* at 577, 106 S.Ct. at 3106 (citing *Chapman v. California*, 386 U.S. 18, 23 n. 8, 87 S.Ct. 824, 827 n. 8, 17 L.Ed.2d 705 (1967)). One of those instances the Court expressly identified in *Rose* was "direct[ing] a verdict for the prosecution in a criminal trial by jury." *Id.* 478 U.S. at 578, 106 S.Ct. at 3106. The Court explained that " 'a trial judge is prohibited from entering a judgment of conviction or directing the jury to come forward with such a verdict ... regardless of how overwhelmingly the evidence may point in that direction.' " *Id.* (quoting *United States v. Martin Linen Supply Co.*, 430 U.S. 564, 572–73, 97 S.Ct. 1349, 1355–56, 51 L.Ed.2d 642 (1977) (citing *United Brotherhood of Carpenters v. United States*, 330 U.S. 395, 408, 67 S.Ct. 775, 782, 91 L.Ed. 973 (1947))). "[T]he error in such a case is that the *wrong entity* judged the defendant guilty,"

*id.* (emphasis added), and therefore the "basic trial process" is "aborted," *id.* n. 6.

It is not possible to read *Rose* as only concerned with a judge who actually instructs a jury that a defendant is guilty—as opposed to a more limited instruction that the Government succeeded in proving one of the elements necessary to a conviction. The Court's further discussion rebuts that restrictive reading. Explaining that a so-called *Sandstrom* error—the improper shifting of the burden of proving intent—is *not* equivalent to a directed verdict for the state, the Court noted that, " '[b]ecause a presumption does not remove the issue of intent from the jury's consideration, it is distinguishable from other instructional errors that prevent a jury from considering *an issue.*' " *Id.* 478 U.S. at 580 n. 8, 106 S.Ct. at 3107 n. 8 (emphasis added) (quoting *Connecticut v. Johnson,* 460 U.S. 73, 95 n. 3, 103 S.Ct. 969, 982 n. 3, 74 L.Ed.2d 823 (1983) (Powell, J., dissenting)). Thus, the Court applied the harmless error analysis in *Rose* since, "the jury ... found ... every fact necessary to establish every element of the offense beyond a reasonable doubt." *Id.* 478 U.S. at 581, 106 S.Ct. at 3107 (internal quotes omitted). That is not true here, where the trial court instructed the jury that one element of the offense has been established as a matter of law.

My reading of *Rose* is buttressed by the views expressed by several of the Justices in *Connecticut v. Johnson,* 460 U.S. 73, 103 S.Ct. 969, 74 L.Ed.2d 823 (1983)—decided prior to *Rose.* In *Johnson,* the Court reviewed a conviction in which the trial judge had instructed the jury that "a person's intention may be inferred from his conduct and every person is conclusively presumed to intend the natural and necessary consequences of his act." *Id.* at 78, 103 S.Ct. at 973. Justices Brennan, White, and Marshall joined an opinion by Justice Blackmun to the effect that such "conclusive presumption" instructions about intent—undeniably error under *Sandstrom v. Montana,* 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979)—could never be harmless error, no matter how overwhelming the evidence of guilt or of intent. *See id.* 460 U.S. at 84–86, 103 S.Ct. at 976–77 (plurality

opinion). Justice Stevens concurred in the judgment, but expressed no opinion on the issue. *See id.* at 89–90, 103 S.Ct. at 978–79 (Stevens, J., concurring in the judgment). Justice Powell, joined by Chief Justice Burger and Justices Rehnquist and O'Connor, dissented primarily because he disagreed with the argument that a conclusive presumption instruction on the issue of intent is equivalent to a directed verdict on the issue. *See id.* at 95, 103 S.Ct. at 982 (Powell, J., dissenting). The inescapable implication of the dissent is that even those Justices would think harmless error analysis inapplicable to an instruction that did direct a verdict in favor of the prosecution *on any necessary element* of a criminal charge. The instruction given in the instant case is even more intrusive into the jury's fact-finding province, and would therefore appear to be *a fortiori* to *Johnson.* My colleagues are apparently unbothered by the views expressed by those *eight* Justices, six of whom are still members of the Court, since they hold that it can be harmless error to direct a verdict on an essential element of the crime without so much as citing *Johnson.*

The Majority instead places primary, and I think mistaken, reliance on *Carella v. California,* —— U.S. ——, 109 S.Ct. 2419, 105 L.Ed.2d 218 (1989), where the Court reversed appellant's conviction for car theft arising from his failure to return a rented car. The Court unanimously held that the jury instructions there—imposing a presumption that rented property that is not returned to its owner within five days after the rental agreement expires shall be presumed embezzled by the renter—were erroneous. The Majority claims that *Carella* should guide us here because the Court "remanded for a harmless error inquiry even though the jury instructions at issue 'relieved the State of its burden of ... proving by evidence every essential element of Carella's crime beyond a reasonable doubt.' " Maj. Op. at 893 (quoting *Carella,* 109 S.Ct. at 2420). But the Majority simply ignores the distinction between the error of shifting the burden of proof at issue in *Carella* and the blatant directed

verdict at issue here. As to the former, *Carella* merely reaffirmed the Court's preexisting position that harmless error can be applied. *See Rose,* 478 U.S. 570, 106 S.Ct. 3101. As to the latter, both *Rose* and *Connecticut v. Johnson* suggest the opposite result. And it is only by ignoring that crucial distinction that my colleagues could believe that Justice Scalia's concurrence in *Carella* supports their outcome. *See* Maj. Op. at 893. Justice Scalia, joined by Justices Brennan, Marshall, and Blackmun, concurred separately to stress how limited the harmless error analysis should be *even in the case of mandatory presumptions in jury instructions. See id.* 109 S.Ct. at 2421 (Scalia, J., concurring in the judgment). In such cases, error would be harmless only when the instruction "did not play *any* role" in the jury's verdict—such as when the defendant is acquitted on the relevant Count or when the defendant admits the element, *id.* at 2423 (emphasis added) (citing *Johnson,* 460 U.S. at 87, 103 S.Ct. at 977 (plurality opinion))—or when the "facts necessarily found by the jury are so closely related to the ultimate fact to be presumed that no rational jury could find those facts without also finding that ultimate fact." *Id.* Given those concurring Justices' view that harmless error inquiry is only rarely permissible even when the burden of proof is merely shifted by presumption, there can be no doubt that it is inappropriate for us to apply harmless error analysis if—as in this case—there was an overt directed verdict on an essential element of the charge.

In any event, the Majority is incorrect when it asserts that "no rational jury could find that North knew of the pending congressional investigation, endeavored to obstruct it, and did so with specific corrupt intent without concomitantly finding that the investigation was pending in the first place." Maj. Op. at 894. In *Carella,* the Supreme Court indicated that it would be permissible to apply harmless error analysis when the jury conclusively—that is, as a matter of logic—found the presumed fact in making its other determinations. Thus,

if it is rationally impossible for the jury to find that the defendant committed all the elements of a criminal act without also finding that he intended to cause injury, that might be harmless. *See Carella,* 109 S.Ct. at 2421. The problem in this case is structurally different from the one discussed in *Carella.* Here, the jury was asked whether North knew of a pending inquiry but only after it was told that there *was* such an inquiry pending. If the jury believed that North wanted to keep information away from a congressional committee, but was not convinced beyond a reasonable doubt that the inquiry was *pending at the time North acted,* then the directed verdict would deny North an acquittal.[35] Whether or not that hypothesis is probable (I don't see how we could tell), the point here is simply that a rational juror *could* have been led to a different outcome by the directed verdict and therefore, even under the Majority's misreading of *Carella,* harmless error analysis is not applicable here.

The Majority also ignores three of our sister circuits that have ruled to the contrary, refusing to apply harmless error analysis when trial judges direct a verdict in favor of the government on any essential element of a crime, *even when the fact is undisputed.* The Sixth Circuit, in *United States v. Mentz,* 840 F.2d 315, 323–24 (6th Cir.1988), was faced with this exact issue when, in a federal bank robbery prosecution, the District Judge instructed a jury that a financial institution's deposits were insured by the FDIC at the time of the alleged robbery, which is a necessary element under the federal bank robbery statute. The *Mentz* court, believing that *Rose* was dispositive of the issue for many of the same reasons as I outlined in my discussion of that case, held that harmless error principles could not be applied even though there was unrebutted evidence of FDIC insurance in the record.

Similarly, the Eighth Circuit, in a case predating *Rose,* reviewed a federal arson conviction under 18 U.S.C. § 844(i), which

---

**35.** Therefore, even if the Majority is correct that the issue of whether something constitutes an inquiry is a question of law, it is irrelevant to the issue before us. *See* Maj. Op. at 894 n. 29.

requires that the destroyed property be "used in interstate commerce or any activity affecting interstate or foreign commerce...." The trial judge instructed the jury that if the building's owners bought insurance from a company doing business outside of Missouri, the building (located in Missouri) was, as a matter of law, used in an activity affecting interstate commerce. The court of appeals observed that there was evidence in the record clearly sufficient to satisfy the *de minimis* interstate commerce element, but nevertheless reversed the conviction "reluctantly." *United States v. Voss*, 787 F.2d 393, 397 (8th Cir.), *cert. denied*, 479 U.S. 888, 107 S.Ct. 286, 93 L.Ed.2d 261 (1986). In language directly applicable to North's contention, the court of appeals stated:

> [I]t is not for us to find the facts.... If the sixth amendment right to have a jury decide guilt and innocence means anything, it means that the facts essential to conviction must be proven beyond the jury's reasonable doubt, not beyond ours. A jury verdict, if based on an instruction that allows it to convict without properly finding the facts supporting each element of the crime, is error. Such error is not corrected merely because an appellate court, upon review, is satisfied that the jury would have found the essential facts had it been properly instructed. The error cannot be treated as harmless.

*Id.* at 398 (citations omitted). (The Eighth Circuit reaffirmed its position in *United States v. White Horse*, 807 F.2d 1426, 1429 (8th Cir.1986), decided after *Rose*.) *See also United States v. Goetz*, 746 F.2d 705, 709 (11th Cir.1984) ("We conclude that a trial court's actions in directing a verdict in a criminal trial, *either in whole or in part*, cannot be viewed as harmless error.") (emphasis added). The Majority's only attempt to distinguish these rulings by our sister circuits is to claim that the fact found by the trial judge here was a "logical prerequisite for the jury's finding of the other elements of the crime." Maj. Op. at 894 n. 28. As I explained above, however, the jury was never logically required to find that there was an inquiry pending here. Rather, they were told that whatever was going on in Congress was a *"pending* inquiry" and then asked whether North knew about it.

It seems to me, therefore, that the governing law is rather clear and the District Court's error requires reversal without regard to the harm caused by the error because the defendant's right to have a jury decide the elements of a crime is " 'so basic to a fair trial' that it can never be harmless." *Rose*, 478 U.S. at 580, 106 S.Ct. at 3107 (quoting *Chapman*, 386 U.S. at 23, 87 S.Ct. at 827); *accord United States v. Goetz*, 746 F.2d 705, 708 (11th Cir.1984).

Although I would, of course, not reach the issue, I also disagree with the Majority's determination that this directed verdict was harmless (certainly, that it was harmless beyond a reasonable doubt). Count 6 of the indictment charged that North destroyed, altered, concealed, and removed NSC records, documents and papers concerning both the arms sales to Iran *and* U.S. efforts to aid the Contras. North's conviction, therefore, could have rested solely on his efforts to obstruct a committee investigating the Contra aid issue, and we must assume for the purposes of this appeal that it did. *See Cramer v. United States*, 325 U.S. 1, 36 n. 45, 65 S.Ct. 918, 935 n. 45, 89 L.Ed. 1441 (1945). While it may have been, in the words of the IC, "utterly undisputed, and indeed incontrovertible" that there were inquiries pending in November of 1986 into the role of executive branch officials in the sale of arms to Iran, it was not nearly so obvious that inquiries were pending concerning aid to the Contras. The IC does *not* claim that there was overwhelming or uncontroverted evidence in the record of ongoing inquiries into Contra aid at the time North committed the acts underlying Count 6; *indeed, the IC does not even argue that such inquiries were pending at all.* Only Judge Gesell was so certain. Unless the Majority is willing to sift through the record and find this disputed fact itself (beyond a reasonable doubt?), thereby effectively directing a verdict against North from the Court of Appeals, it must reverse North's conviction on Count 6. I am truly

baffled by the Majority's claim that this issue is a " 'Johnny-come-lately' for North himself made no mention of the subject of the investigation in his proposed jury instructions." Maj. Op. at 894 n. 30. When North objected to this particular instruction his counsel said, "We object to the finding as a matter of law and particularly because we believe there's no evidence that there was a Contra investigation underway in November 1986." (Tr. 8499; J.A. 1830). He could hardly have been clearer.

The Majority's discussion of the harm issue, *see* Maj. Op. at 893–894, ignores the question of whether there was a pending inquiry into the Contra initiative. Instead it focuses on its view of North's motive in preparing the chronology and destroying documents as if evidence on other elements of the charge renders the legal error harmless. The Majority's only answer to this problem is that "the question of whether North's obstruction related to inquiries into one or both issues is one of 'pertinency,' not 'pendency,' and is therefore a question of *law* for the court rather than for the jury. *See Sinclair v. United States,* 279 U.S. 263, 298 [49 S.Ct. 268, 273, 73 L.Ed. 692] (1928)." Maj. Op. at 853 n. 1. It is surely quite extraordinary—and I think improper—for an appellate court to sidestep a powerful claim of error by relying on a ground not even argued by the prosecutor. We do not normally consider an argument raised for the first time in a *criminal appellant's* reply brief, let alone an argument not raised by *any party. See United States v. Eniola,* 893 F.2d 383, 385 (D.C. Cir.1990); *United States v. Haldeman,* 559 F.2d 31 at 78 n. 113 (D.C.Cir.1976). "The premise of our adversarial system is that appellate courts do not sit as self-directed boards of legal inquiry and research, but essentially as arbiters of legal questions presented and argued by the parties before them." *Carducci v. Regan,* 714 F.2d 171, 177 (D.C.Cir.1983). We occasionally have stretched for defendants, particularly when they are *pro se*—but surely the IC does not qualify as *pro se.*

The IC did not overlook a good argument, however; I think the Majority is quite wrong. *Sinclair* holds, under a quite different criminal statute, that when an individual is called before Congress and "refuses to answer any question pertinent to the question under inquiry ...," the question of pertinency, like the issue of relevancy, is a question of law because "it [does] not depend on the probative value of evidence." 279 U.S. at 298, 49 S.Ct. at 273. As the IC recognized, however, whether or not a pending inquiry existed could be established by probative evidence; indeed the IC did produce evidence to establish the facts—although apparently not evidence that a pending inquiry existed into the issue of whether the Administration was improperly aiding the Contras.

Even assuming the Majority (rather than the IC) is correct and whether a pending inquiry into *Contra assistance* existed at the relevant time is a question of law rather than fact, the District Judge decided it wrongly. There is no evidence that I can find to support that proposition; the IC tellingly limits his "undisputed and incontrovertible" assertion to the pending inquiries about Iranian arm sales. And not even the IC has claimed that attempts to obscure Contra aid can be deemed "pertinent" to an inquiry into Iranian arms sales.

\*　\*　\*　\*　\*　\*

For the foregoing reasons, North's conviction on Count 6 should be reversed and remanded to the district court for a new trial.

## VI. CONCLUSION

There is a great temptation in a case such as this to focus on the institutional interests at stake, the Presidency, the Congress, even the District Judge, faced, as he was, with a daunting task. But I think that is the wrong angle from which to view the appellant's arguments. The district judge was not on trial nor was the Congress or the President; North was.

The Chief Judge believes that although the District Judge made "a few" errors, they were *all* harmless. Of course we see only the issues appealed, but it seems to me there were quite a few errors among

them and they were serious indeed—some even constitutional in nature. He refused to hold a constitutionally required *"Kastigar"* hearing. He refused to grant (or even rule on) appellant's motion to compel the IC's compliance with CIPA's reciprocity provision (which is both statutory and constitutional); he erroneously charged the jury on the most crucial issue in the case— at least as to Count 9 and, in my view, on Count 6 as well. He directed the verdict against North on an essential element of Count 6—whether a pending inquiry existed. He refused to instruct the jury that they had to agree unanimously as to the relevant acts committed by the defendant. He failed to correct the IC's improper closing argument on the security fence Count (which I only barely conclude *is* harmless error). And he permitted the ex-President to avoid testifying in a case in which fairness cried out for his presence.[36]

---

**36.** I am afraid we three judges have produced an enormous amount of paper, but this case presented a great number of grave questions of constitutional and criminal law. This is the only case I can remember in which we should have agreed to counsel's request to exceed the number of briefing pages.